Andrew E. JOHNSON, et al., Plaintiffs,

v.

Sandra MORTHAM, etc.,
et al., Defendants.

No. TCA 94–40025–MMP.

United States District Court,
N.D. Florida,
Tallahassee Division.

April 17, 1996.

As Modified June 6, 1996.

■■■■■

---

**37.** *Id.*

Rod Sullivan, Pro Hac Vice, Alan B. Vlcek, P.A., Jacksonville, FL, Gerald J. Sullivan, Jr., Gerald J. Sullivan, P.A., Jacksonville, FL, for Andrew E. Johnson.

Gerald J. Sullivan, Jr., Gerald J. Sullivan, P.A., Jacksonville, FL, for Thomas S. Bloodworth, Charles Henry Bloodworth, III, Bill Boyer, Frances G. Brown, Robert T. Conner, Harold F. Davis, Arthur Wilson Devoe, Robert Ellison, George Erdel, Paul Farley, Sue Hall, Hugh Milton Hays, Hugh Milton Hays, Sr., Carson Thomas Howes, Jr., Ron Jackson, Carolyn Janice Johnson, Coranell H. Johnson, Susan M. Lamb, Jim Lewis, Pat Mathis, Cynthia McKinney, Daniel McKinney, Jim Neill, Tommy Praeter, Charles Romero, Vicki T. Romero, Dana Wine.

George L. Waas, Attorney General's Office, Department of Legal Affairs, Tallahassee, FL, Brenda Wright, Pro Hac Vice, Jackqueline A. Berrien, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Gerald B. Curington, General Counsel, House of Representatives, Tallahassee, FL, for Jim Smith.

Stephen N. Zack, Pro Hac Vice, Stephen N. Zack, Miami, FL, Brenda Wright, Pro Hac Vice, Jackqueline A. Berrien, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Gerald B. Curington, General Counsel, House of Representatives, Tallahassee, FL, for Pat Thomas.

Richard A. Hixson, Richard A. Hixson, P.A., Tallahassee, FL, Thomas R. Tedcastle, Florida House of Representatives, Tallahassee, FL, Stephen N. Zack, Pro Hac Vice, Miami, FL, Brenda Wright, Pro Hac Vice, Jackqueline A. Berrien, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Gerald B. Curington, General Counsel, House of Representatives, Tallahassee, FL, B. Elaine New, General Counsel, House of Representatives, Tallahassee, FL, for Bolley L. Johnson.

George L. Waas, Attorney General's Office, Department of Legal Affairs, Tallahassee, FL, David Alan Tepper, Department of State, Office of the General Counsel, Tallahassee, FL, for Sandra Mortham.

Brenda Wright, Pro Hac Vice, Todd A. Cox, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Frank Cummings.

Brenda Wright, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Samuel L. Green, Sr., Leonard O'Neal, Glynell Presley, Mary Lawson Brown.

Rodney G. Gregory, Rodney G. Gregory, P.A., Jacksonville, FL, J. Gerald Hebert, Pro Hac Vice, J. Gerald Hebert, P.A., Alexandria, VA, for Corrine Brown.

Charles G. Burr, Charles G. Burr, P.A., Tampa, FL, for Florida State Conference of NAACP Branches.

Before HATCHETT, Circuit Judge,
PAUL, Chief District Judge, and VINSON, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BY THE COURT:

This case arises from the 1992 Florida congressional redistricting process in which a three-judge federal court established a number of districts with racial or ethnic minorities constituting a majority of the voting age population. Plaintiffs are white and hispanic voters who raise an equal protection challenge to Florida's Third Congressional District under the authority of *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).* Plaintiffs claim that District Three is unconstitutional because it segregates voters on the basis of race, and is not narrowly tailored to further a compelling governmental interest.

On November 20, 1995, we granted plaintiffs' motion for partial summary judgment on two issues: first, the three-judge court ("the *DeGrandy* court") which established

the district's boundaries [1] lacked the constitutional authority to adopt a permanent redistricting plan; and second, District Three was drawn for predominately race-based reasons, thereby triggering strict scrutiny. *Johnson v. Mortham*, 915 F.Supp. 1529, 1552–53, (N.D.Fla.1995). *See generally Miller v. Johnson*, 514 U.S. ——, ——, 115 S.Ct. 2475, 2481, 2490, 132 L.Ed.2d 762 (1995) (strict scrutiny triggered when a redistricting or reapportionment plan is drawn for predominately race-based reasons), *on remand*, 922 F.Supp. 1556, No. 194–008, (S.D.Ga.1995), *petition for cert. filed*, 64 U.S.L.W. 3625, 3642 (U.S. Mar. 6, 1996) (Nos. 95–1425, 95–1460); *Shaw*, 509 U.S. at 642–47, 113 S.Ct. at 2825–27 (same).

This cause has now proceeded through discovery on the remaining issue of whether District Three survives strict scrutiny review. A three-day bench trial was concluded in this matter on February 22, 1996. All parties and party-intervenors were represented at the trial. The Court now sets out its findings of fact and conclusions of law in accordance with Rule 52(a), Federal Rules of Civil Procedure, based upon all admissible evidence presented at trial, or otherwise contained in the record.

### DISCUSSION:

As discussed below, the remaining plaintiffs in this action [2] have shown that they have suffered an actual injury in fact. Therefore, plaintiffs have standing to maintain their equal protection challenge to District Three. *See Miller*, 514 U.S. at ——, ——, 115 S.Ct. at 2481, 2485; *United States v. Hays*, 514 U.S. —— – ——, 115 S.Ct. 2431, 2436–37, 132 L.Ed.2d 635 (1995). This Court has jurisdiction to consider plaintiffs' claims pursuant to Title 28, United States Code, Section 1343(a)(3).

---

\* A map of Florida's Third Congressional District is provided as Appendix A to this opinion.

1. *DeGrandy v. Wetherell*, 794 F.Supp. 1076 (N.D.Fla.1992). The *DeGrandy* court included two of the judges of this three-judge court: Judge Hatchett and Judge Vinson.

2. Coranell H. Johnson, Charles Romero, Vicki T. Romero, Harold F. Davis, Arthur Wilson Devoe, George Erdel, Carson Thomas Howes, Jr., and Jim Neill, who are registered voters in District Three; Andrew Johnson, an unsuccessful candidate for the Third District's seat in the 1992 congressional elections; and Robert Ellison, in his official capacity as the treasurer of United We Stand America ("UWSA") for District Three.

■ Since plaintiffs have already met their burden of showing that race was the predominant motivating factor in the drawing of District Three, strict scrutiny applies. *Miller*, 514 U.S. at ——, ——, 115 S.Ct. at 2481, 2490; *Shaw*, 509 U.S. at ——–——, 113 S.Ct. at 2825–27.[3] "To satisfy strict scrutiny, the state must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller*, 514 U.S. at ——, 115 S.Ct. at 2490. As we earlier noted in a separate order, the trial burdens in this case are as follows: "Defendants and Defendant–Intervenors bear the burden of producing evidence demonstrating there is a **strong basis in evidence** that the *DeGrandy* court's predominant use of race-conscious districting satisfies strict scrutiny." On the other hand, plaintiffs bear the burden of "rebutting the evidence put forward by Defendants and Defendant–Intervenors on the strict scrutiny issue, and persuading the Court that Defendants have not made a sufficient showing to satisfy strict scrutiny review." *Johnson v. Mortham*, 915 F.Supp. 1574, 1580 (N.D.Fla. 1996) (citations omitted). We altered the order of presentation at trial for purposes of convenience and clarity, with the defendants and the defendant-intervenors proceeding first, in order to properly reflect the parties' respective trial burdens.

## I. Compelling Governmental Interest:

The first trial issue is whether the *De-Grandy* court had a compelling governmental interest in drawing District Three for pre-

dominately race-based reasons. A compelling interest has been described by the Supreme Court as one "of the highest order." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217, 2233, 124 L.Ed.2d 472 (1993). Defendants contend two compelling interests motivated the *DeGrandy* court in its redistricting plan: first, that the *DeGrandy* court was motivated by a desire to comply with section 2 of the Voting Rights Act; and second, that the *De-Grandy* court desired to adopt a remedial measure designed to eradicate effects of past discrimination in Florida.

On the other hand, plaintiffs assert that there were no compelling interests that justified the creation of District Three. Specifically, plaintiffs contend that there was no voting practice or procedure in northeast Florida that interacted with present effects of past discrimination in a manner that denied or abridged the right of African–Americans to vote. They further maintain that District Three was not drawn in order to avoid a dilution of African–American voting strength in northeast Florida, since the African–American community in northeast Florida was too small and too geographically separated to satisfy the *Gingles*[4] threshold criteria.

Each of the compelling interests advanced by Defendants ˙ and Defendant–Intervenors will be separately addressed.

---

**3.** Another three-judge panel has also held that a court-ordered redistricting plan is subject to strict scrutiny review under *Shaw* and *Miller*, even where the plan is imposed to remedy a constitutional or statutory violation. *King v. State Bd. of Elections*, No. 95–C–827, 1996 WL 130439, at *14–17 (N.D.Ill. Mar. 15, 1996). In *King*, the court rejected the defendant-intervenors' argument that *Shaw* and *Miller* only applied to legislatively created redistricting plans, for three separate reasons: first, the legislative versus judicial distinction is of no consequence where a court has adopted a redistricting plan to remedy violations of federal law, since a long line of Supreme Court decisions have made it clear that such remedial plans are subject to stricter review than plans drawn by legislatures; second, the checks and balances inherent in our constitutional framework dictate that when a court acts in a pseudo-legislative capacity by adopting a redistricting plan, it must be subject

to the ˙same standards of review as legislatures engaging in redistricting; and third, the Supreme Court's ruling in *Adarand Constructors, Inc. v. Pena*, —— U.S. ——, ——, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995), made it clear that strict scrutiny applies to all actions taken for predominately race-based reasons by any governmental actor. Finally, as this Court held in its order of November 20, 1995, the *King* court also concluded that *DeWitt v. Wilson*, 856 F.Supp. 1409 (E.D.Cal.1994), *judgment aff'd in part and appeal dismissed in part*, 514 U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995), was factually distinguishable, and actually supported application of *Shaw* and *Miller* to court-drawn plans. We agree with the *King* court's well-reasoned analysis of this issue regarding court-drawn plans.

**4.** *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

### A. Compliance with the Voting Rights Act:

■ Although a number of lower courts have concluded that compliance with the Voting Rights Act is a compelling governmental interest[5], the Supreme Court has stopped short of adopting such a blanket rule. For example, in *Shaw*, the Court noted:

> The States certainly have a *very strong interest* in complying with federal antidiscrimination laws that are constitutionally valid as interpreted and as applied. But in the context of a Fourteenth Amendment challenge, courts must bear in mind the difference between what the law permits, and what it requires.... We note, however, that only three Justices in UJO were prepared to say that States have a significant interest in minimizing the consequences of racial block voting apart from the requirements of the Voting Rights Act. And those three Justices specifically concluded that race-based districting, as a response to racially polarized voting, is *constitutionally permissible only when the State "employ[s] sound districting principles," and only when the affected racial group's "residential patterns afford the opportunity of creating districts in which they will be in the majority."*

509 U.S. at 654–57, 113 S.Ct. at 2830–32 (quoting *United Jewish Org. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 167–68, 97 S.Ct. 996, 1011, 51 L.Ed.2d 229 (1977) (opinion of White, J., joined by Stevens and Rehnquist, JJ.)) (emphasis added). Similarly, in *Miller*, the Court held that "compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws." 514 U.S. at ——, 115 S.Ct. at 2491 (finding that Georgia's Eleventh Congressional District was not required by the VRA "under a correct reading of the stat-

ute"). *See also Johnson v. DeGrandy*, 512 U.S. ——, ——, 114 S.Ct. 2647, 2667, 129 L.Ed.2d 775 (1994) (Kennedy, J., concurring) ("Given our decision in *Shaw*, there is good reason for state and federal officials with responsibilities related to redistricting, as well as reviewing courts, to recognize that explicit race-based districting embarks us on a most dangerous course. It is necessary to bear in mind that redistricting must comply with the overriding demands of the Equal Protection Clause.").

■ For purposes of analysis in this case, however, we will assume that compliance with the Voting Rights Act is a compelling governmental interest if, and to the extent, there is a "strong basis in evidence" that remedial action is required to avoid violating federal law. *See Miller*, 514 U.S. at ——, 115 S.Ct. at 2491 (collecting cases). In order to have a "strong basis in evidence" to engage in race-based redistricting, a governmental actor must have "information sufficient to support a prima facie showing that its failure to do so would violate the Act." *Hunt*, 861 F.Supp. at 437–40 (citations omitted). *Accord King*, 1996 WL 130439, at *26–27; *Quilter v. Voinovich*, 912 F.Supp. 1006, 1020 (N.D.Ohio 1995), *appeal dismissed*, —— U.S. ——, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995). *Cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) ("strong basis in evidence" requires evidence "approaching a prima facie case of a constitutional or statutory violation") (plurality opinion); *Peightal v. Metropolitan Dade County*, 940 F.2d 1394, 1401 (11th Cir.1991) (same), *cert. denied*, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). Of course, compliance must also be measured under a correct and constitutional reading of the Voting Rights Act.

Without question, the *DeGrandy* court was motivated by a desire to comply with the Voting Rights Act. Yet, it is also apparent

---

**5.** *See, e.g., Shaw v. Hunt*, 861 F.Supp. 408, 438 (E.D.N.C.1994) (holding that "a state necessarily has a 'compelling' interest in engaging in race-based redistricting whenever it has a firm basis for concluding that such action is necessary to bring its electoral districting scheme into compliance" with VRA), *probable jurisdiction noted*, —— U.S. ——, 115 S.Ct. 2639, 132 L.Ed.2d 878 (1995); *Johnson v. Miller*, 864 F.Supp. 1354, 1381–82 (S.D.Ga.1994) (assuming compliance with VRA was a compelling interest), *aff'd, Miller v. Johnson*, 514 U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762; *White v. Alabama*, 867 F.Supp. 1519, 1548 (M.D.Ala.1994) (same) (citing *Hunt*), *vacated*, 74 F.3d 1058 (11th Cir.1996).

that the *DeGrandy* court was operating under the mistaken assumption that Section 2 of the Voting Rights Act required the adoption of a congressional redistricting plan with as many majority-minority districts as could be reasonably accomplished. *See DeGrandy, supra,* 794 F.Supp. at 1085 ("Like the Special Master, we conclude that 'the law supports the drawing of a minority district where, in light of minority concentrations and community of interests, such a district can reasonably be drawn.'") (quoting Report of the Special Master at 14); *id.* ("Where, in a statewide redistricting case such as the present one, this court can reasonably draw a majority-minority district, we cannot choose to create an influence district or districts."); *id.* at 1091 (Vinson, J., specially concurring) ("It is not our goal ... under section 2 of the [Voting Rights] Act *to draw as many minority districts as possible. But we should draw as many as can be reasonably done.*") (emphasis added). The Supreme Court has since held, however, that a correct reading of Section 2 does not require maximization. *Johnson v. DeGrandy,* 512 U.S. ——, ——, 114 S.Ct. 2647, 2659, 129 L.Ed.2d 775, 794 (1994) (rejecting "the rule of thumb apparently adopted by the District Court, that anything short of the maximum number of majority-minority districts consistent with the *Gingles* conditions would violate § 2").

Furthermore, as discussed below, the *De-Grandy* court lacked a compelling interest in drawing District Three to comply with the Voting Rights Act for two additional reasons. First, any Section 2 claim the *DeGrandy* plaintiffs had under the Act was already moot when the *DeGrandy* court established District Three. Second, even if the *DeGrandy* plaintiffs' Section 2 claim was not moot and had remained viable after the existing scheme was struck down, the record demonstrates the absence of a "strong basis in evidence" that a Section 2 violation occurred.

### 1. Mootness of the *DeGrandy* Plaintiffs' Section 2 Claim:

Plaintiffs' counsel stated in closing arguments that "[t]his really, though, has turned into somewhat of a back-door vote dilution case. There's never been an allegation that the plan that was in effect from 1982 to 1992 diluted minority voting strength ..." Tr. at 672. However, the *DeGrandy* plaintiffs had alleged in an eight-count complaint numerous violations of federal law, including constitutionally impermissible malapportionment and unlawful vote dilution. *See DeGrandy* 2nd Am. Compl. (92–40015, Doc. 44). Nevertheless, this Section 2 claim was already moot before the *DeGrandy* court began consideration of a remedial plan.[6] On April 30, 1992, the *DeGrandy* court had entered summary judgment for the plaintiffs on that claim, finding that, in light of the 1990 census results, Florida's existing congressional districting plan was malapportioned in violation of the Equal Protection Clause of the Fourteenth Amendment and the "one-person, one-vote principle" (92–40015, Doc. 304).

In *Growe v. Emison,* 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (decided after the *DeGrandy* Court entered the order now challenged in this case), a unanimous Supreme Court found that a vote dilution claim was moot under analogous circumstances. There, the plaintiffs had alleged in their suit that, in light of the 1990 census results, Minnesota's congressional and legislative districts created in 1983 were malapportioned, and that the districts diluted the vote of minority groups in Minneapolis. A three-judge court found that the state court's legislative reapportionment plan violated the Voting Rights Act because it did not contain a super-majority minority senate district, when its own court-ordered remedial plan had contained such a district. *Emison v. Growe,* 782 F.Supp. 427 (D.Minn.1992). The Supreme Court reversed. *Growe v. Emison,* 507 U.S.

---

**6.** Mootness is an issue that can, and indeed must, be raised sua sponte by this court. *See, e.g., Hogan v. Mississippi Univ. for Women,* 646 F.2d 1116, 1117 n. 1 (5th Cir. Unit A 1981), *aff'd* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). As the Supreme Court has explained, "[f]ederal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 374–75, 78 L.Ed.2d 58, 62 (1983). Further, this was not a situation in which a Section 2 violation was likely to recur if not addressed by the *DeGrandy* court because, as explained *infra,* there was no Section 2 violation under a correct reading of the statute.

25, 113 S.Ct. 1075, 122 L.Ed.2d 388. The Supreme Court first noted that the plaintiffs' vote dilution claim became moot once the state court had declared the 1983 plans to be unconstitutionally malapportioned:

> [I]t is not precisely clear which legislative districting plan produced the vote dilution ... For almost a decade prior to the 1992 election season, the only legislative districting plan that had been in use in Minnesota was the 1983 plan, which all parties agreed was unconstitutional in light of the 1990 census. More importantly, the state court had declared the 1983 plan to be unconstitutional in its final order of January 30. *Once that order issued, the Emison plaintiffs' claims that the 1983 plan violated the Voting Rights Act became moot, **unless those claims also related to the superseding plan.***

*Id.* at 39, 113 S.Ct. at 1083–84 (emphasis added). The Supreme Court then held that even if that were not the case, the district court's failure to consider (much less find) any evidence of racially polarized voting precluded the district court from adopting a remedial plan that included a super-majority minority district. *Id.* at 40–42, 113 S.Ct. at 1084–85.[7]

Therefore, under *Growe*, once the *DeGrandy* court had entered summary judgment in favor of the plaintiffs on their malapportionment claim, the plaintiffs' Section 2 challenge to the 1982 congressional districting plan was no longer cognizable. Furthermore, the *DeGrandy* plaintiffs' Section 2 vote-dilution challenge could not have related to the su-

perseding plan adopted by the *DeGrandy* court—Plan 308—because as Defendants and Defendant–Intervenors have ably pointed out, Plan 308 itself was adopted as a remedy, not as a violative vote-dilution vehicle.

**2. Insufficient Evidentiary Record:**

■ Notwithstanding the fact that the plaintiffs' vote-dilution claim was moot, the *DeGrandy* court nevertheless found that Florida's existing congressional districts, drawn in 1982, violated Section 2 of the Voting Rights Act of 1965 (codified at 42 U.S.C. § 1973).[8] This Court is now placed in the unusual position of retracing the steps of the *DeGrandy* Court to determine whether the creation of District Three was required under a correct reading of Section 2 of the Voting Rights Act.

The *DeGrandy* plaintiffs alleged in their complaint that "[t]he current districts [in the existing 1982 redistricting plan] for each and every state legislative and congressional district violate the Voting Rights Act of 1965, as amended, because the plans, taken as a whole, dilute the voting strength of minority voters statewide." *DeGrandy* 2nd Am. Compl. at ¶ 100. In addition, the *DeGrandy* plaintiffs asserted that "[p]ursuant to the 1990 decennial census, and in accordance with the Fourteenth and Fifteenth Amendments, and the Voting Rights Act, minority voting strength must not be diluted and *districts must be created to ensure racial and language minority-majority and minority-influence districts.*" *DeGrandy* 2nd Amd. Compl. at ¶ 103 (emphasis added).

---

**7.** The *Growe* court also found that the lower court had erred in not deferring to the state court's efforts to adopt new redistricting and reapportionment plans. 507 U.S. at 32–37, 113 S.Ct. at 1080–83.

**8.** Section 2 of the Voting Rights Act, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1373b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis in original).

In reviewing the *DeGrandy* plaintiffs' Section 2 claim, the *DeGrandy* court found that "the absence of an existing plan prevents the court from engaging in the factually intensive analysis of a traditional section 2 challenge ..." 794 F.Supp. at 1083.[9] The *DeGrandy* court obviously considered the Section 2 claim in the context of the malapportionment in Florida's congressional districts in the aftermath of the 1990 decennial census. However, beyond malapportionment (which affected voters of all races and ethnicities), the *DeGrandy* court merely stated that "[t]he absence of a meaningful opportunity for minorities to participate in the political process and elect a candidate of their choice constitutes a violation of section 2 of the Voting Rights Act." *DeGrandy*, 794 F.Supp. at 1080. The *DeGrandy* court supported its conclusion with several very general findings: past effects of discrimination against minorities; disparities in socio-economic conditions; the existence of varying degrees of racially polarized voting in Florida; the lack of minority success in both the United States Congress and the Florida Legislature; and the fact that certain Florida counties had to be precleared by the Justice Department pursuant to the Voting Rights Act. *See* 794 F.Supp. at 1078–80. As discussed below, these general findings are simply insufficient to support a vote dilution claim under a proper interpretation of the Voting Rights Act, which requires a "comprehensive, not limited, canvassing of relevant facts." *Johnson v. DeGrandy*, 512 U.S. at ——, 114 S.Ct. at 2657.[10]

■ The essence of a claim under Section 2 of the Voting Rights Act requires "that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*,

478 U.S. at 47, 106 S.Ct. at 2764. Thus, a plaintiff must prove three threshold criteria when challenging a redistricting scheme: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the minority's preferred candidate is usually defeated by white majority bloc voting. *Id.* at 50–51, 106 S.Ct. at 2766. In addition, various non-statutory criteria are set out in the Senate Report accompanying Section 2, including the history of official discrimination, the socio-economic conditions that hinder the ability to participate effectively in the political process, and the electoral success of members of the minority group. *See* S.REP. No. 417, 97th Cong., 2d Sess. 206–07 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 206–07. These criteria will each be addressed in turn.

### a. Geographic Compactness:

■ Upon review of the *DeGrandy* record and all of the relevant evidence presented at the trial in this case, it is evident that the African–American population in Northeast Florida is not sufficiently large and geographically compact so as to constitute a majority in a fairly drawn congressional district. Using 1990 census data, District Three contains 562,518.5 persons, with 55.0% being African Americans. African–Americans in Northeast Florida are divided into four major population concentrations. The largest populations of African–Americans are at the extremes of Congressional District Three— namely, 133,068 in Duval County (Jacksonville), and 73,669 in Orange County (Orlando), some 100 miles to the south. Other concentrations of African–Americans in District Three include: 23,248 in Volusia County (Daytona Beach), at the coast of the Atlantic Ocean; 21,722 in Alachua County (Gainesville), in the western arm of District Three;

---

9. This statement further supports our conclusion in section I(A)(1) of this opinion that the *DeGrandy* plaintiffs' § 2 claim was moot once the *DeGrandy* court found the existing plan to be malapportioned.

10. *See also Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781 (there must be "an intensely local appraisal of the design and impact" of the electoral structure or practice being challenged) (quoting *Rog-*

*ers v. Lodge*, 458 U.S. 613, 621, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1982)). *Accord, Southern Christian Leadership Conference v. Sessions* ("*SCLC*"), 56 F.3d 1281, 1292 (11th Cir.1995) (en banc) (same), *cert. denied*, —— U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996); *Nipper v. Smith*, 39 F.3d 1494 (11th Cir.1994) (en banc) (same), *cert. denied*, —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).

14,474 in Marion County; and 13,780 in Seminole County. These African–American population concentrations are not physically adjacent to each other, and are linked together only by narrow land bridges of white rural and small town populations. Weber Rep., Pls.' Ex. 3 at ¶ 8, Weber Test., Tr. at 416. In drawing the district, the African–American population concentrations in major urban areas were segregated from the adjoining white populations, thereby excluding from District Three most white voters within these urban areas. See Lichtman Test., Tr. at 630.

In order to achieve its goal of creating a minority-majority district in northeast Florida, the *DeGrandy* court was forced to link these widely dispersed population concentrations together.[11] In so doing, however, the *DeGrandy* court created a district that splits every one of the fourteen counties [12] that constitute the district.[13] Weber Test., Tr. at 424. District Three also divides nearly every town in its path, even splitting individual precincts. Lichtman Test., Tr. at 339, 388, 628–33; Maggiotto Test., Tr. at 612. As Judge Vinson noted in *DeGrandy*, "District 3, in north Florida, has the appearance of something lifted from a Rorschach test. It wanders, web-like, from south of Orlando throughout northeast Florida." 794 F.Supp. at 1090–91.[14] Judge Vinson also noted:

> These odd-shaped districts will present administration difficulties. The census tracts utilized in drawing the districts overlap established voting precincts and will not easily jibe with other state and local district boundaries. They are disconnected from the traditional way we view the formation of such districts. They follow few recognized political boundaries. They will undoubtedly present campaigning problems for the candidates within those districts. Perhaps most importantly, I do not believe that these districts will make sense among the public. They appear to be something created by Gov. Elbridge Gerry.
>
> Without some objective geographical compactness standard to evaluate districts, the potential for future abuse in crafting district boundaries is virtually unlimited.... I would much prefer 23 districts which comply with some reasonable standard of compactness.

*Id.* at 1092 (citations omitted).

Moreover, by any number of quantitative measures of compactness commonly used in political science, Congressional District Three ranks among the least compact dis-

11. The extent to which geographical compactness has to be sacrificed to draw African–American majority-minority districts such as District Three, provides a great deal of insight into why Defendants' expert, Dr. Lichtman, believes that Congress should abandon the compactness requirement altogether. Lichtman Test., Tr. at 393. However, Congress has not chosen to do so, and this Court must consider all relevant factors—including compactness. *See Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766.

12. The Northeast region of Florida has a total of seventeen counties. Bradford, Union, and Nassau Counties are the only counties which do not constitute any part of Congressional District Three.

13. Judge Hatchett's dissent indicates that Florida Senate District Two is "practically identical" to Congressional District Three. In fact, Florida Senate District Two is markedly different. First of all, Senate District Two represents parts of only five counties, not fourteen. Unlike Congressional District Three, Senate District Two does not stretch westward through Lake City, nor does it meander south into Marion or Seminole Counties. Most importantly, Senate District Two does not encompass any part of Orange or Volusia Counties, the second and third largest concentrations of African–Americans in Congressional District Three.

14. Indeed, this is one of the many factors that makes *King v. State Board of Elections* distinguishable from this case. The *King* court found that the Hispanic community in the City of Chicago/Cook County was sufficiently numerous to constitute a majority in a properly drawn district. *King*, 1996 WL 130439, at *24. However, "[m]ost of the Chicago/Cook County Hispanic population is clustered in two dense enclaves, one in Chicago's near northwest side and one on the near southwest side." *Id.* at *9 (quoting *Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 649 (N.D.Ill.1991)). Moreover, the two Hispanic enclaves in *Hastert* are less than a mile apart at their closest point, and their "separation resulted from exogenous physical and institutional barriers—specifically, the east-west Eisenhower Expressway, the University of Illinois–Chicago Circle campus, and various major medical institutions—and thus did not indicate the existence of two distinct communities." *King*, 1996 WL 130439, at *9.

tricts in the country. According to the Congressional Research Service, a branch of the Library of Congress, District Three has a perimeter score [15] of 0.011, which ranks 434th out of 435 congressional districts. District Three's dispersion score [16]—0.111, ranks 429th out of 435 districts. Finally, District Three has a population score [17] of 0.260, ranking 428th out of 435 districts. C.R.S. report, appendix A. Further, when these three measures of compactness are averaged together, District Three has the highest mean ranking, and is the least compact, of any congressional district in the country. Weber Test., Tr. at 423.

Consequently, we conclude that the African–American population is not sufficiently large and geographical compact to meet the first *Gingles* precondition for establishing vote dilution in violation of Section 2 of the Voting Rights Act.

### b. Political Cohesiveness:

The evidence in both *DeGrandy* and this case leave no doubt that African–Americans in Florida, and particularly in District Three, are politically cohesive. This *Gingles* factor has definitely been established.

### c. Racially Polarized Voting:

▋ The *DeGrandy* court concluded that racially polarized voting exists in Flori-

da, and in the areas comprising District Three, but the Court's opinion cites little evidence in support. Although this does not mean that such polarized voting does not in fact exist, it does indicate that the *DeGrandy* court failed to engage in a "comprehensive, not limited, canvassing of relevant facts" [*Johnson v. DeGrandy*, 512 U.S. at ——, 114 S.Ct. at 2657], to reach such a conclusion. Such an examination requires a close analysis of racially polarized voting in the political unit or subdivision being challenged.[18] Absent the requisite "'majority bloc voting' showing[] ... needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population, ... there neither has been a wrong nor can be a remedy." *Growe*, 507 U.S. at 40–41, 113 S.Ct. at 1084.

The *DeGrandy* court's only statement concerning this was that "[t]he results of Florida's legislative elections over the past ten years establish the presence of racially polarized voting," citing Florida's Supreme Court Chief Justice Shaw's dissenting opinion in *In re Constitutionality of Senate Joint Resolution 2G, Special Apportionment Session 1992*, 597 So.2d 276, 287–93 (Fla.1992). *DeGrandy*, 794 F.Supp. at 1079. However, the

---

15. The perimeter score is computed by summing line segments comprising the perimeter of the district, and then constructing a circle with a circumference the same length as the perimeter of the district. The areas of the circle and the district are then computed, and the ratio of the district area to the area of the circle with the same boundary length becomes the perimeter score. Pls.' Ex. 3, DAVID C. HUCKABEE, CONGRESSIONAL RESEARCH SERVICE, CONGRESSIONAL DISTRICTS: OBJECTIVELY EVALUATING SHAPES 7–8 (1994) ("C.R.S. report").

16. The dispersion score is derived by drawing a circle around each district in such a way as to completely encompass the district. Then the area of the district is compared to the area of the circumscribing circle. The ratio of the district area to the circle area yields the dispersion compactness score. C.R.S. report at 8.

17. The population score is the ratio of the district population to the total population contained in a polygon formed by a taut "rubber band" stretched around the district. C.R.S. report at 10 n. 29.

18. *E.g., White v. Regester*, 412 U.S. 755, 769, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973) (section 2 findings must be based an "intensely local appraisal" of the historical, social, and political climate of the geographical area in which the suit is brought); *Gingles*, 478 U.S. at 59 n. 28, 106 S.Ct. at 2771 n. 28 (inquiry into "racially polarized voting" must be "district-specific"); *SCLC*, 56 F.3d at 1305 (Hatchett, J., dissenting) ("Also, unlike the majority, I will undertake the required circuit-by-circuit analysis in reviewing the district court's racial bloc voting findings.... Indeed, the majority's failure to engage in the required circuit-by-circuit analysis is a serious flaw, for the district court's legal errors become obvious under this more particularized level of scrutiny.") (internal citation omitted) (quoting *Gingles, supra* ); *League of United Latin American Citizens, Council No. 4434 v. Clements, (LULAC II)* 999 F.2d 831, 867 (5th Cir.1993) (quoting *White, supra* ). *See also Rural West Tenn. Afr.–Am. Affairs Council, Inc. v. McWherter*, 877 F.Supp. 1096, 1109–10 (W.D.Tenn.) (three-judge panel concluding that in statewide challenge it "should have evaluated more closely regional statistics in our earlier decision in addition to examining statewide evidence"), *aff'd*, —— U.S. ——, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995).

Eleventh Circuit recently emphasized that a district court's fact-findings in a vote-dilution case must be based upon evidence presented *in that case,* and not something from another case [*Johnson v. DeSoto County Bd. of Comm'rs,* 72 F.3d 1556, 1560–61 (11th Cir. 1996) ], particularly an opinion expressed in dissent. Even if Chief Justice Shaw's observations could have been applied in *DeGrandy* [19], Justice Shaw concluded that racially polarized voting existed on the basis of electoral results showing that only five African–Americans were elected to the state legislature between 1982 and 1990, with no tangible evidence that dilutive white-bloc voting or similar causal relationship with a voting practice or structure led to these results. *See* 597 So.2d at 290–91. The *DeGrandy* court did not identify any other evidence of racially polarized voting, including the "district-specific" analysis demanded by *Gingles. See SCLC,* 56 F.3d at 1305 (Hatchett, J., dissenting). [20]

This limited analysis may have been due to the Court's understanding that "[t]he parties agree that racially polarized voting exists throughout Florida to varying degrees." *De-Grandy,* 794 F.Supp. at 1079. Counsel for the NAACP made this very point in closing argument. Nevertheless, the absence of evidentiary findings by the *DeGrandy* court on the issue of racially polarized voting means that we must primarily rely on the evidence presented at trial before us.

Dr. Allan Lichtman, a veteran of Voting Rights Act litigation, provided Defendants' expert testimony on the issue of whether racially polarized voting existed in northeast Florida in 1992, and continues to exist today. In conducting his analysis, Dr. Lichtman relied upon three primary forms of methodology: ecological regression, extreme case analysis, and an examination of the actual outcome of elections. Dr. Lichtman further relied upon the $R^2$ (or squared-correlation coefficient) and statistical significance to assess the reliability of his regression analysis. On the basis of 60 elections between 1984 and 1994, Dr. Lichtman concluded that significant racial polarization exists in Florida at every political level— county-wide and State legislative elections, congressional elections, and State-wide elections. Lichtman Rep., Defs.' Ex. 1; Lichtman Test., Tr. at 325–27, 332–36.

However, we reject Dr. Lichtman's results because of several critical methodological errors in his analysis. First and foremost, Dr. Lichtman only examined black versus white elections, excluding all black versus black and white versus white elections, even though there was an extensive amount of testimony that the African–American community had a clear candidate of choice in such elections. [21] Lichtman Test., Tr. at 321,

---

**19.** A particularly dubious assumption, in light of the *Growe* court's admonition that "[s]ection 2 'does not assume the existence of racial bloc voting; plaintiffs must prove it.'" 507 U.S. at 42, 113 S.Ct. at 1085 (quoting *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764) (finding that a law review article on national voting patterns was no substitute for proof of vote dilution).

**20.** Indeed, we are unable to find any reported successful cases of vote dilution in the last two decades in any of the fourteen counties comprising District Three. *See, e.g., Nipper v. Chiles,* 795 F.Supp. 1525, 1544 (M.D.Fla.1992) (unsuccessful challenge to judicial districts in Duval and Clay counties), *aff'd on other grounds, Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994); *Williams v. Orange County, Fla.,* 783 F.Supp. 1348, 1362 (M.D.Fla.) (unsuccessful challenge to system of electing board of county commissioners in Orange County), *aff'd,* 979 F.2d 1504 (11th Cir. 1992), *cert. denied,* 509 U.S. 905, 113 S.Ct. 2998, 125 L.Ed.2d 692 (1993).

**21.** Typically, the most probative evidence of racially polarized voting will come through elections involving both white and African–American candidates. *LULAC II,* 999 F.2d at 864. *See Nipper,* 39 F.3d at 1540 (Tjoflat, C.J., plurality opinion). Nevertheless, that does not necessarily foreclose the possibility that evidence of racially polarized voting may be shown where there are no African–American candidates or both candidates are African–Americans. As Chief Circuit Judge Tjoflat noted in *Nipper,* if the parties can present sufficient proof that "black voters were energized to support a particular white candidate" when white voters were energized to support another white candidate, that information would be relevant to the vote dilution inquiry. *Id.* Consequently, to the extent that Dr. Lichtman failed to consider "split preference" elections, his findings are insufficient. *Cf. SCLC,* 56 F.3d at 1293 (finding that district court properly determined that Dr. Lichtman's analysis was flawed where that analysis failed to consider split preference elections).

323–24, 362–67. Furthermore, in part as a result of his first error, Dr. Lichtman disregarded a number of congressional elections that are highly relevant to a determination of whether racially polarized voting precludes African–Americans from electing their candidate of choice in congressional elections. In fact, Dr. Lichtman considered only four congressional elections—three involving Congresswoman Brown's elections in races against only white opponents. Lichtman Rep., Defs.' Ex. 1; Lichtman Test., Tr. at 321, 359–62. Finally, Dr. Lichtman failed to consider that differences in white and African–American political party affiliation could explain why racially polarized voting was apparent in a superficial analysis of election results.

While it appears that racially polarized voting exists, at least to some extent, in District Three, this polarization may be a collateral effect of the fact that voters in northeast Florida are ideologically polarized along political party lines. Dr. Lichtman conceded that African–Americans in northeast Florida are overwhelmingly Democrats. Lichtman Test., Tr. at 360.[22] This party-line polarization becomes manifest when African–Americans run against whites[23], or against other African–Americans.[24] Indeed, the average white crossover rate of 23 percent that Dr. Lichtman found as a result of his very limited analysis [see Lichtman Rep., Defs.' Ex. 1 at Table 2; Lichtman Test., Tr. at 325], might very well be the white Democratic vote that any Democratic candidate, white or African–American, would be expected to receive. This ideological polarization along party lines was articulated by Senator Holzendorf [an African–American], who indicated that she was unaware of a single instance in which a Republican had been the candidate of choice among African–Americans in Duval County because "[t]hey haven't given the right message, yet." Holzendorf Test., Tr. at 82.

Finally, and most importantly, the evidence demonstrates that African–Americans have consistently elected the candidate of their choice in congressional elections in northeast Florida under the 1982 districting plan: Congressmen Bill Fuqua and Bill Grant (while he remained a Democrat), from District Two[25]; Congressman Charles Bennett, from District Three; and Congressman Bill Chappell, from District Four. Holzendorf Test., Tr. at 78–81; Hill Test., Tr. at 502. An important truth is that a candidate of choice does not have to be a candidate of the same race.[26] Therefore, even if racially

---

**22.** The registration data supplied by Plaintiffs shows that in three of the counties with the largest African–American population within District Three, African–Americans are overwhelmingly registered as Democrats—while most registered Republicans are white. In Duval County, 91.3 percent of all registered African–American voters are Democrats, while over 97 percent of all registered Republicans are white or non-black. *See* App. to Bell Dep., Pls.' Ex. 6. In Alachua County, 95.7 percent of all registered African–American voters are Democrats, while nearly 98.3 percent of all registered Republicans are white or non-black. *See* App. to Hill Dep., Pls.' Ex. 9. In Volusia County, nearly 88.3 of all registered African–American voters are Democrats, while over 99.1 percent of all registered Republicans are white or non-black. *See* App. to Lowe Dep., Pls.' Ex. 10. *See also* Bositis Test., Tr. at 208 (characterizing District Three as a "Democratic-lea[n]ing district").

**23.** For example, in 1982, white Democratic Congressman Charles Bennett was the African–American candidate of choice when he ran against George Grimsley, an African–American Republican. Holzendorf Test., Tr. at 78–79.

**24.** For example, in 1995, Democrat Fred Matthews, an African–American, was the African–

American candidate of choice when he lost in a city council election to Republican Gwen Chandler–Thompson, an African–American. Holzendorf Test., Tr. at 67–69. Similarly, when African–American Republican Marc Little ran against Congresswoman Brown in the 1994 District Three general election, Little received virtually no support within the African–American community, which overwhelmingly backed Brown. *See* Bositis Test., Tr. at 202–03, 218; Brown Test., Tr. at 298–99.

**25.** Congressman Pete Peterson, a white Democrat who represents the present District 2, has also been the candidate of choice within the African–American community. Russell Test., Tr. at 543–45.

**26.** *Compare* with *National Association for the Advancement of Colored People, Inc. v. City of Niagara Falls,* 65 F.3d 1002 (2d Cir.1995), wherein the court stated:

We decline to adopt an approach precluding the possibility that a white candidate can be the actual and legitimate choice of minority voters. Such an approach would project a bleak, if not hopeless, view of our society—a view inconsistent with our people's aspirations

polarized voting existed in northeast Florida specifically, or more generally throughout Florida, the ability of African–American voters to elect the candidate of their choice in congressional elections would vitiate any claim of Section 2 vote dilution.[27]

#### d. Past History of Discrimination:

At the trial of this matter, several witnesses testified as to Florida's history of discrimination. Dr. Paulson (Defendants' expert in political parties and elections, civil rights, and southern politics) discussed at length the past use of such mechanisms as multiple ballot box laws, tissue ballots or "little jokers," the secret ballot, the "white primary," the poll tax, run-off elections, at-large elections, multiple-member elections,

and gerrymandering as examples of discriminatory practices employed by the State of Florida to prevent African–Americans from having a political voice. Paulson Test., Tr. at 9–34; Defs.' Ex 6B. Other witnesses, including Mr. Samuel Muldrew, Mr. Lloyd N. Pearson, Mr. Glynell Presley, and Mr. Willie H. Williams, testified about their own personal difficulties in registering to vote and exercising their rights to vote in the past. In addition, Mr. Leon Russell, President of the Florida State Branches of the NAACP, testified about the past use of harassment and intimidation to prevent African–Americans from participation in the electoral process.[28]

■ This Court previously took judicial notice of the fact that "Florida's past history

for a multiracial and integrated constitutional democracy. No legal rule should presuppose the inevitability of electoral apartheid—least of all a rule interpreting a statute designed to implement the Fourteenth and Fifteenth Amendments to the Constitution. Indeed, any such rule would be in tension with the Voting Rights Act's directive that members of a protected class have no right to proportional representation.

*Id.* at 1016.

**27.** The evidence plainly established the fact that African–American voters in Northeast Florida have consistently elected the candidate of their choice in congressional elections during the last decade. This is not insignificant. Even assuming, arguendo, that racially polarized voting exists in Northeast Florida, the ability of African–American voters to have an equal voice in the political process precludes them from stating a Section 2 claim. Other courts have reached the same conclusion, where similar evidence was presented, but was not shown to have interacted with a political process or structure to limit minority participation in the political process in question. *See generally Little Rock Sch. Dist. v. Pulaski County Spec. Sch. Dist. No. 1,* 831 F.Supp. 1453 (E.D.Ark.1993) (finding that plaintiffs failed to demonstrate sociological, historical, and economic factors interacted with system of electing school board members to deny minority voters equal access to the political process), *aff'd,* 56 F.3d 904 (8th Cir.1995); *Ortiz v. City of Philadelphia Office of City Comm'rs Voter Registration Div.,* 824 F.Supp. 514 (E.D.Pa.1993) (reaching same conclusion on the basis of similar evidence in challenge of voter purge law), *aff'd,* 28 F.3d 306 (3d Cir.1994), *reh'g and reh'g en banc denied; Magnolia Bar Ass'n, Inc. v. Lee,* 793 F.Supp. 1386 (S.D.Miss.1992) (reaching the same conclusion on the basis of similar evidence, in addition to racial appeals in campaigning, in challenge to system of electing judges to Mississippi Supreme Court), *aff'd,* 994 F.2d 1143 (5th Cir.), *cert. de-*

*nied,* —— U.S. ——, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993). *See also Johnson v. DeGrandy,* where the Supreme Court stated:

We do, however, part company from the District Court in assessing the totality of the circumstances. The District Court found that the three *Gingles* preconditions were satisfied, and that Hispanics had suffered historically from official discrimination, the social, economic, and political effects of which they generally continue to feel ... Without more, and on the apparent assumption that what could have been done to create additional Hispanic supermajority districts should have been done, the District Court found a violation of § 2. But the assumption was erroneous, and more is required, as a review of *Gingles* will show. 512 U.S. at ——, 114 S.Ct. at 2656–62 (internal citation omitted). *Cf. Growe v. Emison,* 507 U.S. at 41, 113 S.Ct. at 1085 (reversing district court's finding of vote dilution that violated § 2 because "the *Gingles* preconditions were not only ignored but were unattainable. As the district court acknowledged, the record contains 'no statistical evidence' of minority political cohesion ... or of majority bloc voting in Minneapolis.").

**28.** Defendants and Defendant–Intervenors also submitted copies of the "Report and Recommendations of the Florida Supreme Court Racial and Ethnic Bias Study Commission" as evidence of discrimination in Florida. Defs.' Exs. 13–14. However, we find that the report provides an insufficient basis to reach a conclusion that discrimination against African–Americans currently precludes their participation in the political process (or more particularly, congressional elections). At least one court has reached a similar conclusion in the context of Florida's judicial selection process, which the reports had expressly addressed. *See Mallory v. Harkness,* 895 F.Supp. 1556, 1559–60 (S.D.Fla.1995) (finding no compelling interest was shown that would justify imposition of race and gender-based quotas for judicial nominations).

of racial discrimination is well documented" (Doc. 91 at 53). *Mortham*, 915 F.Supp. at 1552 (citations omitted). Past discrimination itself is relevant in determining whether a violation of the Voting Rights Act has occurred. *E.g., McMillan v. Escambia County, Fla.*, 748 F.2d 1037, 1043–44 (5th Cir. 1984)[29]; *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1567 & n. 36 (11th Cir.), *appeal dismissed, cert. denied*, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984). Yet, the effects of past discrimination alone are insufficient to establish a Section 2 violation. *League of United Latin Am. Citizens, Council No. 4434 v. Clements* ("*LULAC II*"), 999 F.2d 831, 866–68 (5th Cir.1993) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). In this case, we find no evidence of any *existing* voting practice in Florida that discriminates against African–Americans or other racial or ethnic minority groups. Holzendorf Test., Tr. at 95; Witt Test., Tr. at 157; Presley Test., Tr. at 181; Guthrie Test., Tr. at 250; Lichtman Test., Tr. at 358; Engstrom Test., Tr. at 484. *See also* Tommie Bell Dep., Pls.' Ex. 6; Beverly Hill Dep., Pls.' Ex. 9; Deanie Lowe Dep., Pls.' Ex. 10. Dr. Paulson stated as much in his testimony[30]. Absent proof of any existing discriminatory voting practice, the presence of remote— albeit pervasive—instances of discrimination does little to bolster Defendants' case.

### e. Socio–Economic Disparities:

Defendants and Defendant–Intervenors also presented a great deal of expert testimony concerning socio-economic dispari-

ties between whites and African–Americans in District Three. Dr. Paulson and Dr. Richard Engstrom (Defendants' expert in elections systems and minority politics) reported the disparities between whites and African–Americans in unemployment rates, high school and college graduation rates, income, the number of persons in housing units without vehicles, and the percentage of households below the poverty level. Engstrom Rep., Defs.' Ex. 3; Paulson Rep., Defs.' Ex 6B; Defs.' Ex. 10, Tab 2. We find that these socioeconomic disparities are not unique to District Three, to Florida, or to the South, but rather more generally reflect the socioeconomic differences between whites and African–Americans in similar districts throughout the country. *See* DAVID BOSITIS, THE CONGRESSIONAL BLACK CAUCUS IN THE 103RD CONGRESS (1994).

Nevertheless, we will take judicial notice of the fact that there are significant socio-economic disparities in Florida between white and African–American citizens, much of which may be a result of past discrimination. We do recognize that this is not evidence of a Voting Rights Act violation unless it is coupled with proof that participation in the political process is in fact depressed among minority citizens. *See LULAC II*, 999 F.2d at 866. The reason for showing decreased voter participation is because "[t]he Voting Rights Act and Fifteenth Amendment apply only to racial discrimination, not discrimination based on socio-economic status." *Howard v. Kelly*, No. 93–900, 1994 WL 118211, at *1 (D.D.C. Mar. 31, 1994).

---

**29.** Former Fifth Circuit case, applying Section 9(1) of Public Law 96–452.

**30.** MR. SULLIVAN: You're not here today to testify about the existence of any current law that creates a qualification that discriminates against the rights of African–Americans to participate, are you?

DR. PAULSON: No. I'm here to testify about the impact of those prior laws on the present day.

MR. SULLIVAN: Okay. So, you're not here to testify about any current standard, any current voting practice, any current qualification, or anything that currently makes this an unequal process between blacks and whites; is that right?

DR. PAULSON: Not other than some of the vote dilution techniques which are widely used in these Northeast Florida counties, such things as at-large elections, many of which have been thrown out.

. * * * * * *

MR. SULLIVAN: This was the districting plan in effect in 1982 to 1992. Have you ever seen this map before?

DR. PAULSON: Probably, yes.

* * * * * *

MR. SULLIVAN: You're not here to tell the court that any of these districts were created to dilute minority voting strength, are you?

DR. PAULSON: No.
Paulson Test., Tr. at 40–41.

Voter registration rates for whites and African–Americans are now essentially the same in District Three.[31] Overall, African–Americans in District Three make up 50.6 percent of the voting age population ("VAP") and have a voter registration rate of 50.6 percent, compared to non-Hispanic whites in District Three, who make up 47.6 percent of the VAP and have a voter registration rate of 48.8 percent. *See* Attachment G to *DeGrandy* Independent Expert Report (92–40015, Doc. 388). In Duval County, where 52 percent of District Three's registered voters reside [Paulson Test., Tr. at 38], African–Americans of VAP actually have a higher voter registration rate than whites—64.6 percent compared to 62.0 percent. Engstrom Rep., Defs.' Ex. 3 at App. A; Engstrom Test., Tr. at 482. State-wide, African–Americans have an overall voter registration rate of 50.95 percent, compared to the overall state registration rate of 53.72 percent of the VAP—a difference of 2.77 percent. *See id.* This minor difference between African–American voter registration rates and statewide voter registration rates leads the Court to conclude that participation in the political process is not depressed among African–American voters at a statistically significant level. Furthermore, the testimony of Mr. Lloyd Pearson, an African–American who over the course of thirteen years single-handedly registered over 40,000 people (most of whom are African–Americans)[32] [Pearson Test., Tr. at 521], belies Defendants' argument that socio-economic disparities hamper voter registration in the African–American community.

On the other hand, voter turnout among African–American voters has undoubtedly been lower than turnout among white voters in Florida. We must note, however, that much of the turnout data, especially the data supplied by Dr. Engstrom, is highly questionable[33]. Similarly, the turnout data provided by Plaintiffs' expert, Dr. Michael Maggiotto, which shows that turnout in District Three among African–Americans was significantly higher than among whites [*see* Maggiotto Rep. Pls.' Ex. 15 at 6], is methodologically unsound because Dr. Maggiotto failed to adjust for split-precincts that included voters residing outside the District. Lichtman Test., Tr. at 338–40, 623–36. More reliable figures were provided by Dr. David Bositis, Defendants' expert in congressional politics and race and representations, although these figures obviously were unavailable to the *DeGrandy* court at the time District Three was drawn[34]. Dr. Bositis showed that in District Three, turnout among African–American VAP was 45.7 percent in 1992 and 41.2 percent in 1994, compared to white VAP turnout of 52.7 percent in 1992, and 57.6 percent in 1994.[35] Statewide, turnout among African–

---

31. The Court finds Dr. Engstrom's data, which shows voter registration in District Three among African–Americans is eight percent lower than among whites, *see* Engstrom Rep. Defs.' Ex. 3 at App. A, Engstrom Test., Tr. at 470–71, to be completely unreliable as a result of the same methodological errors that skewed his voter turnout data. *See infra* note 33.

32. The Court agrees with one counsel's characterization of Mr. Pearson as "a one man civil rights movement." Tr. at 668.

33. Based on Dr. Lichtman's figures, Dr. Engstrom provided data showing that turnout among voters in the counties encompassing District Three was between 18 and 27 percent lower for African–American voters than non-African American voters in two presidential and gubernatorial elections between 1988 and 1994. *See* Engstrom Rep., Defs.' Ex. 3 at App. B. However, these figures are unreliable because they include three counties outside District Three (Bradford, Nassau, and Union counties) with substantial prison populations, consisting of a disproportionately large number of African–American prisoners [counted in census data as part of the county's population] who have had their civil rights—including the right to vote—taken away. Paulson Test., Tr. at 38–40; Engstrom Test., Tr. at 479–83. Voter registration rates among African–Americans of VAP in Bradford and Union Counties are 35.0 and 30.1 percent, respectively. Engstrom Rep., Defs.' Ex. 3 at App. A. Although Nassau County has a voter registration rate of 55.7 percent, *id.*, the overall effect of adding these three counties to the fourteen counties in District Three distorts the actual registration disparity of 1.8 percent to reflect a disparity of 8 percent.

34. This problem does not render the figures irrelevant, however, since the evidence has shown that voting patterns in Florida have remained consistent in the last decade.

35. Dr. Lichtman agreed in his testimony that in the 1992 Congressional election in District Three, white turnout was about seven percent higher than African–American turnout. Lichtman Test., Tr. at 339–40.

American VAP was 46.3 percent in 1992 and 29.7 percent in 1994, compared to white VAP turnout of 59.7 percent in 1992 and 45.0 percent in 1994. Bositis Rep., Defs.' Ex. 4 at Table 1; Bositis Test., Tr. at 204. Some of this lower turnout is accounted for by the slightly lower (2.77%) voter registration rates among African–American voters. Other reasons, such as voter apathy, may also play a role in lower turnout. Regardless of the reasons for lower voter turnout, the following discussion reflects that African–Americans have been able, and continue to be able, to elect the candidates of their choice in elections in spite of lower turnout.

Consequently, the Court finds that notwithstanding their lower socio-economic status, African–Americans in Florida now enjoy equal access to and participation in the political process.

### f. Lack of Electoral Success:

The *DeGrandy* court also pointed to the lack of electoral success by African–American candidates in Florida [36]. The court correctly acknowledged that the 1982 amendments to the Voting Rights Act adopted a result-oriented test [37], concluding that "[p]laintiffs demonstrate a violation of the Act only when equal access to the political process has been denied." *DeGrandy*, 794 F.Supp. at 1082. There is no dispute about African–Americans' lack of electoral success in years past. However, the absence of past electoral success in elections is not dispositive; rather, it is merely evidence of vote dilution that has denied plaintiffs equal access to the political process [38]. *Compare with Johnson v. DeGrandy*, where the Supreme Court held:

> Lack of electoral success is evidence of vote dilution, *but courts must also examine other evidence in the totality of the circumstances*, including the extent of the opportunities minority voters enjoy to par-

ticipate in the political processes. To be sure, some § 2 plaintiffs may have easy cases, but although lack of equal electoral opportunity may be readily imagined and unsurprising when demonstrated under circumstances that include the three essential *Gingles* factors, *that conclusion must still be addressed explicitly, and without isolating any other arguably relevant facts from the act of judgment.*

512 U.S. at ——, 114 S.Ct. at 2657 (emphasis added) (internal citations omitted). *See also McWherter*, 877 F.Supp. at 1108 ("We agree with the conclusion reached by other federal courts that findings of racial polarization and historical inequality do not necessarily result in a violation of Section 2 of the Voting Rights Act. This is true even when a reapportionment plan does not provide for substantial proportionality."). As discussed above, the *DeGrandy* court's failure to engage in a fact-intensive inquiry and findings on racially-polarized voting patterns in Florida prevents us from now concluding that application of the *Gingles* totality of the circumstances test supported a finding of Section 2 liability.

Moreover, the evidence presented at trial shows that African–Americans do in fact enjoy considerable electoral success in District Three and Florida—even within majority white districts—because of significant crossover by white voters. For example, State Senator Betty Holzendorf, an African–American, testified that she received 78.1 percent of the vote against a white candidate, even though the VAP of her district is 44.7 percent African–American and 53 percent white. Holzendorf Test., Tr. at 74–75. And Senator Holzendorf's election is not an anomalous or isolated event. State Representative Alzo Reddick won in a district that has a 46.2 percent African–American VAP. Lichtman Test., Tr. at 390. State Senator Arnette Girardeau was elected in a northeastern

---

**36.** *See* 794 F.Supp. at 1079 ("An African–American has not represented Florida in the United States Congress in over a century.... From 1889 until 1968, African–Americans were unable to elect a single representative to the state house. Additionally, African–Americans were unable to elect a representative to the state senate until ten years ago....") (citation omitted).

**37.** *See generally Chisom v. Roemer*, 501 U.S. 380, 395, 111 S.Ct. 2354, 2364, 115 L.Ed.2d 348 (1991) ("Section 2(a) adopts a results test, thus providing that proof of discriminatory intent is no longer necessary to establish any violation the section.").

**38.** *See* the discussion on the "disclaimer" provision of the Voting Rights Act, *infra* note 54.

Florida district that had little more than a forty percent African–American VAP. State Representative Cynthia Chestnut won in a district that is only 28 percent African–American. Holzendorf Test., Tr. at 76–77; Lichtman Test., Tr. at 389–90. Nate Glover won an overwhelming majority of the vote in the first at-large primary when he was elected Sheriff of Duval County, in which African–Americans comprise fewer than 24 percent of the registered voters. Bell Dep., Pls.' Ex. 6 at 35–36. The testimony is replete with other current examples of electoral success by African–American candidates, at all political levels. *See* Clifton Test., Tr. at 106; Witt Test., Tr. at 151–52; Presley Test., Tr. at 175, 178–81; Williams Test., Tr. at 510–13. *See also* Bell Dep., Pls.' Ex. 6; Hill Dep., Pls.' Ex. 9; Lowe Dep., Pls.' Ex. 10.

The following exchange underscores the support that African–American candidates receive from white voters:

> SEN. HOLZENDORF: .... And so the person that is going to represent the entire county has to be able to bring a concern for all of the people in the county and not just one particular area.
>
> MR. SULLIVAN: So, in other words, for a black to have success in a district that is made up of both blacks and whites, the black candidate has to reach out to the white community?
>
> SEN. HOLZENDORF: That's correct.
>
> MR. SULLIVAN: And, if they don't reach out, they don't get the white vote?
>
> SEN. HOLZENDORF: That's correct.
>
> MR. SULLIVAN: And a black candidate, like yourself, has to reach out to the white community in order to obtain white votes?
>
> SEN. HOLZENDORF: That's correct.

Holzendorf Test., Tr. at 83.

In fact, if District Three Representative Corrine Brown had not received such white crossover vote, she would not have been elected. Congresswoman Brown ran against two formidable candidates in 1992 and 1994,

Don Weidner and Marc Little. Although African–American turnout in District Three was only 45.7 percent in 1992 and 41.2 percent in 1994 [Bositis Rep., Defs.' Ex. 4 at Table 1; Bositis Test., Tr. at 204],[39] Congresswoman Brown still garnered 59 percent of the vote in 1992 and 58 percent of the vote in 1994—near "landslide" levels of victory. Bositis Test., Tr. at 216–18; Brown Test., Tr. at 299. Therefore, despite past discrimination, we find that African–Americans now enjoy a great deal of electoral success at every political level, even in districts where they comprise only a small portion of the voting age population.

### g. Preclearance Of Florida Counties:

The *DeGrandy* court also pointed out that "[a]s a result of Florida's past discrimination practices, the United States Justice Department must preclear five Florida counties pursuant to Section 5 of the Voting Rights Act ..." 794 F.Supp. at 1079. These counties are Collier, Hardee, Hendry, Hillsborough, and Monroe Counties. 40 Fed.Reg. 43746 (1975); 41 Fed.Reg. 34329 (1976). *See* 28 C.F.R. pt. 51, App. However, none of these counties are included in District Three. Further, to the extent that the *DeGrandy* court was addressing a statewide claim under Section 2, there is no evidence that any violations of the Voting Rights Act were then (or are today) present in these preclearance counties. In fact, as discussed below in section II *infra*, the remedial plan adopted by *DeGrandy* actually had a retrogressive effect on the ability of African–American voters in some of these five counties to be able to elect the candidates of their choice.

### 3. Summary:

■ In sum, to state a "strong basis in evidence" that a Section 2 violation has occurred, there must be some indication that past discrimination has actually hampered the ability of minorities to participate in the political process [*LULAC II*, 999 F.2d at 866], through interaction with a "certain electoral law, practice, or structure." *Gingles,*

---

**39.** Dr. Bositis testified that "Adjusting for these gaps in black and white turnout, and even assuming that the gap between black and white turnout in Florida District Three is narrower than what the gap is statewide, I would expect that on election day in 1992 and election day in 1994 there were probably as many white faces at the polls as black, or maybe more." Bositis Test., Tr. at 204.

478 U.S. at 47, 106 S.Ct. at 2764. There is insufficient evidence to support such a finding in this case. The three primary categories of evidence relied upon by *DeGrandy* included effects of past discrimination, socioeconomic disparities between whites and African–Americans, and African–Americans' lack of electoral success. However, as discussed above, the failure of the *DeGrandy* court to show under the totality of the circumstances how this evidence interacted with the electoral structure being challenged (e.g., the existing redistricting plan) to hamper the ability of African–Americans to participate in the political process, precludes a finding of unlawful vote dilution. As a result, the *De-Grandy* court lacked the requisite "strong basis in evidence" that a Voting Rights Act violation existed, or that race-based redistricting was required under the Act.

Consequently, Plaintiffs have carried their burden of persuading the Court that the *DeGrandy* court lacked a compelling interest in drawing District Three in order to comply with the Voting Rights Act.

### B. Remedying Present Effects Of Past Discrimination:

 There is a significant state interest in eradicating the present effects of past racial discrimination. *E.g., Miller,* 514 U.S. at ——, 115 S.Ct. at 2490; *Shaw,* 509 U.S. at 654, 113 S.Ct. at 2831; *United States v. Paradise,* 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality opinion). *Accord Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1564–65 (11th Cir. 1994), *reh'g en banc denied,* 60 F.3d 717. *Shaw* recognized the possibility that such an interest could be "entirely distinct from the Voting Rights Act." However, there must still be a " 'strong basis in evidence for [concluding] that remedial action [is] necessary' " to cure the specific instances of past discrimination. *Id.* at 654–57, 113 S.Ct. at 2831–32 (citations omitted). *See also* the citations and analysis contained in Section I(A) of this

opinion. "Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 276, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) (plurality opinion). *Accord Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (plurality opinion). Rather, the discrimination must be identified with some specificity in the electoral law, practice, or structure to which the relief is to apply. *Id.* at 504, 109 S.Ct. at 727; *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1553 (11th Cir.1994).

As noted above, Florida has a long and unfortunate history of racial discrimination. For too many years, racially motivated voting practices such as the poll tax and the Democratic "white primary" were allowed to make a mockery of the Fifteenth Amendment to the United States Constitution.[40] Thankfully, such practices have long been abolished and are only a part of Florida's sad legacy of discrimination. Nevertheless, Defendants maintain that the lingering effects of Florida's long history of discrimination continue to this day, and that the *DeGrandy* Court had a compelling interest in remedying those lingering effects. Yet, Defendants and Defendant–Intervenors have presented no evidence of any current voting practice or procedure which denies or impairs the right to vote of African–Americans. Absent such evidence, the *DeGrandy* court lacked the requisite "strong basis in evidence" that present effects of past discrimination required adoption of a race-based redistricting plan.

In fact, Defendants' counsel recognized in closing arguments that the *DeGrandy* court failed to engage in the requisite fact-intensive analysis of whether any violation of federal law mandated the creation of District Three:

> MR. BURR: .... I believe that DeGrandy either was or could have been a remedy case. When I say "remedy case," obvious-

---

40. The Fifteenth Amendment provides:
 Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude—

 Section 2. The Congress shall have the power to enforce this article by appropriate legislation.
 U.S. CONST. amend. XV, §§ 1–2.

ly, I'm not referring to a remedy of a simple one person/one vote malapportionment Problem.

I believe the record in DeGrandy was such that it would have supported a finding, *if the DeGrandy court had chosen to make one,* that District Three was created as a race-conscious remedy to eradicate the lingering effects of a pervasive pattern of discrimination against black voters and would be black voters in Northeast Florida.

Similarly, *the DeGrandy court could have, if it had chosen to do so,* rule that the lingering effects of vote dilution in Northeast Florida require, mandated the creation either of District Three or a district very much like District Three in order to avoid a head-on collision to the Voting Rights Act.

\* \* \* \* \* \*

... I want to hit on one last point, and this is the one I wanted to come back to about, well, if, in fact, the DeGrandy court could have found a Section 2 violation in 1992 and did not, what's the reason for that? How did that really happen?

And I run the risk of bordering on presumptuousness here in talking to two members of this court who, of course, were members of the panel in DeGrandy, but that is sort of the nature of this case. But it seems to me that *the DeGrandy court did not have to make—or did not make findings of a violation of the Fourteenth Amendment or Section 2 simply because it didn't have to. It wasn't required to.*

By the time the congressional phase of the DeGrandy case ended, all of the parties that were before the court—the House and the Senate and the Democrat[ ]s and the Republicans and the NAACP, and all of the others—basically, everybody was of the same mind, and that was that there should be created in Northeast Florida a congressional district that would give blacks a reasonable opportunity to elect a candidate of their choice. *So, it simply was not incumbent upon the court to go ahead and make a difficult and perhaps divisive finding about an issue that all of the parties had agreed to.*

Tr. at 679, 686–87 (emphasis added). The Court appreciates counsel's acknowledgment of what the *DeGrandy* court did not do. However, this acknowledgment demonstrates a fatal misapprehension of the nature of a federal court's remedial powers—and effectively ends this case.

 In recent years, the federal courts have wrestled with the problem of utilizing affirmative action as a remedy for past racial discrimination. It has been said that "a state has a compelling interest in taking race-based affirmative action where it has a firm basis for concluding that such action is necessary to eradicate the effects of past or present racial discrimination within its own jurisdiction, even when it has *no* federal statutory mandate to do so." *Shaw v. Hunt,* 861 F.Supp. at 443–44 (collecting citations). However, such expansive authority does not exist for federal courts that have assumed the redistricting role. "[F]ederal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law." *Voinovich v. Quilter,* 507 U.S. 146, 156, 113 S.Ct. 1149, 1156, 122 L.Ed.2d 500 (1993) (citing *Growe,* 507 U.S. at 40–41, 113 S.Ct. at 1084). As Justice O'Connor noted in *Missouri v. Jenkins,* the reason for this limitation is that

> Courts ... are different. The necessary restrictions on our jurisdiction and authority contained in Article III of the Constitution limit the judiciary's institutional capacity to prescribe palliatives for societal ills. The unfortunate fact of racial imbalance and bias in our society, however pervasive or invidious, does not admit of judicial intervention absent a constitutional violation.... Unlike Congress, which enjoys " 'discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' " federal courts have no comparable license and must always observe their limited judicial role.

— U.S. ——, ——, 115 S.Ct. 2038, 2061, 132 L.Ed.2d 63 (1995) (O'Connor, J., concurring) (internal citations omitted). The same reasoning applies when a federal court consid-

ers what remedy to impose [41]. Once a constitutional or statutory violation is shown, a federal court must limit its remedy solely to redressing the violation. *See generally Milliken v. Bradley*, 433 U.S. 267, 279–88, 97 S.Ct. 2749, 2756–61, 53 L.Ed.2d 745 (1977) ("*Milliken II* ") ("the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution [or statute].' ") (quoting *Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) ("*Milliken I* ")); *Chisom v. Roemer*, 501 U.S. 380, 404, 111 S.Ct. 2354, 2369, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting) ("Section 2 of the Voting Rights Act of 1965 is not some all-purpose weapon for well-intentioned judges to wield as they please in the battle against discrimination.").

Even assuming the *DeGrandy* court had a sufficient basis for concluding that present effects of past discrimination resulted in a constitutional or statutory violation (apart from the Voting Rights Act)—which the record does not support—there is little evidence that the *DeGrandy* court was in fact motivated by an intent to remedy past discrimination. Instead, the *DeGrandy* opinion is permeated with language indicating that the *DeGrandy* court's focused intent in drawing District Three was to create a second African–American majority-minority district. *See* 794 F.Supp. at 1085–87, 1091.

In *Miller,* when the Court confronted a similar absence of evidence that the state actor was pursuing an interest in remedying present effects of past discrimination, the Court instead concentrated on the state actor's actual motivation: "creating a third majority-black district to satisfy the Justice Department's preclearance demands." 514 U.S. at ——, 115 S.Ct. at 2490. We will therefore tailor our remaining analysis [42] to what we find to have been the *DeGrandy* court's actual motivation: creation of at least two Afri-

can–American majority-minority districts, and one African–American influence district, as the *DeGrandy* court presumed was required under the Voting Rights Act.

Consequently, we must, and do, conclude that plaintiffs have carried their burden of persuading the Court that the *DeGrandy* court lacked a compelling interest in drawing District Three in order to remedy present effects of past discrimination.

## II. Narrowly Tailored:

■ Based upon the 1990 decennial census results which entitled Florida to four additional congressional seats and the ensuing malapportionment in Florida's congressional districts, the *DeGrandy* court found violations of Article I, Section 2 of the United States Constitution [which requires Congressional Redistricting every 10 years], the Equal Protection Clause of the Fourteenth Amendment, the one-person-one-vote principle, and the Voting Rights Act. 794 F.Supp. at 1090. Therefore, the *DeGrandy* court had the power to fashion a remedial plan narrowly tailored to correct the malapportionment. *See, e.g., Milliken II,* 433 U.S. at 279–88, 97 S.Ct. at 2756–61. However, the *DeGrandy* court went beyond correcting malapportionment. Instead, it perceived that the Voting Rights Act required race-based redistricting through the creation of as many African–American majority-minority and minority influence districts as was reasonable and practicable—including District Three. Since we have already concluded that the *DeGrandy* court lacked a compelling interest in drawing District Three, it is not really necessary to address whether District Three was narrowly tailored to further any compelling interest. Nevertheless, we will engage in such an inquiry to insure that our analysis is complete, recognizing that there may be further judicial review of this matter.

---

**41.** *See generally* L. Tribe, ᴀᴍᴇʀɪᴄᴀɴ ᴄᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ, § 3–10, at 79–80 (2d ed. 1988) ("Constitutional concerns of ripeness must be applied to every aspect of a lawsuit.... Ripeness requirements ... constrain a court's power over remedies: even plaintiffs previously injured by a challenged exercise of governmental power may be foreclosed from relief sought to prevent speculative future harm.").

**42.** Although the analysis of whether District Three was narrowly tailored is superfluous, since Plaintiffs have already persuaded the Court that the *DeGrandy* court lacked a compelling interest to draw District Three.

█ Assuming it had been established that a compelling interest requires race-based redistricting "under a correct reading of the [Voting Rights Act] statute," *Miller*, 514 U.S. at ——, 115 S.Ct. at 2491, any remedial plan must still be narrowly tailored. *See id.* at ——, 115 S.Ct. at 2490. *Cf. Dillard v. City of Greensboro*, 74 F.3d 230, 234 (11th Cir.1996) (there must be "a sufficient evidentiary basis to establish that the plan is narrowly tailored to remedy that discrimination"); *Harvell v. Blytheville Sch. Dist.*, 71 F.3d 1382, 1391 (8th Cir.1995) (en banc) (same). The remedial plan must, therefore, be limited to correcting the violation in the most narrowly tailored manner—e.g., by narrowly fashioning the remedy for only those practices [43] or political units [44] that actually violate federal law.

To determine whether a remedy is in fact narrowly tailored, the Supreme Court has examined race-based remedial plans under a five factor test: (1) the efficacy of alternative remedies; (2) whether the remedial plan imposes a rigid racial "quota" or just a flexible racial "goal"; (3) the planned duration of the remedial plan; (4) the relationship between the remedial plan's goal for minority representation in the pool of individuals ultimately selected to receive the benefit in question and the percentage of minorities in the relevant pool of eligible candidates; and (5) the impact of the remedial plan on the rights of innocent third parties. *Shaw v. Hunt*, 861 F.Supp. at 445 (collecting cases). *See, e.g., Croson*, 488 U.S. at 510–11, 109 S.Ct. at 730–31; *Paradise*, 480 U.S. at 171, 107 S.Ct. at 1066 (plurality opinion); *Wygant*, 476 U.S. at

279–84; 106 S.Ct. at 1849–52; *Fullilove v. Klutznick*, 448 U.S. 448, 510–15, 100 S.Ct. 2758, 2791–93, 65 L.Ed.2d 902 (1980). As the *Shaw* court pointed out, the second, third, and fourth factors will virtually always be satisfied in the redistricting context. *See* 861 F.Supp. at 446–48. Consequently, we will turn our attention towards an examination of how District Three fares under the first and fifth factors.

## A. Less Race–Based Plans Were Available:

### 1. Legal Standards:

█ It has been noted that "[t]he first factor requires the court to decide whether the state could have accomplished its compelling purpose just as well by some alternative means that was either completely race-neutral or made less extensive use of racial classifications." *Shaw v. Hunt*, 861 F.Supp. at 445. However, since

[a] state ... engaging in race-based redistricting to comply with the Voting Rights Act obviously has no *completely* race-neutral alternative means of accomplishing that end,.... the primary inquiry ... will therefore be whether the state could have complied with the Act by enacting a redistricting plan which, though race-based made *less extensive* use of racial classifications than the one it chose.

*Shaw v. Hunt*, 861 F.Supp. at 445–46 (emphasis in original) (collecting citations). The inquiry, therefore, focuses on two questions: "whether the plan creates more majority-

---

**43.** *See generally Shaw*, 509 U.S. at 654, 113 S.Ct. at 2831 ("[W]e do not read *Beer* [*v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629] or any of our § 5 cases to give covered jurisdictions carte blanche to engage in racial gerrymandering in the name of nonretrogression. A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression.").

**44.** *See generally Clark v. Calhoun County, Miss.*, 21 F.3d 92, 96 n. 2 (5th Cir.1994) ("The court should make sure that any remedial plan is narrowly tailored to correct any § 2 violation found to exist in Calhoun county."); *Whitfield v. Democratic Party of Ark.*, 890 F.2d 1423, 1432 (8th Cir.1989) ("We are well aware of the difficulty of

fashioning a remedy for Phillips County alone, while allowing the other counties of Arkansas to continue implementing a majority vote runoff requirement for primary elections. However, the evidence requires just such a remedy, and courts have created remedial orders which affect only one legislative district, while affecting no other portion of the Arkansas state legislative structure."), *on reh'g*, 902 F.2d 15 (8th Cir.1990), *cert. denied*, 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1193 (1991); *Rybicki v. State Bd. of Elections of Ill.*, 574 F.Supp. 1082, 1124–25 (N.D.Ill.1982) (three judge panel) ("Because our finding of liability is limited to two relatively small groups of districts, we believe that the remedy should be designed to ameliorate the effects of unconstitutional vote dilution in those two areas.").

minority districts than is reasonably necessary to comply with the Act, and whether the majority-minority districts it creates contain substantially larger concentrations of minority voters than is reasonably necessary to give minority voters a realistic opportunity to elect representatives of their choice in those districts." *Id.* at 446 (citing *Hays v. Louisiana,* 839 F.Supp. 1188, 1206–08 (W.D.La. 1993), *rev'd on other grounds,* 514 U.S. ——, 115 S.Ct. 2431.[45]

■ Recently, the Supreme Court has defined the proper contours of the Voting Rights Act in order to further clarify what the Act permits and what it requires with regard to drawing majority-minority districts. The reason for this line of jurisprudence is because the Act had been used by federal courts, the states, and the Department of Justice to create "racially 'safe boroughs'" for different racial and ethnic groups. *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2598, 129 L.Ed.2d 687 (1994) (Thomas, J., concurring in the judgment) (quoting *United States v. Dallas County Comm'n,* 850 F.2d 1433, 1444 (11th Cir.1988) (Hill, J., specially concurring)). As Justice Thomas recognized, "[t]hat practice now promises to embroil courts in a lengthy process of attempting to undo, or at least to minimize, the damage wrought by the system we created." *Holder,* —— U.S. at ——, 114 S.Ct. at 2598 (Thomas, J., concurring in the judgment).[46] Indeed, that is what brings the instant equal protection challenge before the Court. As will be discussed below, the rule from the Supreme Court decisions is clear: Congress did not pass the Voting Rights Act to replace a system of economic and social segregation with a system of political segregation.[47] Furthermore, to the extent any race-based redistricting plans are required, they must still be narrowly tailored to bring the plan into compliance with constitutional and statutory dictates.

As already discussed, the Supreme Court rejected the creation of a super-majority minority state senate district in *Growe,* where no Section 2 violation had been shown. The lower court had relied on "[j]udicial experience, as well as the results of past elections" to conclude that the creation of such a district in Minneapolis was necessary "to find that a districting scheme complies with the ... Act." *Emison v. Growe,* 782 F.Supp. at 440. A unanimous Supreme Court reversed. *Growe v. Emison,* 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388. The Supreme Court held that the lower court's failure to consider any evidence of racially polarized voting precluded the district court from adopting a remedial plan that included a super-majority minority district. *Id.* at 39–42, 113 S.Ct. at 1084–85.

■ In *Voinovich v. Quilter,* the plaintiffs raised an "influence-dilution" claim, contending that a state reapportionment plan that packed African–American voters into a

---

**45.** *See also Quilter,* 912 F.Supp. at 1021 ("Assuming race must be considered to comply with the Voting Rights Act, the question then becomes whether a state could have complied with the Voting Rights Act with means that were less race-based.").

**46.** Justices Thomas and Scalia went even further, suggesting that they would hold that an apportionment plan is not a "standard, practice, or procedure" that may be challenged under § 2, thereby overruling *Gingles. DeGrandy,* 512 U.S. at ——, 114 S.Ct. at 2667 (Thomas, J., dissenting); *Holder,* —— U.S. at ——, 114 S.Ct. at 2619 (Thomas, J., concurring in the judgment) (arguing that the terms contained in § 2 apply "only to state enactments that regulate citizens' access to the ballot or the processes for counting a ballot," but not how much weight a ballot or vote should be given).

**47.** *See generally Miller,* where the Court stated:

The Voting Rights Act, and its grant of authority to the federal courts to uncover official efforts to abridge minorities' right to vote, has been of vital importance in eradicating invidious discrimination from the electoral process ... Only if our political system and our society cleanse themselves of that discrimination will all members of the polity share an equal opportunity to gain public office regardless of race.... That end is neither assured nor well served, however, by carving electorates into racial blocs.

514 U.S. at ——, 115 S.Ct. at 2494. *Cf. Shaw,* 509 U.S. at 647, 113 S.Ct. at 2827 ("[R]eapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid.").

few districts with large African–American VAPs, deprived them of influence districts which they were otherwise entitled to under Section 2. The Supreme Court first assumed that such a challenge was cognizable under the Voting Rights Act. 507 U.S. at 152–54, 113 S.Ct. at 1154–56. But the Court held that the trial court erred in holding that the Act precludes creation of majority-minority districts absent the necessity to use such districts to remedy a violation of Section 2. The Court reasoned:

> Section 2 contains *no per se prohibitions against particular types of districts:* It says nothing about majority-minority districts, districts dominated by certain political parties, or even districts based on partisan political concerns. Instead, Section 2 focuses exclusively on the *consequences* of apportionment. Only if the apportionment scheme has the effect of denying a protected class the equal opportunity to elect its candidate of choice does it violate Section 2; where such an effect has not been demonstrated, Section 2 simply does not speak to the matter. Indeed, in *Gingles* we expressly so held: "[E]lectoral devices ... may not be considered per se violative of Section 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the political process." As a result the District Court was *required to determine the consequences of Ohio's apportionment plan* **before** *ruling on its validity;* the failure to do so was error.

507 U.S. at 155, 113 S.Ct. at 1156 (citation omitted) (emphasis added). Unlike federal courts, states do not have to find a statutory or constitutional violation before adopting majority-minority districts, and the states' choices must be respected absent a violation of federal law. *Id.* at 156–67, 113 S.Ct. at 1156–57. Therefore, the *Quilter* Court reversed the lower court's finding of Section 2 liability, noting that if the lower court had applied the *Gingles* test, it would have had to reject the plaintiffs' claim because there had been no showing of white majority bloc voting. *Id.* at 157–58, 113 S.Ct. at 1157–58.

In *Johnson v. DeGrandy*, the Supreme Court examined the Florida legislative reapportionment plan adopted by the same *DeGrandy* court that adopted District Three. The three-judge court had found that the Florida House reapportionment was deficient because it failed to maximize the number of Hispanic super-majority districts. *See DeGrandy v. Wetherell*, 815 F.Supp. 1550, 1580 (N.D.Fla.1992). On appeal, the Court specifically addressed the question of whether Section 2 requires a state to affirmatively gerrymander districts in order to maximize minority voting, and answered in the negative. 512 U.S. at ——, ——, 114 S.Ct. at 2660, 2662. As Justice O'Connor noted in her concurring opinion:

> The critical issue in this case is whether Section 2 of the Voting Rights Act ... requires courts to 'maximize' the number of districts in which minority voters may elect their candidates of choice. The District Court, applying the maximization principle, operated "on the apparent assumption that what could have been done to create additional Hispanic super-majority districts should have been done." The Court today makes clear that the District Court was in error, and that *the Voting Rights Act does not require maximization of minority voting strength.*

512 U.S. at ——, 114 S.Ct. at 2664 (O'Connor, J., concurring) (emphasis added)[48]. Accordingly, the Supreme Court found that the three-judge court "misjudged the relative importance of the *Gingles* factors and of historical discrimination, measured against evidence tending to show that in spite of these facts, [the reapportionment plan] would provide minority voters with an equal measure of politi-

---

48. The opinion further elaborated:

It may be that the significance of the facts under § 2 was obscured by the rule of thumb apparently adopted by the District Court, that anything short of the maximum number of majority-minority districts consistent with the *Gingles* conditions would violate § 2, at least where societal discrimination against the mi-

nority had occurred and continued to occur. But reading the first *Gingles* condition in effect to define dilution as a failure to maximize in the face of bloc voting (plus some other incidents of societal bias to be expected where bloc-voting occurs) causes its own dangers, and they are not to be courted.

512 U.S. at ——, 114 S.Ct. at 2659.

cal and electoral opportunity." *Id.* at ——, 114 S.Ct. at 2658.

Finally, we must briefly return to *Miller v. Johnson,* 514 U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762.[49] In *Miller,* just as in *DeGrandy,* the Department of Justice adopted a maximization policy[50]. It refused to preclear Georgia's redistricting plan unless it included African–American majority-minority districts in proportion to their numbers in Georgia's total population[51]. The Court found that the Justice Department's policy, which led to the creation of the challenged district, was "not required by the Voting Rights Act under a correct reading of the statute." *Id.* at ——, 115 S.Ct. at 2491[52]. The Supreme Court pointed out that Georgia's earlier plans were "ameliorative," e.g., they increased the number of majority-minority districts from 1 out of 10 to 2 out of 11, and these plans could therefore not " 'violate § 5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution.' " *Id.* at ——, 115 S.Ct. at 2492 (quoting *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976)). Since the Georgia legislature did not have a discriminatory intent in only seeking to create two African–American majority-minority districts, the Court found the plans could not have violated Section 5. *Miller,* 514 U.S. at ——, 115 S.Ct. at 2492–94. As a result, the challenged district was not nar- rowly tailored to further a compelling interest, and the *Miller* court therefore affirmed the lower court's finding that the district violated the Fourteenth Amendment.

## 2. Analysis Under These Legal Standards:

■ The recent Supreme Court decisions demonstrate that in this case, the *DeGrandy* court made several errors of constitutional magnitude in engaging in race-based redistricting to create District Three. First, as already discussed in section I, the *DeGrandy* plaintiffs' vote dilution claim was moot after the *DeGrandy* court declared the 1982 redistricting plan to be unconstitutionally malapportioned. *Cf. Growe,* 507 U.S. at 39, 113 S.Ct. at 1083–84. Second, even if the claim remained viable, the *DeGrandy* court's failure to examine any evidence of vote dilution precludes a finding of Section 2 liability which necessitated creation of majority-minority districts such as District Three. *See, e.g., Johnson v. DeGrandy,* 512 U.S. at ——, 114 S.Ct. at 2656–62; *Quilter,* 507 U.S. at 157–58, 113 S.Ct. at 1156; *Growe,* 507 U.S. at 39–42, 113 S.Ct. at 1084–85. The *DeGrandy* court's remedy fails under these standards set by the Supreme Court.[53]

It is true that the *DeGrandy* court did not employ a strict maximization policy. In fact, if *DeGrandy* had applied such a policy, it

**49.** Although *Miller* assessed the quantum of evidence needed to prove a claim under *Shaw v. Reno,* it is not just a Fourteenth Amendment case. Indeed, one court has astutely noted that *Miller* is in fact a "statutory interpretation case," to the extent that the Court repudiated the Department of Justice's interpretation of the Voting Rights Act. *Bossier Parish Sch. Bd. v. Reno,* 907 F.Supp. 434, 444 (D.D.C.1995).

**50.** While the *Miller* court called it a "maximization" policy, it appears that the Department of Justice in fact applied a "proportionality" policy. "Maximization" would require adoption of a redistricting plan that includes the maximum number of majority-minority districts. *See Johnson v. DeGrandy,* 512 U.S. at ——, 114 S.Ct. at 2658–60. "Proportionality," on the other hand, "links the number of majority-minority voting districts to minority members' share of the relevant population." *Id.* at ——, n. 11, 114 S.Ct. at 2658 n. 11.

**51.** The 1990 census showed that Georgia had a population of 6,478,216 persons, 27 percent of whom are African–Americans. *Miller,* 514 U.S. at ——, 115 S.Ct. at 2483. The Department of Justice required Georgia to adopt a redistricting plan including three African–American majority-minority districts, or 27 percent of Georgia's eleven congressional districts. *Id.* at ——, 115 S.Ct. at 2483–84.

**52.** *Cf. Gingles,* 478 U.S. at 94, 106 S.Ct. at 2789 (O'Connor, J., concurring) (Congress did not intend in the Voting Rights Act to provide minority voters with the "maximum feasible minority voting strength.")

**53.** Since intervening law has shown that the *DeGrandy* court abused its discretion in the creation of District Three, this Court is not required to defer to the *DeGrandy* court's finding that Plan 308 (which created District Three) was the most narrowly tailored plan available. *Cf. King,* 1996 WL 130439, at *28 (deferring to underlying court's finding that the remedial plan was narrowly tailored where the underlying court had properly applied a § 2 analysis).

could possibly have created as many as 5 African–American majority-minority districts and 5 Hispanic majority-minority districts based upon the VAP (43.4% of the total districts), or 6 African–American majority districts and 5 Hispanic majority districts based upon population (47.8% of the total districts). Adoption of such a plan would have given these two racial and ethnic groups, which comprise 23.15% of the VAP and 25.77% of the population, control of 43.4% of the districts based on VAP and 47.8% of the districts based on population—effective political power of at least 85 percent above these groups' numerical strength. *See* Attachment G to *DeGrandy* Independent Expert Report.

While the *DeGrandy* court did not engage in a maximization policy, it *did* pursue the very type of defacto proportional representation that the Supreme Court has since disapproved.[54] *See generally DeGrandy*, 794 F.Supp. at 1091 (Vinson, J., specially concurring) ("It is not our goal, therefore, under Section 2 of the Act to draw as many minority districts as possible. But we should draw as many as can reasonably be done."). *See also id.* at 1085–87. Instead of looking at the consequences of adopting an alternative redistricting plan that would not have been as race-based as the one that created District Three, the *DeGrandy* court believed it had to create as many African–American majority-minority and minority influence districts as possible to comply with Section 2. The decisional law shows that this was an erroneous belief. *See Miller*, 514 U.S. at ——, 115 S.Ct. at 2492–94; *Johnson v. DeGrandy*, 512 U.S. at ——, 114 S.Ct. at 2659; *Quilter*, 507 U.S. at 155, 113 S.Ct. at 1156.

Moreover, the *DeGrandy* court was offered other more narrowly tailored plans that were less race-based and more cognizant of traditional race-neutral redistricting criteria. To the extent that these plans created fewer than two African–American majority-minority districts and one African–American minority influence district, they were summarily rejected. *See DeGrandy*, 794 F.Supp. at 1086–87. However, the *DeGrandy* court apparently relied upon an erroneous assumption that its failure to create a proportional number of African–American majority-minority and influence districts would violate Section 2 of the Act. This assumption has since been repudiated by the Supreme Court.

■■■■■ Furthermore, several of the plans considered by the *DeGrandy* court were submitted by the Florida Legislature or members of the Legislature. The Independent Expert properly noted that the only plan passed by the Legislature, the Wetherell Plan, was not a "legislative plan" because it was only passed by one house of Florida's bicameral legislature. *DeGrandy* Independent Expert Report at 26. However, the *DeGrandy* court improperly discounted the state's interests in these separate plans, including the Wetherell Plan. It is well-established that a court considering adoption of a redistricting plan must give "full deference" to a state-sponsored plan: "[I]n the absence of any finding of a constitutional or statutory violation with respect to those districts, a court must defer to the legislative judgments the plans reflect, even under circumstances in which a court order is required to effect an interim legislative apportionment plan." *Upham v. Seamon*, 456 U.S. 37, 40–41, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982) (per cu-

---

**54.** The *DeGrandy* court did not apply a "proportionality" policy as defined by the disclaimer clause of § 2. The disclaimer clause, also known as the proportional representation clause or the Dole Amendment, provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). As the Supreme Court noted, "[t]his proviso speaks to the *success* of minority candidates, as distinct from the political or electoral *power* of minority voters." *Johnson v. DeGrandy*, 512 U.S. at —— n. 11, 114 S.Ct. at 2658 n. 11. Instead, the *DeGrandy* court applied a propor-

tionality policy designed to equate African–American political power with the number of African–Americans in Florida's population. Congresswoman Brown's testimony reflects the results of this proportionality policy:

> ... [I]f you look at the results, for the first time in the history of this State, the congressional delegation is reflective of the people that live there. We have two Hispanics, three African–Americans, five women, fifteen Republicans, and eight Democrats. So, the map reflects the people, and it reflects the diversity in this State.

Brown Test., Tr. at 282.

riam).[55] In other words, a court "should follow the policies and preferences of the State, expressed in statutory and constitutional provisions or in reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973). Decisions made by "the legislature in pursuit of what are deemed important state interests ... should not be unnecessarily put aside in the course of fashioning relief...." *Id.* at 796, 93 S.Ct. at 2355. Even so, that is precisely what the *DeGrandy* court did in rejecting out of hand the various proposals offered by the various legislative representatives and the plan adopted by the Florida House of Representatives.

For example, in addressing the Wetherell Plan (*see* 92–40015, Doc. 165), which would have created one African–American VAP majority district and two African–American influence districts, the *DeGrandy* court rejected it because it

> ... placed policy considerations ahead of strictly legal ones. Thus, the plan elevates the secondary criteria of compactness, coherent communities of interest, and respect for traditional political boundaries

over the primary principle of ensuring that minority voting strength is not diluted. 794 F.Supp. at 1087. However, in so holding, the *DeGrandy* court simply misapprehended what the Voting Rights Act allowed, as opposed to what the Act required. Consequently, the State's significant interests in maintaining its traditional redistricting values were sacrificed whenever those interests came into conflict with the *DeGrandy* court's underlying goal of creating three African–American majority-minority and influence districts.

Defendants' expert, Dr. Richard Scher, testified about the redistricting values that Florida relied upon at the time of the *DeGrandy* decision. Dr. Scher first pointed out that "[t]he only districting criteria that is actually mentioned in either of the [1885 and 1968 Florida] constitutions was contiguity." Scher Test., Tr. at 109–10. Other districting criteria, not specifically required by Florida's Constitution, include compactness, preservation of county lines and other political boundaries, protection of incumbents [56], equality of population [57], and partisan politics [58]. The combined effect of these criteria on redistricting plans adopted from 1972 onward caused the preservation of county lines and

---

**55.** *See also Burns v. Richardson*, 384 U.S. 73, 85, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966) ("a State's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause."); *League of United Latin Am. Citizens, Council No. 4434 v. Clements* ("*LULAC I* "), 902 F.2d 293, 321 (5th Cir.1990) (Johnson, J., dissenting) ("[B]ecause reapportionment is primarily a matter for legislative consideration, the doctrine of judicial deference to state interests is especially strong when a court orders a temporary or interim plan.") (collecting citations), *on reh'g*, 914 F.2d 620, *rev'd*, 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), *on remand*, 986 F.2d 728 (5th Cir.1993), *on reh'g*, *LULAC II*, 999 F.2d 831; *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir.1985) ("[E]ven where a legislative choice of policy is perceived to have been unwise, or simply not the optimum choice, absent a choice that is either unconstitutional or otherwise illegal under federal law, federal courts must defer to that legislative judgment.").

**56.** Dr. Scher supported his conclusion concerning protection of incumbent congressional representatives as follows:

> DR. SCHER: It [Table 1] looked at the incumbents, the Florida congressmen standing for re-election after redistricting between 1900 and 1992. And, as you can see, there were 68 incumbents who chose to run again. All 68 were re-elected.
> MS. WISEMAN: In other words, 100 percent incumbents who ran after redistricting in this century were re-elected?
> DR. SCHER: That is correct, 100 percent—no one lost.
> MS. WISEMAN: Indicating that protection of incumbents is of some priority?
> DR. SCHER: That's the conclusion I drew from that, yes.

Scher Test., Tr. at 113. *See also* Scher Rep., Defs.' Ex. 5, Table 1. However, protection of incumbents in northeast Florida was not one of the state's redistricting interests in 1992, since the two incumbents in this area had retired. *See* Scher Test., Tr. at 116.

**57.** To comply with the requirements of *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Scher Test., Tr. at 113.

**58.** Dr. Scher explained how partisan politics affected the redistricting process. Tr. 113–18.

other political boundaries to increasingly be sacrificed. Scher Test., Tr. at 115–16. In addition, Dr. Scher opined that in 1992 "the enforcement of the Voting Rights Act was added to the mix and, obviously, complicated matters." Scher Test., Tr. at 116.

Dr. Scher, John Guthrie, staff director of the Florida Senate Committee on Reapportionment in 1992, and Mr. Leon Russell, head of the Florida NAACP [59], suggested in their testimony that the Florida Legislature intended to create an African–American majority-minority district in northeastern Florida to further the state's redistricting interest of complying with the Voting Rights Act. However, the record belies this view.

Although District Three was based in large part on the Margolis Plan [60], Dr. Scher's

**59.** Judge Paul respectfully dissents on the panel's decision to allow Mr. Russell, who did not serve in any capacity with the Florida Legislature during the *DeGrandy* litigation, to testify concerning what the Legislature's intent was during the redistricting process. *See* Russell Test., Tr. at 536–37.

**60.** Weber Test., Tr. at 433. Plan 287, proposed by Gwen Margolis of the Florida Senate (92–40015, Doc. 158). *See* Defs.' Ex. 10, Tabs 5 & 9. Plan 287 included two Hispanic and two African–American majority-minority districts, and no influence districts. *DeGrandy*, 794 F.Supp. at 1086. District Three, which contains an African–American VAP of 50.6 percent and a Democratic majority of 76.4 percent, closely resembles the Margolis Plan's proposed third district, which would have contained an African–American VAP of 50.1 percent and a Democratic registration majority of 76.4 percent. *See* Attachments C and G to *DeGrandy* Independent Expert's Report. Plan 287 was not actually adopted by the Florida Senate.

**61.** Dr. Lichtman testified that "... Republicans were utilizing, for political ends, as politicians are wont to do, their support for the creation of black majority districts." Lichtman Test., Tr. at 393.

**62.** The following exchange makes this strategy readily apparent:

MR. SULLIVAN: Okay. When you mentioned that there were partisan pressures that were involved in the creation of District Three, what did you mean?
DR. SCHER: The legislature in 1992 was almost at parity between the Democratic party and the Republican party. Both parties were really attempting to foster their own base of support in the Northeast Florida area.

testimony indicates that the Republicans in the State Senate were more interested in aggregating Democrats in a single district in northeastern Florida than in creating an African–American majority-minority district. Dr. Lichtman's testimony supports this view.[61] In fact, the Republicans' desire to minimize Democratic voting strength shows just how politics made strange bedfellows in the 1992 redistricting process, as Republicans joined with African–American Democrats in an attempt by each group to enhance their own political power.[62] The Department of Justice aided this effort by contending (as it still seems to be doing) that the Voting Rights Act required the creation of a majority-minority African–American district in northeast Florida.[63]

MR. SULLIVAN: And the way to foster that base of support was for Republicans and black Democrats to work together on the redistricting process?
DR. SCHER: That was one of the strategies that the Republican party employed, yes.
Scher Test., Tr. at 122.

**63.** The Defendants and Defendant–Intervenors make the same fundamental mistake in this case. Defendants' evidence on the narrowly tailored prong concentrates on a comparison between District Three and the majority-minority districts contained in the Margolis, James, Ireland, and NAACP plans, which all had a black VAP of at least 50.0 percent. Defendants conclude that *District Three is the most narrowly tailored of these majority-minority districts.* Wright Closing Argument, Tr. at 695. *See also* Weber Test., Tr. at 432–38. However, the *DeGrandy* court was not confined to just these districts, even if some violation of federal law had been present. To the extent that a certain level of African–American VAP was needed to allow African–Americans to elect a candidate of their choice, it appears from recent election results that the VAP could have been as low as 30.0 percent. Dr. Lichtman could not find a single example of any district in northeast Florida with an African–American VAP of 27.7 percent or higher in which the candidate of choice of African–Americans had been defeated. Lichtman Test., Tr. at 390–91. This appears to be a result of the Democratic polarization of African–American voters, which then only requires about 20 percent of white crossover votes to provide a majority in excess of 50 percent. Moreover, as we have repeatedly stated throughout this order, the Voting Rights Act does not require a particular type of district—just one that does not "result in unequal access to the political process." *Voinovich v. Quilter*, 507 U.S. at 155, 113 S.Ct. at 1156.

However, by drawing District Three in a manner that packed African–Americans and Democrats together, the Court sacrificed the state's important interest in compactness and thereby exceeded its remedial powers under *Gingles.* The Democratic-controlled Florida House of Representatives[64] strongly objected to the creation of District Three on this very basis:

> The House defendants contend that the Special Master ignored the first requirement of the three-prong test in *Gingles* ... Specifically, the "grotesquely" shaped north Florida majority-minority district in the Special Master's plan (District 3) flaunt's *Gingles's* requirement that the African–American minority be "sufficiently large and geographically compact to constitute a majority in a single-member district."... District 3 is a political unit incapable of meaningful representation and indicates that the Special Master improperly sought to achieve proportional representation, contrary to the provisions of the Voting Rights Act.... Finally, the House defendants contend that the independent expert and Special Master chose a "separatist" interpretation of the Voting Rights Act. *They warn this court against using the ... Act to promote "political apartheid."*

*DeGrandy,* 794 F.Supp. at 1089–90 (emphasis added) (summarizing 92–40015, Doc. 427).

The Florida House of Representatives had passed the Wetherell Plan, which had a much more compact district three that included an African–American VAP of 33.3 percent. *See* Attachment C to *DeGrandy* Independent Expert's Report; Defs.' Ex. 10, Tab 9. Several other plans submitted by members of both houses of the Florida Legislature would have created an African–American influence district in northeastern Florida—not a majority-minority district—with an African–American VAP ranging between 25.0 to 47.5 percent.[65] Many of these were viable plans that would have corrected a violation of federal law—if in fact one had existed beyond mere malapportionment—in a much narrower fashion. As a result, since less race-based plans were available, District Three cannot pass constitutional muster.

### B. Overly Burdensome Impact Of The Race–Based Plan On Innocent Third Parties:

■ District Three is also overly burdensome on the rights of innocent third parties. The *DeGrandy* court's adoption of a plan that pulled widely separated groups of African–American voters together to form District Three, while enhancing the proportional voice of African–American voters statewide, not only denied equal access to the political process to white voters within District Three, *but also to African–American voters outside of District Three.* African–American voters residing outside the two African–American majority-minority and influence districts include: 550,518 persons, or 47.8 percent of the state's total African–American VAP and 5.5% of the state's total VAP; and 831,303 persons, or 47.2% of the state's total African–American population and 6.4% of the state's total population. *See* Attachment C to *DeGrandy* Independent Expert's Report. Many of these voters may have been able to better form coalitions with persons placed in District Three. Instead, sacrificing their equal rights to vote may well have been the price of attaining fair representation for African–Americans statewide.[66] In fact, the Spe-

---

**64.** The Florida House of Representatives, a party defendant in this action and still Democratic-controlled, now seeks to *uphold* District Three.

**65.** More specifically, these other plans included the following: State Representative DeGrandy's plan (Plan 212), with an African–American VAP of 47.5%; Lawyer's Committee/Humphrey plans (Plan 202), with an African–American VAP of 47.5%; State Senator Gordon's plan (Plan 279), with an African–American VAP of 25.2%; and State Representative Reddick's plan (Plan 296), with an African–American VAP of 36.3%. *See*

Attachment C to *DeGrandy* Independent Expert's Report; Defs.' Ex. 10 at Tab 9.

**66.** *Cf. Johnson v. DeGrandy,* where the Supreme Court noted:

> Even if the State's safe harbor were open only in cases of alleged dilution by the manipulation of district lines, however, it would rest on an unexplored premise of highly suspect validity: that in any given voting jurisdiction ... the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class. Under ...

cial Master noted that the redistricting plan creating District Three had a retrogressive effect on some covered Section 5 counties, but discounted that finding because "the overall plan substantially strengthens minority representation *in Florida.*" *DeGrandy* Special Master's Report and Recommendation (92–40015, Doc. 411) at 21 (emphasis added).

Defendants and Defendant–Intervenors offered testimony showing that Congresswoman Brown ably represents the interests of all her constituents—both African–American and white. In addition, Congresswoman Brown and other witnesses stated that while campaigning in and representation of District Three posed some logistical problems, District Three is a political unit capable of representation. These statements may all be true. However, they beg the basic question that this Court has to address: whether District Three achieves a compelling interest in the manner most narrowly tailored to avoid infringement of the fundamental rights of innocent third parties. The fact that innocent third parties receive a fair result cannot ameliorate the deprivation of those parties' fundamental right to equally participate in the political process.[67]

Defendants also submitted a great deal of evidence that District Three possesses socioeconomic commonality and cohesion. *See* Lichtman Rep., Defs.' Ex. 1; Engstrom Rep., Defs.' Ex. 3; Bositis Rep., Defs.' Ex. 4; Defs.' Ex. 10; Holzendorf Test.; Bositis Test.; Guthrie Test.; Brown Test.; Lichtman Test.; Hill Test. However, this evidence is somewhat spurious, since the reason so many of District Three's constituents share common interests is because the *DeGrandy* court took about six pockets of mostly lower income African–American voters, and tied them together with narrow land bridges containing a high percentage of lower income white voters. Consequently, evidence of socioeconomic similarities has little,

if any, relevance in the present strict scrutiny inquiry.

In light of the foregoing, the Court finds that the creation of District Three was unduly burdensome on the rights of innocent third parties. Consequently, even if there were no less race-based plan available—which clearly is not the case—District Three cannot be narrowly tailored to further any compelling interest.

## C. Summary:

Although the foregoing discussion has addressed the issue of whether District Three satisfies strict scrutiny, the discussion itself is grounded largely in the principles of federalism and separation of powers. *See Mortham,* 915 F.Supp. at 1545 n. 24. Therefore, we deem it appropriate to revisit the former Fifth Circuit's statement on these principles nearly two decades ago, which still have equal force today:

> The Supreme Court has put tight reins on judicial power to reapportion because of the judiciary's uneasy position in these cases. The least representative branch of the government must take care when it reforms the most representative branch.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> We have recognized that race may be considered as a factor in determining whether a proposed apportionment is acceptable.... But we have also held that "safe" seats for the minority are not required of a reapportionment plan in a dilution case.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The district judge must [therefore] be mindful of the impact of the proposed plans on different racial groups. His duty is to avoid both gerrymanders and racial dilution requires that much. The judge must analyze the plan and determine that the probable results are such that minority strength is not diluted. But this legitimate

---

[this] view, the most blatant racial gerrymandering in half of a county's single member districts would be irrelevant under § 2 if offset by political gerrymandering in the other half, so long as proportionality was the bottom line. *512 U.S. at ——, 114 S.Ct. at 2661.*

**67.** *See generally Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) ("The right to vote on an equal basis with other citizens is a fundamental right in a free society; indeed, in any viable form of representative government. It is preservative of all government rights.").

concern with the outcome cannot justify a strict proportionality brought about by manipulation of district lines. If the plan passes the dilution test, ... race is no longer an important factor. The boundaries should be drawn with an eye to compactness, contiguousness, and the preservation of natural, political, and traditional boundaries; Not racially balanced representation. *We are not legislatures.*

*Marshall v. Edwards,* 582 F.2d 927, 934, 936–37 (5th Cir.1978)[68], *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), *appeal after remand,* 629 F.2d 425 (5th Cir.1980), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981) (internal citations omitted) (emphasis added).

Furthermore, it has also become painfully obvious to us that the creation of majority-minority districts cannot be utilized as a panacea for all of the existing socio-economic divisions between various racial and ethnic groups. Such a use requires acting "on the implicit assumption that members of racial and ethnic groups must all think alike on important matters of public policy and must have their own 'minority preferred' representatives holding seats in elected bodies if they are to be considered represented at all." *Holder,* —— U.S. at ——, 114 S.Ct. at 2597 (Thomas, J., concurring in the judgment). However, this assumption merely perpetuates racial stereotypes that are at war with the very notions of equality:

> "[w]hen racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated.... Since that system is at war with the democratic ideal, it should find no footing here."

*Shaw v. Reno,* 509 U.S. at ——, 113 S.Ct. at 2827–28 (quoting *Wright v. Rockefeller,* 376 U.S. 52, 67, 84 S.Ct. 603, 611, 11 L.Ed.2d 512 (1964) (Douglas, J., dissenting)). Moreover, "[r]acial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions" [*Shaw,* 509 U.S. at ——, 113 S.Ct. at 2833] that strike at the very heart of achieving a color-blind society.

▉▉▉▉▉ This Court cannot condone the use of remedial statutes, such as the Voting Rights Act, in a manner that, paradoxically, exacerbates racial tensions through the perpetuation of stereotypical notions. It is one thing for a racial or ethic minority to show a court that some political structure or process denies them equal access to the political process, thereby requiring imposition of a remedial plan. It is completely different where, as here, a racial or ethnic group cannot point to any such structure or process. Under such circumstances, a court lacks constitutional authority to adopt a remedial measure. Furthermore, when a remedial plan is necessary, it must be limited solely to the eradication of the structure or process that offends the Constitution. Remedial plans cannot be used to immunize minority voters "from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics." *Johnson v. De-Grandy,* 512 U.S. at ——, 114 S.Ct. at 2661.

Consequently, plaintiffs have carried their burden of persuasion under both parts of the strict scrutiny test, and are entitled to judgment.[69]

### III. Remedy:

▉▉▉▉▉ Throughout the course of this litigation, plaintiffs have suggested several re-

---

68. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

69. Defendants' counsel pointed out in closing arguments that strict scrutiny is not necessarily strict in theory, but fatal in fact. Wright argument, Tr. at 694–95. Decisional law supports counsel's statement. *Adarand,* —— U.S. at ——, 115 S.Ct. at 2117; *King,* 1996 WL 130439, at

*22 (quoting *Adarand*). In fact, in *King,* the court upheld Illinois' Fourth Congressional District under strict scrutiny review. *Id.* at *28–29. However, in this case, the evidence has clearly demonstrated the absence of both a compelling interest and a narrowly tailored remedial plan that led to the creation of District Three. Under the facts of this particular case, strict scrutiny review is fatal to District Three.

medial measures. Only one is appropriate. The Constitution expressly provides for redistricting by states, not the federal courts. *See* U.S. CONST. art. I, § 2, cl. 3, *as amended by* U.S. CONST. amend. XIV, § 2; U.S. CONST. art. I, § 4, cl. 1; *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) [70]. Since decennial redistricting is the constitutional minimum required, a state is free to adopt new redistricting plans in between regularly scheduled decennial reapportionments. *See generally Reynolds v. Sims,* 377 U.S. 533, 583–84, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964) (more frequent apportionment is "constitutionally permissible," and even "practicably desirable"). The appropriate course of action in this instance is therefore clear: "When a federal court declares an existing apportionment scheme unconstitutional, it is ... appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." [71] *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497. Having been down this road once before, the Court will only fashion a new redistricting plan if the Florida Legislature does not timely propose a remedy. *Id.* at 540, 98 S.Ct. at 2497.[72]

However, time is of the essence in this case. The candidate filing deadlines are just a few months away. Potential candidates (including incumbents) will need to know the contours of the state's congressional districts, so they can organize their campaigns accordingly. Voters will need to know the districts in which they reside. The State of Florida will need to set up the appropriate administrative features within its voting precinct structure. As a result, a new redistricting plan must be in place as soon as possible.

Fortunately, the Florida Legislature began its regular session on March 5, 1996. The Court therefore remands this matter to the Florida Legislature to redraw Florida's Third Congressional District.[73] In adopting a new redistricting plan, the Florida Legislature is not confined to maintaining any portion of the existing interim plan, but is merely constrained by the legal and constitutional requirements disclosed herein. *See generally Burns v. Richardson,* 384 U.S. 73, 85, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966) ("[A] State's freedom of choice to devise substitutes for an apportionment plan found unconstitutional either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause."). Any plan adopted by the Florida Legislature shall be submitted to this Court for review no later than May 22, 1996.

Although any redistricting plan proposed by the State is subject to administrative preclearance pursuant to Section 5 of the Voting Rights Act, a federal court may authorize the emergency interim use of such a plan without first obtaining preclearance. 28 C.F.R. § 51.18(c) (1995). The Court will therefore review the Florida Legislature's plan, if any is forthcoming, to determine whether it is in compliance with federal law. If the Court determines that the plan is lawful, the Court will authorize the plan's use on an emergency interim basis for the 1996 congressional elections. The Florida Legislature will be required to obtain Section 5 preclearance for the use of such a plan for any elections after 1996.

This Court will retain jurisdiction in the event that the Florida Legislature does not timely adopt a valid redistricting plan, to enter such orders as it may deem to be

---

**70.** *See generally Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975) ("[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.").

**71.** It is obvious, however, that members of Congress elected under Florida's existing interim redistricting plan will maintain their seats until such time as those elected under the new redistricting plan are sworn into office.

**72.** Contrary to the dissent, we cannot deny the Florida Legislature the first opportunity to adopt a new redistricting plan. Not only is it required under existing constitutional law and the doctrines of federalism and separation of powers, but to do otherwise would encourage the very type of judicial activism in the political process that this Court has a duty to avoid.

**73.** Based on the principles discussed in this order, the Florida Legislature cannot simply readopt the *DeGrandy* redistricting plan.

appropriate, including an order for a valid redistricting plan. *See, e.g., Scott v. Germano,* 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965). We may appoint a Special Master to propose an interim redistricting plan to be imposed in the event that the Florida Legislature fails to fulfill its constitutional reapportionment duty. *Cf. Terrazas v. Slagle,* 789 F.Supp. 828, 840 (W.D.Tex.1991), *aff'd, Richards v. Terrazas,* 505 U.S. 1214, 112 S.Ct. 3019, 120 L.Ed.2d 891; 506 U.S. 801, 113 S.Ct. 29, 121 L.Ed.2d 3 (1992). The Court will take this matter under advisement, and enter a separate order if necessary. However, in taking such action, the Court wants to reemphasize that it does not want to again be placed in a position where the Florida Legislature has abdicated to the Court its constitutional duty to adopt a redistricting plan. Rather, the Florida Legislature must have the strength of will and moral courage to timely enact a new congressional redistricting plan that comports with all constitutional mandates.

## IV. Conclusion:

This decision should not be interpreted as "turning back the clock" on the gains made by African–American voters, and other racial and ethnic voting minorities. Nor should the decision be interpreted as cutting back on the continued viability of the Voting Rights Act as a means to remedy discriminatory voting practices. Rather, the Supreme Court has dictated that federal courts must abide by the underlying premise that in drawing race-based redistricting and reapportionment plans, they must at all times be cognizant of the limits that the Constitution will tolerate. Although the *DeGrandy* court engaged in a well-intentioned effort to enhance the voting opportunities of African–American and Hispanic voters[74], intervening case law has shown that the three-judge panel did so with an erroneous understanding of what Section 2 of the Voting Rights Act required. It is for that reason that the Court has concluded that Florida's Third Congressional District cannot survive the present constitutional equal protection challenge.

Accordingly, it is hereby **ORDERED AND ADJUDGED:**

(1) Florida's Third Congressional District is a racially gerrymandered district that is not narrowly tailored to further a compelling governmental interest. Accordingly, Florida's Third Congressional District violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and it must be redrawn for the 1996 congressional elections.

(2) Congresswoman Brown, the current representative from District Three, and all other representatives presently holding congressional office under the existing districting plan, shall maintain their offices until such time as the 1996 congressional elections are held and the newly elected congressional representatives take office.

(3) The State defendants are enjoined from using the existing congressional districting plan (containing the Third Congressional District) for the Fall 1996 congressional elections, or any elections thereafter. The Florida Legislature is directed to adopt a new congressional redistricting plan that remedies the constitutional infirmities of Congressional District Three, and since time is of the essence, such plan should be submitted to the Court by May 22, 1996.

(4) The Court will retain jurisdiction in the event that the Florida Legislature does not timely adopt a valid redistricting plan, to enter such orders as it may deem to be appropriate, including an order for a valid redistricting plan. The Court further will retain jurisdiction for the purpose of assessing attorney fees and costs.

(5) The Clerk is directed to enter judgment for plaintiffs, and close this case, subject to the retained jurisdiction for the limited purposes herein specified.

**DONE AND ORDERED.**

---

**74.** The fact that a court was well-intentioned in engaging in race-conscious redistricting does not make the court-drawn plan any less unconstitutional, where claimants have shown that the plan deprives them of equal protection under the law.

HATCHETT, Circuit Judge, dissenting.

The majority finds that the *DeGrandy v. Wetherell* court did not have a compelling interest for creating Congressional District 3 (District 3) and that District 3 was not narrowly tailored. The majority concludes that the *DeGrandy* court erred in finding as compelling interests compliance with the Voting Rights Act and remedying the effects of Florida's past discrimination against African–Americans. In reaching its conclusions, the majority strips the *DeGrandy* plaintiffs of a remedy and even more strange fails to provide a remedy to the plaintiffs in this case. In formulating this untenable result, the majority has (1) infused issues into the case that

neither the plaintiffs nor defendants raised; (2) totally disregarded relevant precedent; (3) rewritten the requirements for claims under Section 2 of the Voting Rights Act; (4) ensured that the application of strict scrutiny is only "strict in theory" but "fatal in fact"; and (5) based many of its legal conclusions on internally inconsistent rationales. The majority's opinion in this case bears a striking resemblance to the sentiments that compelled the passage of the Fourteenth Amendment and the Voting Rights Act: namely, that African–Americans and other minorities are susceptible to exclusion from full participation in the political process.

The minority plaintiffs in the *DeGrandy* litigation alleged that they suffered constitutional and statutory violations as a result of the state of Florida's population increases and shifts in the congressional and state legislative districts. After a full trial, the *DeGrandy* court found constitutional violations and Voting Rights Act violations. As part of a remedy for these violations, the court adopted a plan that included the present District 3. The majority, in this case, proceeds as though it has the right to retry the prior *DeGrandy* case, a separate case that the parties in that litigation did not appeal. Noteworthy is the fact that the plaintiffs in this case have overturned the decision in *DeGrandy*, without being parties to the *DeGrandy* litigation. Stranger still is the fact that Judge Vinson, who authored an opinion in the *DeGrandy* litigation upholding District 3 in the face of the same challenges presented in this case, now forms the majority in condemning District 3.

### I. *DeGrandy v. Wetherell*

In *DeGrandy*, a three-judge court held that the state of Florida's congressional districts violated both the one-person, one-vote requirement of the Fourteenth Amendment to the United States Constitution and the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. *DeGrandy v. Wetherell*, 794 F.Supp. 1076, 1090 (N.D.Fla.1992). The *DeGrandy* litigation arose out of a lawsuit that Miguel DeGrandy, a Hispanic member of the Florida House of Representatives, and other registered voters (DeGrandy plaintiffs) initiated in 1992. The DeGrandy plaintiffs alleged that the congressional district scheme in Florida, at the time of the lawsuit, violated the Equal Protection Clause of the United States Constitution and the Voting Rights Act.[1]

At the time the DeGrandy plaintiffs filed their lawsuit, the state of Florida had become entitled to four additional congressional seats due to population growth that occurred between 1980 and 1990. *DeGrandy*, 794 F.Supp. at 1078. The Florida state legislature, however, ended its 1992 session without adopting either a congressional redistricting or a state reapportionment plan. *DeGrandy*, 794 F.Supp. at 1079. As a result of the Florida state legislature's inaction, the task of redistricting fell on the federal courts. *DeGrandy*, 794 F.Supp. at 1083–84.

After all parties in the litigation presented their cases, the *DeGrandy* court made specific findings of fact regarding Florida's history of both official and unofficial discrimination against African–Americans and other minorities, especially in the context of voting. *DeGrandy*, 794 F.Supp. at 1079. For example, the *DeGrandy* court found that the state of Florida imposed a poll tax on African–American voters under article VI, section 8 of the Florida Constitution. *DeGrandy*, 794 F.Supp. at 1079. The *DeGrandy* court also found that Florida's constitution segregated African–American and white schoolchildren as well as prohibited the intermarriage of whites with African–Americans. *DeGrandy*, 794 F.Supp. at 1079.

The *DeGrandy* court noted a more contemporary version of Florida's official discrimination against African–Americans was revealed "as recently as 1967, [in] § 350.20 Fla.Stat. [that] provided in part: The Florida Public Service Commissioners may prescribe reasonable rules and regulations relating to the separation of white and colored passengers in passenger cars being operated in this state by any railroad company or other common carrier." *DeGrandy*, 794 F.Supp. at 1079. The *DeGrandy* court also took judicial notice of prior federal court findings of past discriminatory election practices in Florida such as at-large elections, white primaries, majority vote requirements, and candidate filing fees. *DeGrandy*, 794 F.Supp. at 1079. Faced with overwhelming evidence of both past and recent discriminatory practices, the *DeGrandy* court concluded that "the legal barriers and the economic barriers which the legacy of racism has created in the state of

---

1. The court consolidated the DeGrandy litigation with a similar lawsuit that the Florida State Conference of the National Association for the Advancement of Color People Branches (NAACP) and many individual African–American voters filed on April 7, 1992. In the NAACP's complaint, the plaintiffs alleged a Section 2 claim and unconstitutional malapportionment. *DeGrandy* 2nd Am.Compl. at ¶ 100.

Florida, have prevented African–Americans from fully participating in the political process." *DeGrandy*, 794 F.Supp. at 1079.

Not only did the court find pervasive discriminatory practices and lingering effects of those practices, the *DeGrandy* court and the litigants agreed that racially polarized voting occurred throughout Florida to varying degrees. *DeGrandy*, 794 F.Supp. at 1079. Since all of the parties in the litigation stipulated that racially polarized voting occurred in Florida, the *DeGrandy* court did not have to engage in an extensive analysis of racially polarized voting. In light of this overwhelming evidence of both official and unofficial acts of discrimination to disenfranchise minority voters, the *DeGrandy* court devised a redistricting plan that would remedy constitutional and statutory violations against African–American voters and other minorities that would neither offend the Constitution nor Section 2 of the Voting Rights Act. *DeGrandy*, 794 F.Supp. at 1083. First, the *DeGrandy* court appointed a Special Master to facilitate the formation of a redistricting plan. The Special Master reviewed several proposed plans, but ultimately decided to devise his own plan to more effectively address the constitutional and statutory violations. The Special Master developed plan 308 which called for the creation of two African–American majority districts (Districts 3 and 17) and one African–American influence district (District 23). *DeGrandy*, 794 F.Supp. at 1087–88. Second, the *DeGrandy* court reviewed the proposed plans and Special Master's plan 308 and adopted the Spe-

cial Master's plan creating two African–American majority districts and one African–American influence district.[2] The *DeGrandy* case was not appealed; thus, the ruling became final. It is important to remember that the *DeGrandy* case became final and was never appealed. This truth, *DeGrandy* was not appealed, renders the majority's reasoning incomprehensible. The majority now dismantles District 3 of the *DeGrandy* court's redistricting plan and throws into confusion Florida's congressional election process.

## II. District 3 Achieved the Objectives of the *DeGrandy* Court

Before addressing the majority's numerous erroneous legal conclusions and incompatible rationales, it is important to assess the representation that constituents living in District 3 have received as a result of the development of this district. Although I do not suggest that the successful representation obtained in this district predominates over constitutional considerations, it is important to recognize that this district has accomplished what the *DeGrandy* court set out to achieve: remedying the past exclusion that African–American voters endured in Florida's political process and creating a district that works for all of its constituents. Moreover, this discussion exposes the absurdity of the majority's finding that District 3 will inevitably be overburdensome to "innocent" white residents in District 3. District 3 not only complies with constitutional and statutory mandates, it works.[3]

---

**2.** The *DeGrandy* court also considered and rejected the following plans: the Ireland plan—because it was extremely long, irregularly shaped, and likely to have communities with competing interests; the James plan—because it packed African–American voters into two districts; the De-Grandy plan—because it linked together areas likely to have competing interests and only established a single African–American majority district; the Lawyer's Committee plan—because it contained the same disadvantages as the De-Grandy plan; the Common Cause plan—because it only created one majority African–American voting district; the Wetherell plan—because it elevated other traditional districting criteria over the principle of ensuring that minority voting strength was not further diluted; the Gordon plan—because it split the Hispanic community in Dade County; the Reddick plan—because it minimized the ability of minority groups, particularly

African–Americans, to fully participate in the political process; and the Webster plan—because it perpetuated the traditional dilution of African–Americans voting strength by keeping African–American voters submerged in heavily populated white districts. *DeGrandy*, 794 F.Supp. 1076, 1086–88.

**3.** The majority states that the configuration of District 3 denies white voters equal access to the political process because they were placed within "widely separated group[s] of African–American voters." Not only is this finding unsubstantiated and unsound, it reeks of hypocrisy. First, the plaintiffs in this case did not offer any evidence of being denied equal access to the political process in District 3. Second, under the majority's reasoning, all African–Americans who reside in irregularly shaped majority white districts are

During the trial, the defendants presented evidence demonstrating the benefits that all constituents within District 3 have derived from the district's current configuration. Congresswoman Corrine Brown currently represents District 3, and, as the candidate of choice, she has served all of her constituents. This court received exhibits, testimony, and affidavits attesting to the tremendous and effective representation District 3 has received from Congresswoman Brown. For example, this court heard testimony from Thomas Gerald Witt, an 85–year–old white republican who has been the mayor of Lake City for approximately eighteen years. His testimony strongly suggests that all constituents within District 3 are currently receiving effective representation. The following exchange occurred at trial:

Q: You have been mayor for, you said, approximately eighteen years. Could you give me an assessment, based on your position as the chief executive officer of the Lake City municipality, what your assessment is of the type of representation that Lake City has received as a result of the configuration and shape of the congressional district known as District Number 3?

A: Well, I tell you it's almost unbelievable.

Q: What do you mean by that, sir?

A: I've had several constituents tell me, it looks like Corrine would save a lot of gas money if she'd move to Lake City. She was in Lake City whenever we needed her, and she was quite dedicated to be the kind of representative that any community would like to have.

Q: Have you seen any racial dimension to her representation?

A: None at all.

Q: Based on your knowledge of your city and the representation that you've testified today about, with regard to the third congressional district, what effect would it have on Lake City if the current third congressional district were dismantled?

A: Well, if it would mean losing Miss Brown, why, it would be sort of like a tragedy. We feel like we have something that we've never had before, and we sure don't want to lose it.

Q: How would you contrast the representation that's being received right now by Lake City in comparison to prior years?

A: Well, like I said, we just sort of read in the paper who was representing us and seldom saw anyone.

The court also heard testimony from Glynell Pressley, a lifelong resident of Lake City and chairman of a political organization known as the Community Fair Action Committee (CFAC), who testified, in part, as follows:

Q: Mr. Pressley, has the creation of the third congressional district had any impact in your community?

A: It definitely has. It has heightened the political awareness of African–Americans in the community. It has—we've been privileged to have Representative Corrine Brown in our community not only in our community of Lake City but in the small communities which is predominantly white or for white. [sic] First time in history of Columbia County that we've had a congress person visit in a town meeting. The populace for white in Columbia County. [sic] Not only did that happen but she's been visible in town meetings in Lake City. She's been to shelters for old persons. She's just been a visible person in the community. She's brought in dollars for the community. Prior congress persons we didn't see other than on the paper and in the news media.

The court also heard testimony from Waylon Clifton, the Chief of Police of Gainesville, Florida. Chief Clifton's testimony also rebutted the plaintiffs' suggestion that District 3 was not narrowly tailored because it fostered an afro-centric perspective in Congress. The Police Chief testified as follows:

---

also being denied equal access to the political process. Obviously then, the majority's reasoning will spark much litigation, unless the majority is willing to assume that only white voters, who are in the minority can be denied, equal access to the political process.

Q: Have you perceived, as Chief of Police, in all of your dealings with Congresswoman Brown, have you perceived any kind of racial dimension or racial aspect to the representation that she attempts to give?

A: Absolutely not.

Q: How would you describe the representation you presently have—I think you said you were chief for eleven years. How would you compare the representation you've received under the current configuration with representations the city has received with regard to law enforcement in the past?

A: In the past obviously for a number of years law enforcement really had no bills, no provisions provided within the federal government for law enforcement.

Q: How would you characterize the representation now that is being afforded to law enforcement community in Gainesville?

A: Well, specifically in regard to Congresswoman Brown, she has more or less led the charge there for us as far as law enforcement goes. She has facilitated as I said our grant applications. We have received substantial amounts of money. But not only that, she seems to take a particular interest in law enforcement. I'm never in Gainesville and she's in Gainesville that she doesn't seek me out, not only for recognition but to discuss the different kind of crime problems we've got and how we both can work on them.

Q: Have you had any opportunities, since 1992, to meet with Congresswoman Brown or members of her staff?

A: On many occasions.

Q: Would you describe some of those to the court, please?

A: Congresswoman Brown was very instrumental in helping us at the police department and the police chiefs in the state of Florida to get the crime bill passed Congress. She facilitated a number of meetings with members of the House of Representatives in Washington. She and Representative Thurmond actually got me on in a briefing with the President of the United States, with his cabinet, when he submitted the bill to the senate; and I was on the sideline of the signing of the crime bill.

Additionally, she has helped—she has facilitated federal grants based on the provisions of that bill for the Gainesville Police Department.

Q: What have some of those grants been used for?

A: All of the grants have been used for community policing. We have received, I think a $450,000 federal grant, matched by our local of $150,000, so $600,000. And we are one of the few, I think thirteen, cities in the state designated as a federal weed and seed site with a $2.1 million grant, hopefully in our future.

From the evidence presented at trial, all constituents in District 3 have been well served under its current configuration. Moreover, the evidence presented at trial suggests that District 3 as drawn induces its representative to reach out to all constituents within the district. District 3 is diverse and contains only a bare majority of 50.6 percent of African–American voters.[4] Without resorting to law, anyone employing common sense would conclude that a 50–50 split could hardly result in vote dilution.

Under its current configuration, cities, local governments, and residents within District 3 have received many other benefits. For example, the Mayor of Jacksonville, Florida, wrote Congresswoman Brown thanking her for her diligent efforts with the "Jacksonville projects" which resulted in the construction of a new downtown courthouse. A United States Senator from Florida also recognized Congresswoman Brown's exceptional efforts in helping the state of Florida retain $97.5 million of federal transportation

---

4. In one breath the majority finds that a bare majority of 50.6 percent African–American voters denies equal access to white voters; yet, in the next breath the majority finds that African–American voters will not be denied equal access even if their voting age population is only 25.0 percent. This is another example of the majority's internally inconsistent positions.

funds that will help with the construction of the I–4 interchange in Orlando, among other projects. These are just a couple of examples of the numerous letters of gratitude Congresswoman Brown has received for the excellent representation she has provided to District 3.[5]

In order to demonstrate how the configuration of District 3 actually fosters biracial coalitions to achieve effective representation, the defendants presented testimony from Congresswoman Brown. Congresswoman Brown testified that because of her district's configuration she conducts town meetings throughout the district to meet with all citizens within District 3 to discuss issues. For example, she stated that in August 1995 she conducted 25 town meetings and personally met with 5,000 of her constituents throughout District 3. She also testified that through her offices she conducts workshops and seminars on how small cities may utilize the departments and agencies of the federal government, and oftentimes, these workshops are in areas that are predominantly white or have white city managers and city officials. Congresswoman Brown also testified that she chose her committee assignments based upon the needs of the constituents in District 3 and not based on her personal preferences. She testified that her preferences would have been to serve on education and labor committees because her background is in those areas; however, she decided to seek positions on the Transportation Committee and the Veterans Affairs Committee because of the large number of veterans in District 3 and the substantial infrastructure improvements needed in her district. Congresswoman Brown also identified three other major concerns in District 3 that transcend racial lines: housing, economic development, and crime prevention.

Recognizing these needs, Congresswoman Brown pursued courses of action to serve her constituents; for example, Congresswoman Brown secured $18 million in housing grants for the city of Gainesville, particularly the east side of Gainesville that had not benefited from development in the past eighteen years. Moreover, Congresswoman Brown testified that she provided over $11 million in federal dollars for the COPS program for crime prevention. The defendants' counsel pressed Congresswoman Brown on the issue of representation:

Q: Do you represent people of just one race?

A: I represent all of the people in my district. My philosophy has always been that, when the community has a cold, the African–American community has pneumonia. So, you've got to work to treat the symptoms and the problems in the communities and I've done that.

Q: Congresswoman Brown, if I ask you to describe to the court why this district, the Third Congressional District of Florida, makes sense to the people who live within it and your representation of those people, what would you say?

A: Well, the first thing I'd say that the court in its wisdom drew the district but it drew the entire map. And if you look at the results, for the first time in the history of the state, the congressional delegation is reflective of the people that live there. We have two Hispanics, three African–Americans, five women, fifteen republicans, and eight democrats. So, the map reflects the people, and it reflects the diversity in the state.

Q: And what about the voices or the voters within the Third Congressional Dis-

---

5. The current configuration of District 3 lends itself to effective representation as evidenced in the praise Congresswoman Brown has received from the following: Glenda Hood, the mayor of the city of Orlando; F. Lee Tillotson, executive director of the Greater Orlando Aviation Authority; Leroy D. Jones, vice president of the Brotherhood of Locomotive Engineers; Daniel Holsenbeck, vice president of the University of Central Florida; Miles Francis, executive director of the Jacksonville Transportation Authority; Walter Lee, president of the Jacksonville Chamber of Commerce; Charles Spence, president of Florida Community College at Jacksonville; Carla Marlier of WJCT Television Station; Eddie Talley, president of Transport Workers Union Local 291, AFL–CIO; Jim LaSala, international president of the Amalgamated Transit Union; James Brazee, president of the Vietnam Veterans of America, Inc.; James Magill, director of Veterans of Foreign Wars of the United States; and Carl Tankersley, administrative supervisor, city of Crescent City, Florida.

trict, how are their needs being met by the Third Congressional District?

A: Well, my opinion is that, before the Third Congressional District was drawn, the voters in this area was disenfranchised. The participation was low. In one particular area, they didn't go to town meetings, they didn't go to the offices of the congressional people for constituent services. It is different now. If I call a meeting, a town meeting in Ocala at 12 o'clock on Saturday I'm going to have a hundred people there. People want representation, but they want to feel that their representative represents them.

The evidence in this case shows that District 3 works, and it works for everyone.[6]

## III. Erroneous Finding of Racial Gerrymander

In January 1994, plaintiffs filed this lawsuit pursuant to 28 U.S.C. § 1343, claiming that District 3, which the *DeGrandy* court created, violated their rights under the Equal Protection Clause of the Fourteenth Amendment. *Johnson v. Mortham*, 915 F.Supp. 1529, 1534 (N.D.Fla.1995). *The plaintiffs in this case did not allege that District 3 violated the Voting Rights Act nor did they claim that the district represented an unconstitutional dilution of white voting strength.*[7] *Mortham*, 915 F.Supp. at 1534. The plaintiffs in *Mortham* moved for summary judgment, and the majority granted them partial summary judgment on the claim that District

3 amounted to a racial gerrymander. *Mortham*, 915 F.Supp. at 1551.

In finding that District 3 amounted to a racial gerrymander, the majority stated that "one does not need to look any further than a map of the third district to reach the conclusion that race was in fact the predominate motivating factor of the *DeGrandy* court." *Mortham*, 915 F.Supp. at 1550.[8] In arriving at its decision to grant partial summary judgment in favor of the plaintiffs, the majority placed far too much emphasis on the shape of District 3. The majority's error, in relying primarily on shape, becomes apparent in light of the Supreme Court's statement in *Miller* that:

> Our observation in *Shaw* of the consequences of racial stereotyping was not meant to suggest that a district must be bizarre on its face before there is a constitutional violation. Nor was our conclusion in *Shaw* that in certain circumstances a district's appearance (or, to be more precise, its appearance in combination with certain demographic evidence) can give rise to an equal protection claim, 509 U.S. at 649, 113 S.Ct. at 2828, a holding that bizarreness was a threshold showing, as appellants believe it to be. Our circumspect approach and narrow holding in *Shaw* did not erect an artificial rule barring accepted equal protection analysis in other redistricting cases. Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial

---

**6.** This evidence also demonstrates that the functional concerns Judge Vinson expressed in his concurrence in *DeGrandy* about District 3's inability to operate effectively never materialized. *DeGrandy*, 794 F.Supp. at 1092 (Vinson, J., specially concurring).

**7.** Even though the plaintiffs did not allege that white voters suffered vote dilution, the majority suggests that white voters suffered vote dilution. The majority found that white voters in District 3 were denied equal access to the political process.

Not a single white voter from District 3 testified in this case about being denied equal access to the political process in District 3. In fact, the plaintiffs did not present a single "fact witness" and relied on the testimony of two experts. The majority even discounts the testimony of one of these two expert witnesses. On more than one

occasion, the majority has directed the litigation of this case from the bench. The finding of white voters being denied equal access to the political process in District 3 is another example of the majority's infusion of issues into the case that none of the parties raised.

**8.** I reiterate my earlier position that the majority erred in granting partial summary judgment to the plaintiffs on the claim that District 3 amounted to an unconstitutional racial gerrymander. *See Johnson v. Mortham*, 915 F.Supp. 1529, 1563–66 (N.D.Fla.1995) (Hatchett, J., dissenting). One only has to review the *DeGrandy* opinion to realize that the three-judge court considered traditional redistricting principles along with race, but certainly did not allow racial considerations to predominate in formulating the congressional districts.

evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.

*Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2486, 132 L.Ed.2d 762 (1995).

A review of the *DeGrandy* opinion, the Special Master's report, and the Independent Expert's report demonstrates that the *DeGrandy* court considered several variables other than race in formulating District 3.[9] For example, the *DeGrandy* court acknowledged that it had a constitutional obligation to achieve population equality among districts. *DeGrandy,* 794 F.Supp. at 1084. The *DeGrandy* court also took into consideration the principles from Section 2 and Section 5 of the Voting Rights Act. *DeGrandy,* 794 F.Supp. at 1083 ("This court must consider in crafting the redistricting plan the Section 2 requirement of ensuring that the plan does not dilute the votes of racial or language minorities."). Furthermore, the *DeGrandy* court considered compactness recognizing that generating compact districts was "desirable." *DeGrandy,* 794 F.Supp. at 1084.

In configuring the congressional districts to comply with constitutional prescriptions and the Voting Rights Act, the *DeGrandy* court also adhered to the principles set forth in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *DeGrandy,* 794 F.Supp. at 1083. For example, the *DeGrandy* court rejected proposed plans that contained African–American populations that did not comprise communities of interest such as the Ireland plan. In rejecting the Ireland plan, the *DeGrandy* court stated:

> The ... plan's African–American majority district in central Florida is extremely long, irregularly shaped, and extends from Palm Beach County in south Florida to Volusia County in central Florida and from St. Lucie County on the Atlantic coast to Pinellas County on the Gulf coast. This long, irregularly shaped district traverses parts of seventeen counties and involves three major media markets. The communities linked in this sprawling district are

likely to have competing interests and do not constitute communities of interest.

*DeGrandy,* 794 F.Supp. at 1086. The *DeGrandy* court also rejected other proposed plans that attempted to link African–American populations together that could not reasonably constitute communities of interest. *DeGrandy,* 794 F.Supp. at 1086 (rejecting a plan because it contained African–American populations in Tampa and Orlando that were likely to have competing interests). In view of the many variables that were factored into the *DeGrandy* court's decision in redistricting and in view of the careful consideration given traditional districting criteria, the majority has erred · in ruling that District 3 constituted a racial gerrymander.

**IV. Applicability of *Shaw* and *Miller***

I also disagree with the majority's application of strict scrutiny in assessing the constitutionality of District 3. *See Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2482, 132 L.Ed.2d 762 (1995) (recognizing that when race is the predominant factor in districting, then strict scrutiny applies). Assuming, however, that District 3 is a racial gerrymander, I have maintained throughout these proceedings and hold to the position that the Supreme Court's decisions in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) and *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) do not control this case.

I continue to believe that the principles emanating from both *Shaw* and *Miller* only apply to a state legislature's redistricting scheme, and not a federal court plan drawn to remedy a constitutional violation or a Voting Rights Act violation. In *Shaw v. Reno,* Justice O'Connor's opinion stated at the outset that "[t]his case involves two of the most complex and sensitive issues this court has faced in recent years: the meaning of the constitutional right to vote and the propriety of race based *state legislation* designed to benefit members of historically disadvantaged racial minority groups." *Shaw,* 509 U.S. at 633, 113 S.Ct. at 2819 (emphasis

---

9. Of course, racial and ethnic considerations are appropriate in drawing districts to further the objectives of the Voting Rights Act. *United Jew-* *ish Org. of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977).

added). More importantly, Justice O'Connor's opinion also stated, "[t]oday, we hold only that appellants have stated a claim under the Equal Protection Clause by alleging that the North Carolina General Assembly adopted a reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race and that the separation lacks sufficient justification." *Shaw*, 509 U.S. at 658, 113 S.Ct. at 2832.

Likewise, a review of *Miller v. Johnson* indicates that its mandate is confined to resolving challenges to a state legislature's redistricting plan and not a federal court drawn remedial plan. Consider, for example, the following passage from *Miller*:

The courts in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislatures will, for example, almost always be aware of judicial demographics; but it does not follow that race predominates in the redistricting process. The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race. The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or direct evidence going to the legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interest to racial considerations. Where these or other race neutral considerations are the basis for redistricting legislation and are not subordinated to race a state can "defeat a claim that a district has been gerrymandered on racial lines."

*Miller*, —— U.S. at ——, 115 S.Ct. at 2488 (quoting *Shaw*, 509 U.S. at 647, 113 S.Ct. at 2827). While I do not suggest that federal courts may disregard the Constitution in crafting remedies for Voting Rights Act and constitutional violations, I do not believe that the same rigorous standards applied to legislative bodies in enacting redistricting plans apply equally to federal courts enacting remedial redistricting plans. For example, in *United States v. Paradise*, the Supreme Court suggested that more deference should be accorded to district court remedies, even in the context of assessing a narrowly tailored remedy, when it explained:

In determining whether this order was "narrowly tailored" we must acknowledge the respect owed a district judge's judgment that a specified relief is essential to cure a violation of the Fourteenth Amendment. A district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discrimination effects of past as well as bar like discrimination in the future.

*United States v. Paradise*, 480 U.S. 149, 183, 107 S.Ct. 1053, 1072–73, 94 L.Ed.2d 203 (1987) (citation omitted). In addition, the Supreme Court suggested that remedial plans need not always be limited to the least restrictive means of implementation recognizing "that the choice of remedies to redress racial discrimination is a 'balancing process left within appropriate constitutional or statutory limits to the sound discretion of the trial court.'" *Paradise*, 480 U.S. at 183, 107 S.Ct. at 1073 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 508, 100 S.Ct. 2758, 2790, 65 L.Ed.2d 902 (1980) (Powell, J., concurring)).[10]

---

10. The majority contends that a long line of Supreme Court decisions have made it clear that federal courts' remedial plans are subject to stricter review than plans drawn by legislatures. In *Connor v. Finch*, the Supreme Court stated that federal court drawn plans are generally held to stricter standards while engaging in redistricting. *Connor v. Finch*, 431 U.S. 407, 414, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977). Although the Court ostensibly established a *per se*

I continue to believe that *DeWitt v. Wilson* provides a more appropriate framework for reviewing a court drawn plan. *DeWitt v. Wilson*, 856 F.Supp. 1409 (E.D.Cal.1994), *aff'd in part and appeal dismissed in part*, —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995). In *DeWitt*, a three-judge federal court found that a 1992 redistricting plan that the California Supreme Court developed was constitutional notwithstanding the court's consideration of race in drawing the lines. *DeWitt*, 856 F.Supp. at 1413. In reaching that result, the court stated that "[w]e conclude that in the context of redistricting, where race is considered only in applying traditional redistricting principles along with the requirements of the Voting Rights Act, that strict scrutiny is not required." *DeWitt v. Wilson*, 856 F.Supp. 1409, 1415 (E.D.Cal.1994), *aff'd in part and appeal dismissed in part*, —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995). The Supreme Court summarily affirmed *DeWitt* the same day it issued its opinion in *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). *DeWitt v. Wilson*, —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995). The majority has misapplied *Shaw* and *Miller*.

## V. Satisfying Strict Scrutiny

Recognizing that federal courts must comply with constitutional limits in implementing redistricting plans, I am convinced that District 3 should survive strict scrutiny even under the rigors of *Shaw* and *Miller*. As the majority points out, in order to satisfy strict scrutiny the congressional district has to be narrowly tailored to further a compelling governmental interest. *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); *see also Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Admittedly, satisfying strict scrutiny is not easy. In this case, however, the majority has not heeded the Supreme Court's attempt "to dispel the notion that strict scrutiny is strict in theory but fatal in fact." *Adarand Constructors, Inc. v. Pena*, —— U.S. ——, ——, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995). This is evident from the majority's holding that no compelling interest existed to warrant the *DeGrandy* court's creation of District 3.

### A. Compelling State Interest

In this case, the defendants put on overwhelming evidence demonstrating that the *DeGrandy* court had a compelling state interest in adopting the congressional redistricting plan that encompassed District 3.[11] Again, one only has to look at the factual findings made in the *DeGrandy* case to appreciate the magnitude of the compelling state interest that the majority simply disregards as an insufficient basis in evidence.

First, I believe that under the reasoning of the Supreme Court in the voting rights context a compelling governmental interest may exist in complying with the Voting Rights Act when creating congressional districts. *Miller v. Johnson*, —— U.S. ——, ———— ——, 115 S.Ct. 2475, 2490–91, 132 L.Ed.2d 762 (1995); *Shaw v. Reno*, 509 U.S. 630, 652–53, 113 S.Ct. 2816, 2830, 125 L.Ed.2d 511 (1993). In *Shaw*, the Supreme Court stated

rule of stricter standards applying to federal court drawn plans in one breath, in the next breath the Court stepped back from that position when it acknowledged that stricter standards will apply to federal court drawn plans "unless there are persuasive justifications" for allowing a federal court to deviate from those standards. *Connor*, 431 U.S. at 414, 97 S.Ct. at 1833–34. Next, the majority contends that because a federal court engaged in redistricting is acting in a pseudo-legislative capacity, it must be subject to the same standards of review as a legislature engaging in redistricting. The federal court's role is quite distinct in this context, however, because it is providing a remedy to state legislative action that caused a constitutional or statutory violation.

11. Indeed, one of the more troubling aspects of the majority's conclusion is the meager amount of evidence the plaintiffs put on in this case. This court placed the burden of persuasion on the plaintiffs to prove the absence of a narrowly tailored plan to further a compelling interest. The plaintiffs only presented two expert witnesses. The majority concedes, as it must, that one of the expert's—Dr. Maggiotto—testimony was unreliable because his methodologies were unsound. Likewise, the plaintiffs' other expert testimony from Dr. Weber was unreliable because he actually testified, during the *DeGrandy* proceedings, in favor of the plan that formed the basis for District 3. The plaintiffs' failed to meet their burden of persuasion.

that "[s]tates certainly have a very strong interest in complying with federal antidiscrimination laws that are constitutionally valid as interpreted and as applied." *Shaw*, 509 U.S. at 654, 113 S.Ct. at 2830. Although the Supreme Court did not use the term "compelling interest," I believe its use of "very strong interest" suggests that the Voting Rights Act may constitute a compelling state interest under certain circumstances. *See Quilter v. Voinovich*, 912 F.Supp. 1006, 1019 (N.D.Ohio), *appeal dismissed*, ——— U.S. ———, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995). The Supreme Court has recognized that compliance with federal laws, particularly remedial laws, justifies the use of racial classifications to assure compliance when sufficient evidence exists to justify the conclusion that there has been prior discrimination. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 292–93, 106 S.Ct. 1842, 1848–49, 1856–57, 90 L.Ed.2d 260 (1986); *see also Croson*, 488 U.S. at 500, 109 S.Ct. at 725.

Second, a compelling interest exists in remedying the effects of past discrimination. Both *Shaw* and *Miller* indicate that a congressional district that relies heavily on race can be justified in light of a "significant state interest in eradicating the effects of past discrimination." *Miller*, ——— U.S. at ———, 115 S.Ct. at 2490 (citing *Shaw*, 509 U.S. at ———, 113 S.Ct. at 2831); *see also Adarand Constructors, Inc. v. Pena*, ——— U.S. ———, ———, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995); *City of Richmond v. J.A. Croson*, 488 U.S. 469, 494, 509–11, 109 S.Ct. 706, 722, 730–31, 102 L.Ed.2d 854 (1989); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). Before I proceed with my analysis relating to finding a compelling interest, it is necessary to address two preliminary arguments the majority proffers to reject a finding of a compelling state interest in this case.

**1. Majority's Erroneous Findings**

At the outset, the majority's analysis reveals a degree of confusion that—standing alone—precludes me from joining the majority opinion. First, the majority begins its analysis of compliance with the Voting Rights Act as compelling interests by pointing out that the *DeGrandy* court "was operating under the mistaken assumption that section 2 of the Voting Rights Act required the adoption of a congressional redistricting plan with as many majority-minority districts as could reasonably be accomplished." This finding simply avoids the underlying issue. Whether a court or state legislature correctly "complies" with the Voting Right Act does not inform the court one way or the other as to whether "compliance" constitutes a compelling interest.

Not only do I believe that the majority's initial finding relating to compliance as a compelling interest is unhelpful, it is apparent from the *DeGrandy* opinion that the majority misconstrues or mischaracterizes what the *DeGrandy* court attempted to accomplish in drafting a redistricting plan. It is clear that the *DeGrandy* court did not attempt to create as many majority-minority districts as reasonably "possible"; rather, the court created as many majority-minority districts as reasonably "necessary" to ensure "that the plan does not dilute the votes of racial or language minorities." *DeGrandy*, 794 F.Supp. at 1083. The *DeGrandy* court did not operate under the premise that it had to maximize the number of majority-minority districts in order to prevent a Section 2 violation. In his specially concurring opinion, Judge Vinson stated: "*It is not our goal, therefore, under Section 2 to draw as many minority districts as 'possible.'* But we should draw as many as can reasonably be done." *DeGrandy*, 794 F.Supp. at 1091 (emphasis added). More importantly, Judge Vinson also stated that: "I believe the plan we adopt *is fair and accomplishes what we are striving to do....*" *DeGrandy*, 794 F.Supp. at 1092 (emphasis added). It is clear from both the *DeGrandy* opinion and Judge Vinson's concurring opinion that the *DeGrandy* court was "striving" to prevent further dilution of minority votes and remedy statutory and constitutional violations the court found. *DeGrandy*, 794 F.Supp. at 1084–91. The *DeGrandy* court was motivated to create majority-minority districts, but only to the extent "necessary" to ensure that minorities did not continue to endure violations of their constitutional and statutory rights. *DeGrandy*, 794 F.Supp. at 1090–91. Amazingly, the majority now mischaracter-

izes the *DeGrandy* court's efforts as an attempt to maximize majority-minority districts.[12]

Second, the majority finds that the *DeGrandy* plaintiffs' Section 2 claim is moot in light of the *DeGrandy* court's granting summary judgment on the plaintiffs' claim of an unconstitutional malapportionment in Florida's districting scheme. As a preliminary matter, I note that neither the defendants in *DeGrandy* nor the plaintiffs in this case raised the issue of mootness. The majority has again—mistakenly—infused another issue into the trial that none of the parties raised.

The majority relies on *Growe v. Emison*, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) for support. *Growe* is inapposite to this case. In *Growe*, a group of plaintiffs filed a malapportionment claim against Minnesota's state congressional and legislative districts in state court. A separate group of plaintiffs filed suit in federal court based on malapportionment and Section 2 of the Voting Rights Act. The state and federal proceedings were pending simultaneously.

The state court rendered a decision finding that the state of Minnesota's state congressional and legislative districts were unconstitutionally malapportioned and the court adopted a remedy. *Emison v. Growe*, 782 F.Supp. 427, 433 (D.Minn.1992). When the state court entered its final order on January 30, 1992, the federal proceedings were still pending. The federal court issued a ruling after the state court's ruling and found that the state court's legislative plan violated the Voting Rights Act because it did not contain a majority-minority district. *Emison v. Growe*, 782 F.Supp. 427, 439–40 (D.Minn. 1992).

The Supreme Court reversed ruling that the plaintiffs' Section 2 claim in the federal court proceedings was moot. *Growe*, 507

U.S. at 39, 113 S.Ct. at 1083–84. The Supreme Court found that the state court had issued a final order invalidating the state's legislative districting plan and had enacted a new plan; therefore, the federal litigation on the Section 2 claim was moot. *Growe*, 507 U.S. at 39, 113 S.Ct. at 1083–84. The majority's attempt to extend the reasoning of *Growe* here is flawed because in *Growe* the state court also analyzed and issued a ruling on the issue of whether the state's plan violated Section 2 of the Voting Rights Act even though the state court plaintiffs did not raise the issue. *See Cotlow v. Growe*, No. C8–91– 985 (Minn. Special Redistricting Panel Nov. 21, 1991) (Findings of Fact, Conclusions of Law, and Preliminary Order for Judgment on Legislative Redistricting). In *DeGrandy*, the plaintiffs' Section 2 claim was not moot because when the court issued its summary judgment motion on the malapportionment claim no ruling on the Section 2 claim had occurred. An issue becomes moot once a controversy is resolved. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395– 96, 100 S.Ct. 1202, 1208–09, 63 L.Ed.2d 479 (1980). The *DeGrandy* plaintiffs, unlike the *Growe* plaintiffs, did not have their Section 2 controversy resolved. Moreover, the Section 2 issue could only become moot if the *DeGrandy* defendants could fulfill their heavy burden of proving that the alleged statutory violation was not likely to recur and the events that are alleged to have made the action moot have "completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).[13]

In this case, the *DeGrandy* plaintiffs were entitled to have their Section 2 controversy resolved. Of more significance, the *DeGrandy* court did not find that the Section 2 claim was moot because it went on to rule on the Voting Rights Act violation. *DeGrandy*, 794

---

**12.** Indeed, the majority concedes that the *De-Grandy* court did not employ a "strict maximization policy." Nonetheless, the majority attempts to characterize the *DeGrandy* court's attempt to create majority-minority districts that could "reasonably be done" to prevent further statutory violations as an incorrect application of Section 2.

**13.** It is also important to note that the *DeGrandy* court considered the Section 2 analysis against the proposed plans to ensure that the plans did not dilute the votes of language or racial minorities. *DeGrandy*, 794 F.Supp. at 1083. Therefore, the majority's mootness finding is clearly erroneous.

F.Supp. at 1090 (finding that Florida's current congressional districts violate the Equal Protection Clause of the Constitution, the one-person-one-vote principle and the Voting Rights Act of 1965, as amended 42 U.S.C. § 1973). Therefore, the majority's conclusion that the *DeGrandy* plaintiffs' Section 2 claim was moot is simply wrong.

## 2. Compliance with the Voting Rights Act

The majority has also erred in finding that the *DeGrandy* court lacked a compelling interest in complying with the Voting Rights Act. The Voting Rights Act was adopted to "banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). Court ordered plans, like legislatively enacted plans, must comply with the mandates of Section 2 and Section 5 of the Voting Rights Act, 42 U.S.C. § 1973 and § 1973 c. *SRAC v. Theodore*, 508 U.S. 968, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993), *vacating and remanding Burton v. Sheheen*, 793 F.Supp. 1329 (D.S.C.1992) (vacating for consideration in light of Solicitor General's position that argued that the district court had erred in failing to fully consider whether remedial plan complied with antidilution principles of Section 2); *McDaniel v. Sanchez*, 452 U.S. 130, 148–49, 101 S.Ct. 2224, 2235–36, 68 L.Ed.2d 724 (1981). Also, court ordered redistricting plans must meet "special standards of population equality and racial fairness," *Upham v. Seamon*, 456 U.S. 37, 39, 102 S.Ct. 1518, 1520, 71 L.Ed.2d 725 (1982), and be " 'free from any taint of arbitrariness or discrimination,' " *Connor v. Finch*, 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977) (quoting *Roman v. Sincock*, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)).

The Supreme Court has found that a compelling state interest includes avoiding federal statutory violations and remedying past or present violations of federal statutes aimed at removing discrimination from society. *Croson*, 488 U.S. at 491–93, 500, 109 S.Ct. at 720–22, 725; *Wygant*, 476 U.S. at 289, 106 S.Ct. at 1854–55 (O'Connor, J., concurring).

Similarly, the Supreme Court has made it clear that states have a compelling interest in implementing race-based remedies when necessary to eradicate the effects of past racial discrimination. *Croson*, 488 U.S. at 491–93, 109 S.Ct. at 720–22; *Wygant*, 476 U.S. at 280–82, 106 S.Ct. at 1850–51. I believe that the decision in *Shaw v. Hunt* correctly recognized the corollary to the foregoing principles in the voting rights context when it stated:

> Under these principles, we think it clear that a state has a "compelling" interest in engaging in race-based redistricting to give effect to minority voting strength whenever it has a "strong basis in evidence" for concluding that such action is "necessary" to prevent its electoral districting scheme from violating the Voting Rights Act.

*Shaw v. Hunt*, 861 F.Supp. 408, 437 (E.D.N.C.1994), *probable jurisd. noted*, — U.S. —, 115 S.Ct. 2639, 132 L.Ed.2d 878 (1995). Several other courts have also recognized that complying with the Voting Rights Act may constitute a compelling interest. *See Johnson v. Miller*, 864 F.Supp. 1354, 1381–82 (S.D.Ga.1994), *aff'd*, *Miller v. Johnson*, — U.S. —, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *White v. Alabama*, 867 F.Supp. 1519, 1548 (M.D.Ala.1994), *vacated*, 74 F.3d 1058 (11th Cir.1996); *accord King v. State Bd. of Elections*, 1996 WL 130439, *27 (N.D.Ill. Mar. 7, 1996) (recognizing the compliance with the Voting Rights Act as a compelling state interest); *Quilter v. Voinovich*, 912 F.Supp. 1006, 1019 (N.D.Ohio 1995) (recognizing that compliance with Voting Rights Act may serve as a compelling state interest under certain circumstances). The *DeGrandy* court properly relied on compliance with the Voting Rights Act as a compelling interest that justified the creation of District 3.

In *DeGrandy*, the unenviable task of drawing congressional districts fell upon the court, and the *DeGrandy* court designed congressional districts to ensure that they did not perpetuate constitutional and Voting Rights Act violations it found minorities suffered under Florida's existing congressional districts. To ensure that whatever plan it adopted complied with the requirements of Section 2 of the Voting Rights Act, the *De-*

*Grandy* court relied on the Supreme Court's teachings in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) for guidance in crafting a plan that would not violate the Voting Rights Act. Under *Gingles*, a multi-member districting scheme may violate the Voting Rights Act when: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district"; (2) the minority group is "politically cohesive"; and (3) the white majority "votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766–67. Accordingly, I believe that

> when a state has reliable information that indicates the relevant minority group could establish a prima facie challenge under section 2 of the Voting Rights Act to the existing districting plan, then it has a "strong basis in evidence" for concluding that it must engage in race-based redistricting to comply with section 2 of the Voting Rights Act and it has established a "compelling interest" for remedial measures.

*Quilter v. Voinovich*, 912 F.Supp. at 1020 (citing *Shaw v. Hunt*, 861 F.Supp. 408, 440 (E.D.N.C.1994)). In order to reach its conclusion, the majority has totally disregarded binding precedent and rewritten the requirements for finding a violation of Section 2 of the Voting Rights Act.

**a. Political Cohesion and Racial Bloc Voting: The Second and Third *Gingles* Factors**

In proving the second and third *Gingles* factors in this case, the defendants presented more than sufficient evidence to establish the existence of a "politically cohesive" minority group and to show that "racially polarized" voting in the northeastern area of Florida usually led to the defeat of minorities' candidate of choice.[14] In addition to the substantial evidence the defendants offered at trial, the *DeGrandy* court also found that racially polarized voting occurred in Florida. *De-Grandy*, 794 F.Supp. at 1079. During the trial in this case, the court heard testimony from an expert witness, Professor Alan Lichtman. Dr. Lichtman testified that based upon his statistical analysis of county-wide legislative, congressional, and presidential election returns voting in the seventeen county area he examined revealed evidence of consistent racially polarized voting. Dr. Lichtman employed a technique known as "ecological regression" which is a technique that has been consistently employed in voting rights cases.[15] Dr. Lichtman testified that his analysis of Florida elections revealed that African–American voters are generally cohesive and white voters vote sufficiently as a bloc to defeat African–American voters' candidate of choice in majority white jurisdictions. Lichtman Report at 10–17, tables 1–4. In fact, in four recent biracial congressional elections in the area, on average ninety-four percent of African–American voters supported an African–American candidate while an average of only twenty-three percent of non-African–American voters supported the African–American candidate.[16] Lichtman Report at 11–12.

In an effort to reach its conclusion in this case, the majority rejects Dr. Lichtman's

---

**14.** The majority states that African–Americans in northeast Florida "consistently elected" their candidate of choice under the 1982 redistricting plan. I disagree. Nothing in the testimony the majority cites demonstrates that the African–American community consistently elected its candidate of choice. Nothing in the record supports the majority's assertion that African–Americans in northeast Florida have "consistently" elected a candidate of their choice.

**15.** Ecological regression or ecological inference was employed in *Thornburg v. Gingles* and by the Eleventh Circuit in *Nipper v. Smith*, 39 F.3d 1494 (11th Cir.1994) (*en banc*), *cert. denied*, —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).

**16.** The majority finds that the success of some African–American candidates in District 3 demonstrates that minorities are capable of electing their candidates of choice. Clearly, that contention is erroneous in light of the Supreme Court's finding that "the election of a few minority candidates" is not indicative of the absence of minority vote dilution. *Thornburg v. Gingles*, 478 U.S. 30, 75, 106 S.Ct. 2752, 2779, 92 L.Ed.2d 25 (1986). Moreover, the Supreme Court went on to state that "the language of Section 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a Section 2 claim." *Gingles*, 478 U.S. at 75, 106 S.Ct. at 2779.

analysis and totally disregards precedent in revamping the test for ascertaining racially polarized voting. First, the majority rejects Dr. Lichtman's testimony because of "critical methodological errors"; namely, he only evaluated election contests involving an African–American and white candidates. This finding is baseless and contradicts precedent in this circuit. It is well established in the Eleventh Circuit that in determining the existence and extent of racially polarized voting, black versus white elections are the most probative contests to assess and are entitled to more weight than other contests. *See, e.g., SCLC v. Sessions,* 56 F.3d 1281, 1293 (11th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996); *Nipper v. Smith,* 39 F.3d 1494, 1540 (11th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).

Without even engaging in superficial analysis, the majority also finds that in order to determine whether racially polarized voting occurred a court must examine whether racial bias motivated the voting community and must examine party affiliations. This is a blatant disregard of what Section 2 requires and defies binding precedent. The majority's suggestion that racial animus needs to be demonstrated in order to show racially polarized voting is unfounded and goes against Circuit and Supreme Court precedents.[17] In *Gingles,* the Supreme Court held that

> the legal concept of racially polarized voting, as it relates to claims of vote dilution, *refers only* to the existence of a correlation between the race of the voters and the selection of certain candidates. *Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting....*

*Gingles,* 478 U.S. at 74, 106 S.Ct. at 2778 (emphasis added). The majority's error becomes even more apparent in light of the plain terms of the statute that provides in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice or proce-

dure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes ... are not equally open to participation by members of [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered: provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their portion in the population.

42 U.S.C. § 1973. Nothing in this section suggests that plaintiffs must prove that racial animus is driving the majority electorate or require the plaintiffs to negate partisan politics. The correctness of my position is established in the legislative history of Section 2, in the following passage from a Senate Report:

> During the committee deliberations, opponents of the results test argued that the report bill is inconsistent with the results standard because Section 2, as amended, still contains the phrase "a denial or abridgement [of the right to vote] on account of race or color." The argument is that the words "on account of" themselves create a requirement of purposeful discrimination. This claim overlooks the present structure of the Voting Rights Act, which completely refutes it. Section 5 of the present Act requires the Attorney General or the district court to disapprove a proposed voting law change unless the submitting jurisdiction establishes that it "does not have the purpose and will not

---

**17.** Even under the majority's erroneous standard for assessing racially polarized voting, two judges employing the same standard actually found racially polarized voting existed in Duval County, one of the more heavily populated counties in District 3. *See Nipper v. Smith,* 39 F.3d 1494, 1537 (11th Cir.1994) (Tjoflat, C.J., joined by Anderson, J.).

have the effect of denying or abridging the right to vote on account of race or color...." ... Thus it is patently [clear] that Congress has used the words "on account of race or color" in the Act to mean "with respect to" race or color, and not to connote any required purpose of racial discrimination. Any other arguments based on similar parsing of isolated words in the bill, that there is some implied "purpose" component in Section 2, even when plaintiffs proceed under the results standard, are equally misplaced and incorrect.

S.Rep. No. 417 at 27–28 n. 109, *reprinted in* 1982 U.S.C.C.A.N. at 177, 205–06.

I must make an additional observation. As a practical matter, how does the majority propose that minority voters prove racial animus? Under the majority's unsound approach, minority voters would have to question voters about their motives for voting for particular candidates. First, it is unlikely that voters or political parties motivated through racial considerations will openly admit to being so motivated. Second, plaintiffs engaging in a searching inquiry regarding voters' motivation may be infringing on First Amendment rights. *Kirksey v. City of Jackson*, 663 F.2d 659, 662 (5th Cir. Unit A Dec. 1981) (holding that because of First Amendment concerns, voters' motivations are not subject to searching scrutiny in voting rights cases), *clarified*, 669 F.2d 316 (5th Cir.1982).

### b. First *Gingles* Factor

Since more than sufficient evidence was adduced at trial to demonstrate political cohesive minority voters and sufficient racial bloc voting to prevent minorities from electing their candidates of choice, I now consider the first *Gingles* factor—the size and geographical compactness of the minority group. The majority has erred in relating compactness to the shape of the district.[18] The first *Gingles* factor does not demand compactness in the shape of the district in any absolute sense. The majority's confusion and erroneous finding apparently stems from the failure to realize that the "compactness" inquiry in *Gingles* concerns whether the "minority population," and not the district drawn to encompass that population, is geographically compact and sufficiently numerous to constitute a majority single district. *King v. State Bd. of Elections*, 1996 WL 130439, at *25. Therefore, the majority's analysis of geographic compactness is flawed because it equates the *Gingles* threshold requirement of geographical compactness with the principles of compactness used to assess whether racial gerrymandering has occurred. *King*, 1996 WL 130439, at *25.

Moreover, assuming we follow the majority's course of analysis, according to *Gingles*, the compactness of a proposed majority-minority district must be examined in light of the state's traditional and customary redistricting practices. In light of those customary and traditional redistricting practices, a majority-minority congressional district may survive strict scrutiny. For example, the Supreme Court summarily affirmed the ruling in *Jeffers v. Clinton* which held that the proposed majority black legislative districts, although somewhat irregular in configuration, satisfied the *Gingles* threshold standard because they were "not materially stranger in shape" than other legislatively drawn districts. *Jeffers v. Clinton*, 730 F.Supp. 196, 207 (E.D.Ark.1989), *aff'd mem.*, 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *see also Houston v. Lafayette County*, 56 F.3d 606 (5th Cir.1995); *Clark v. Calhoun County*, 21 F.3d 92, 95–96 & n. 2 (5th Cir. 1994); *Cane v. Worcester County*, 35 F.3d 921, 926–27 n. 6 (4th Cir.1994) (proposed district acceptable under *Gingles* despite irregularities in shape because it is "similar in appearance to one of the former residency districts"). The majority in this case errs because its ruling establishes a higher stan-

---

**18.** Although the majority places great emphasis on the term "compactness," it is interesting to note that the term has no standard definition among political scientists according to expert testimony from Dr. Scher. *See also* Richard H. Pildes & Richard G. Niemi, Expressive Harms "Bizarre Districts" in Voting Rights: Evaluating Election District Appearances after Shaw v. Reno, 92 Mich.L.Rev. 483 (1993); Congressional Res.Serv., Congressional Districts: Objectively Evaluating Shapes, at 2–3 (1994).

dard for compactness for majority-minority districts than for any other districts.[19]

It is clear that neither Section 2 nor the Constitution mandates a federal law compactness requirement that demands a higher standard of compactness for majority-minority districts than for any other districts. *See Shaw v. Reno,* 509 U.S. 630, 647, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993) (traditional districting principles such as compactness are not constitutionally required); *Miller,* —— U.S. at ——, 115 S.Ct. at 2497. To illustrate very clearly that this court is holding District 3 to higher standards than a non-majority African–American district, it is important to note that the Florida State Senate District 2 is practically identical to District 3.[20] During the trial, the court heard testimony from the state senator from District 2 describing the substantial identity between her district and District 3. Senator Betty Holzendorf testified as follows:

Q: What I would like you to do, is to describe to the court the similarities between the current senate district that you represent, geographically, and the eastern portion of Congressional District 3.

A: My current Senate District 2 is the same as senate—the congressional district except, when you get to St. Johns County, you cut across Putnam County to go into Alachua County.

Note, that Senate District 2 has a majority white voting age population. This evidence along with other exhibits admitted at trial indicate that the *DeGrandy* court adhered to the state of Florida's districting principles and that the majority has heightened the compactness inquiry for majority-minority districts.

I also believe that the majority has erred because its determination of compactness does not take into account the effectiveness of the representation received in the district. *See Dillard v. Baldwin County Bd. of Educ.,*

686 F.Supp. 1459, 1465–66 (M.D.Ala.1988); *see also DeWitt v. Wilson,* 856 F.Supp. 1409, 1413–14 (E.D.Calif.1994) (three-judge court), *aff'd in part and appeal dismissed in part,* —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995) (compactness includes considerations of transportation and communication). Despite the defendants' undisputed presentation of evidence demonstrating that District 3 is designed in a way that provides all of its constituents the opportunity for effective representation, the majority erroneously rejects such offers as irrelevant. In *DeGrandy* the court found that "the consideration of communities of interest is relevant to the determination of compactness." *DeGrandy,* 794 F.Supp. at 1085. The *DeGrandy* court specifically found that African–Americans living in District 3 are cohesive and share a community of interest notwithstanding the fact that they live in different municipalities. *DeGrandy,* 794 F.Supp. at 1085; Special Master's Report at 27.

The evidence presented at trial not only demonstrated that African–Americans within District 3 share a community of interest, but indeed the evidence goes further to demonstrate that both African–American and white residents in District 3 share common economic and demographic characteristics that set them apart from African–Americans and non-African–American residents in other districts. Lichtman Report at 17–19. Also, undisputed testimony in this trial revealed that residents within District 3 enjoy greater access to, and more input with, their congressional representative under the current configuration of District 3 than they experienced prior to 1992. It is clear that the majority has failed to give due consideration to these communities of interest in the context of the first *Gingles* factor which is particularly appropriate in the state of Florida because strict geographic compactness *per se* is not a statutory redistricting requirement.[21] Simi-

---

19. In order to expose the majority's application of stricter standards for majority-minority districts compared to majority-white districts, a map of oddly shaped majority-white districts is attached. Def.Ex. 10, Tab 10. *See* Appendix.

20. In addition to Florida Senate District 2 being essentially identical to Congressional District 3, a

number of other state senate and house districts are bizarre in shape and traverse geographically dispersed areas of the state. *See* Def.Exh. at Tab 10.

21. According to the expert testimony of Dr. Richard Scher, the only statutory or constitutional requirement for districting in the state of Florida

larly, the evidence presented at trial demonstrated that the preservation of county boundaries is neither required nor a de facto practice in Florida legislative redistricting, according to expert John Guthrie. I believe that the majority errs in refusing to recognize the functional compactness of District 3. *See* Bernard Grofman & Lisa Handley, *Identifying and Remedying Racial Gerrymandering,* 8 J.L. & Politics, 345, 389 (1992) (functional comparative approach is preferable for determining if proposed majority-minority district is sufficiently compact).

I do not understand how the majority comfortably relies on the testimony of Dr. Ronald Weber to rebut the strong evidence of functional compactness. Dr. Weber's testimony lacks credibility because in 1992 before the *DeGrandy* court, Dr. Weber testified in support of the "Margolis plan" which included a majority African–American district that is practically identical to District 3. Dr. Weber acknowledged the substantial similarity of the proposed majority-minority district in the Margolis plan and District 3, and he testified that the Margolis plan scored "relatively well" on three measures of compactness. In contradicting his earlier testimony, Dr. Weber testified in this case that those same three measures of compactness undermine any possible justification for the configuration of District 3. In light of his contradictory assertions, I fail to see how the majority can place any reliance on Dr. Weber's opinion on this matter.

Admittedly, District 3 ranks poorly on the three mathematical measures for compactness upon which Dr. Weber relied, and I do not disregard this fact.[22] I believe, however, that those "compactness scores" should not outweigh the substantial evidence of functional compactness. Furthermore, the mathematical formulae relied upon in those three mathematical measures of compactness are not generally accepted in the field as authoritative, *cf. DeGrandy,* 794 F.Supp. at 1091 n. 3, and I do not believe that any court has

recognized that such an inflexible method of analysis is the most appropriate standard for evaluating compactness under *Gingles*. Interestingly, even the two sources that Dr. Weber principally relied upon in his analysis acknowledge that the three mathematical formulae Dr. Weber used for measuring compactness should not be used in isolation and that many demographers and political scientists believe those quantitative measures are inappropriate and unreliable. *See* Richard H. Pildes & Richard G. Niemi, *Expressive Harms "Bizarre Districts" in Voting Rights: Evaluating Election District Appearances after Shaw v. Reno,* 92 Mich.L.Rev. 483 (1993); Congressional Res. Serv., *Congressional Districts: Objectively Evaluating Shapes,* at 2–3 (1994).

Undeniably, the three *Gingles* factors are of primary consideration in analyzing a claim of a possible Section 2 violation, but, those factors alone are not dispositive. The inquiry must also include an assessment of the totality of circumstances. In considering the totality of the circumstances, a court must assess factors including: (1) the extent of any history of official discrimination in the state; (2) the extent to which the state has used voting practices that enhance the opportunity for discrimination; and (3) the extent to which members of the minority group in the state or political subdivision continue to bear the effects of discrimination in such areas as education, employment, and health that hinder their ability to participate effectively in the political process. *Gingles,* 478 U.S. at 43–45, 106 S.Ct. at 2762–64. In refusing to find a compelling state interest, the majority failed to consider other factors the Supreme Court deems important in evaluating whether a Section 2 claim exists. In assessing whether a Section 2 claim exists, courts must also consider the presence or absence of "substantial proportionality" between the number of majority-minority districts and the minority's group's share of the relevant

---

is "contiguity." In fact, Dr. Scher testified that his review of districting plans in 1972 and 1980 revealed that compactness was given a very low priority. Dr. Scher went on to testify that his research reveals that District 3 fits within Florida's traditional districting criteria.

**22.** Note, however, that the state of Florida has several predominantly white districts that are unusually shaped or bizarre, and these districts are Senate Districts 4, 14, 18, and 35; State House Districts 10, 22, 25, 32, 36, 44, 56, 61, 66, 78, and 92. Def.Exh. at tab 10. *See* Appendix.

population. *Johnson v. DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2658. Although African-Americans comprise close to fourteen percent of Florida's population, until 1992 not a single majority African-American congressional district existed in the state of Florida. This evidence bolsters the *DeGrandy* court's finding that Florida's existing apportionment plan violated Section 2.

### c. Totality of the Circumstances: Past Discrimination and Socio-Economic Conditions

Because I believe that occasionally allegations of discrimination and the effects of discrimination are met with skepticism, it is necessary to present in great detail some of the evidence and testimony presented at the trial of this case.

### (1) Expert Testimony of Dr. Daryl Paulson

During this trial, the defendants put on many lay and expert witnesses to substantiate their claim that discriminatory practices in Florida effectively disenfranchised African-Americans from the political process in the past and that those past practices presently affect African-Americans' participation in the political process. The court recognized Dr. Daryl Paulson as an expert in southern politics, civil rights, political parties, and elections. Dr. Paulson's report and testimony at trial outlined practices used to disenfranchise African-Americans during those relevant time periods.

**1865–1900:** Dr. Paulson testified that during the reconstruction period, specifically from 1870 to the 1880s, African-Americans enjoyed extensive participation in Florida's political process both in terms of voting and holding public office at all levels, including local, state, and national office. Dr. Paulson testified that approximately twenty-five percent of the Florida State Legislature consisted of African-Americans. Moreover, he testified that the state of Florida even elected an African-American representative to the United States Congress when Josiah Walls was elected to serve in 1870, 1872, and 1874. Dr. Paulson attributed the success of African-Americans' political participation to the presence of federal troops in the south to ensure that African-Americans could exercise their rights under the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

According to Dr. Paulson's testimony, in the late 1870s, federal troops withdrew from the south, including Florida, and therefore removed the only protection that African-Americans had in order to exercise their political rights. Dr. Paulson also discussed the immediate acts the state of Florida took to squash African-Americans' attempt to participate in the political process as they had when federal troops were present. For example, in 1885, the state of Florida redrafted its constitution with one of the purposes to repress African-Americans' right to vote. Moreover, in 1889, the Florida legislature passed a number of laws designed with the discriminatory intent of preventing African-Americans from voting. As a result of these discriminatory acts during this period, Dr. Paulson testified that African-Americans experienced a tremendous decline in the (1) registration rates, (2) participation rates, and (3) holding of public offices. For instance, Dr. Paulson pointed to the fact that in 1888 African-Americans' voter turnout was around sixty-two percent, and in 1892 it dropped precipitously to eleven percent.

From 1885 to 1900, the state of Florida adopted a multitude of laws to block African-Americans' participation in Florida's political process. For example, in 1889, the state of Florida enacted perhaps its most significant barrier to African-American political participation: the poll tax. In addition to the poll tax, Florida employed the secret ballot. Florida employed the secret ballot to take advantage of the high illiteracy rate among the African-American population. Under the secret ballot law in Florida, an illiterate person could not receive assistance in reading the ballot. Therefore, under the guise of protecting the integrity of the ballot, the state of Florida kept a large proportion of illiterate African-Americans from voting because no one could enter the voting booths to help in reading the ballots.

Next, the state of Florida instituted the multiple ballot box law or the eight ballot box law. Under the multiple ballot box law, a

voter was required to cast eight separate ballots and to place them in eight different ballot boxes. If any ballot was placed in an incorrect ballot box, it could not be counted. Since the illiteracy rate for African–Americans during this time period was approximately forty percent, a substantial number of African–American voters cast votes that were discarded because the voters placed the ballots in incorrect ballot boxes.

Other techniques utilized to disenfranchise African–American voters during this time period included "tissue ballots" or "little joker ballots" and vote fraud. In order to effectuate a tissue ballot scheme, election officials, in areas densely populated with African–Americans, would stuff the ballot boxes to ensure that the box contained more ballots than eligible voters. In order to correct the discrepancy, the election officials would pull out a number of ballots equal to the excess and, not surprisingly, they often pulled out the "tissue ballots" or "little jokers" which had been given to African–American voters. Unquestionably, these practices effectively excluded African–Americans from their right to participate in Florida's political process.

**1900–1950:** Florida's attempt to exclude African–Americans from participating in the political process did not end in the nineteenth century. Dr. Paulson testified that during the period from 1900 to 1944 Florida continued in its practices to assure that only whites could affect Florida's political process. For instance, in 1902, the Florida Democratic Party adopted a "white primary" policy excluding African–American voters from participating in the democratic party primaries. Dr. Paulson testified that as late as 1944, no African–American voters in Florida registered as democrat, and only about 20,000 registered as republican. This is significant because democratic candidates frequently ran unopposed. Moreover, Dr. Paulson testified that in addition to official practices employed to diminish African–Americans' desire to vote, unofficial acts such as economic discrimination and threats of physical harm decreased African–Americans' incentives to vote.

In 1944, the Supreme Court decided *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) which banned all-white primaries, and in 1945, the Florida Supreme Court in *Davis v. State ex rel. Cromwell,* 156 Fla. 181, 23 So.2d 85 (1945), held Florida's white primaries to be unconstitutional. In response to this ruling, the city of Jacksonville switched from a ward to an at-large election scheme to prevent the election of African–American candidates from predominantly African–American wards. Prior to the switch, an African–American consistently represented the sixth ward on Jacksonville's city council. This ended, however, in 1907 when the state legislature gerrymandered election boundaries to dilute the African–American vote.

**1950–Present:** Dr. Paulson also testified that during the period from 1950 to the present, various measures were pursued to hinder African–Americans in voting. For example, he testified that in 1975 when Congress considered an extension of the Voting Rights Act, representatives from southern states, including Florida, vehemently objected to this proposed amendment arguing that the Voting Rights Act had accomplished its objectives and was no longer needed. Moreover, Dr. Paulson testified that many elections in the state of Florida during the 1950s and 1960s had overt racial appeal. According to Dr. Paulson, virtually every governor who ran or was elected in the state of Florida during the 1950s and 1960s expressly supported policies of segregation. For example, Governor Claude Kirk attempted to take over the Manatee County School Board in defiance of federal court orders to desegregate the schools. Former Governor LeRoy Collins stated that the state of Florida was just as determined as any other state to maintain segregation. Likewise, in a 1960 campaign, Governor Farris Bryant accused his opponent of being an integrationist and referred to himself as a firm believer in segregation.

**District 3:** Dr. Paulson's testimony also specifically addressed how African–Americans in the northern part of Florida and specifically within District 3 suffered from state sponsored and unofficial acts of discrimination in voting. Dr. Paulson testified that approximately seventy-five percent of

Florida's population during the early part of the twentieth century resided in the northern tier counties of Florida, including Jacksonville. Jacksonville was the largest city in the state of Florida at that time. Dr. Paulson testified that in Jacksonville, where African–Americans comprised fifty-seven percent of the population, the state of Florida abolished elective government in 1889 for a temporary period. In 1907, the city of Jacksonville engaged in racial gerrymandering to dilute the African–American vote in predominantly African–American districts. In 1945, the city of Jacksonville switched from district elections to an at-large system to prevent heavily populated African–American areas from electing their candidate of choice. Dr. Paulson also testified that the lingering effects of the past discriminatory practices are demonstrated when one considers (1) economic conditions of African–Americans in the northern portion of Florida, (2) educational progress, and (3) political participation.

## (2) Expert Testimony of Dr. Richard Engstrom

In order to demonstrate how the past discriminatory practices currently affect the African–American community in the northern part of Florida, the defendants presented the expert testimony of Dr. Richard Engstrom. Dr. Engstrom testified that he observed a lower voter registration rate among African–Americans in the seventeen county area of northern Florida. Fourteen of those counties are included in District 3. Dr. Engstrom testified that in the subject area approximately 50.9 percent of African–Americans of voting age were registered to vote compared to 58.9 percent of voting age whites registered to vote. Moreover, Dr. Engstrom testified to the actual voter participation rate that occurred in this area based on participation estimates derived through ecological regressional analysis that Dr. Lichtman performed. Dr. Engstrom analyzed the election returns from elections in 1988, 1990, 1992, and 1994 and found that African–Americans had a lower participation rate in these elections than non-African-Americans in all four elections.

Dr. Engstrom also analyzed socio-economic data of residents within District 3 and testified that his studies revealed that the percentage of persons twenty-five years or older who were high school graduates among the African–American community was lower than it was among white residents in this area. Likewise, he examined the percentage of college graduates in the area and found that African–Americans also had a lower percentage of college graduates than whites. Dr. Engstrom also looked at the income of the residents within District 3 and found that African–Americans had a lower per capita income and median family income than whites.

### (3) Specific Instances of Discrimination

During this trial, the defendants presented testimony from several witnesses in order to confirm the actual effects of Florida's legacy of discrimination that the expert testimony addressed from a statistical and historical perspective. The defendants presented testimony from Mr. Samuel Muldrew, a World War II veteran and resident of Jacksonville, Florida, for fifty-five years. Mr. Muldrew recounted his experiences of trying to register to vote and in attempting to exercise his right to vote. Mr. Muldrew testified that he first registered to vote in 1950, and that it was difficult for him and other African–Americans to vote. To illustrate, Mr. Muldrew stated that election officials would move voting booths from place to place or relocate known voting booth locations to the opposite side of town away from densely populated African–American areas. Mr. Muldrew also testified that during the 1950s and 1960s, many African–Americans in the Jacksonville area did not own automobiles or have alternative means of transportation.

In discussing his experiences with the political process, Mr. Muldrew compared his contact with the political process prior to the *DeGrandy* court's drawing of District 3 with the representation and access he and others have had subsequent to the *DeGrandy* decision. In so doing, Mr. Muldrew testified that he attempted in vain for the past forty-five years to obtain a Purple Heart and his full veteran benefits. He got no favorable results. Shortly after Congresswoman Corrine Brown was elected to represent District 3, she facilitated his receipt of a Purple Heart

and his full veteran benefits. As a result of Congresswoman Brown's assistance to Mr. Muldrew, he informed several other veterans of her effective representation in order to help facilitate their receipt of benefits. As someone who personally experienced the consequences of official and unofficial acts of discrimination against African–Americans, Mr. Muldrew's summation confirmed that the *DeGrandy* court's formulation of District 3 served a compelling state interest when he stated that "I was proud to say that Mrs. Brown was not a black congress[woman] or nor was she a white congress[woman]. She was a people congress[woman] and that I can appreciate."

Perhaps the most compelling testimony presented in this case came from Mr. Lloyd Pearson. Mr. Pearson's testimony aptly captured the essence of the lingering effects racial discrimination has had on African–Americans in Florida's political process. Even plaintiffs' counsel during closing arguments recognized the strength of Mr. Pearson's testimony concerning the effects of discrimination when he stated that one of the real "heroes" of this case is Lloyd Pearson. Mr. Pearson testified that he has lived in Jacksonville, Florida, for the past seventy-four years and is a resident of Florida's third congressional district. Mr. Pearson is a retired postal worker. Mr. Pearson testified that he first registered to vote in 1942, and found "it was quite an experience." Mr. Pearson testified that he had to register as a republican, and this frustrated him because at that time most candidates ran on a democratic ticket. He stated that after 1944, when white primaries were struck down, he was able to register as a democrat and became involved in helping to register African–Americans and others to vote. Mr. Pearson explained the difficulties he encountered in trying to persuade African–Americans to attempt to participate in Florida's political process. He testified that many African–Americans did not want to register to vote because they feared that their white employers would seek retribution. He revealed that his greatest barrier to getting African–Americans interested in voting was the egregious experiences many of them observed other African–Americans encounter in their attempt to exercise the right to vote.

After retiring from the post office, Mr. Pearson was deputized as an assistant registrar in Duval County. He essentially became a "one person registration machine," registering approximately 40,000 persons over a thirteen-year period. His efforts were not without obstacles. Many of the people he helped register to vote were "purged" from the voter registration lists for failing to exercise their right to vote within two years. For example, in 1989, he helped register 9,000 African–Americans and 3,000 white voters, but in 1991 election officials purged from the rolls 13,000 African–Americans and 19,000 whites.

Mr. Pearson indicated that he also had difficulties with the elections office. Mr. Pearson testified that in trying to register African–Americans to vote he was often told that voting was "white folk's business" and that others urged him to "stop pushing" them to vote. In concluding his testimony, Mr. Pearson stated that based upon his thirty years of experience in voter registration work in Jacksonville, Florida, he has observed substantial benefits from the creation of District 3. He noticed an increase in African–Americans registering to vote and increased coalitions between white and African–American voters in the area.

The court heard testimony from Leon Russell, the current state president of the Florida State Conference of NAACP Branches.[23] Mr. Russell testified that the assassination of Harry T. Moore in 1951 struck fear in the hearts of African–American residents in Florida considering whether to exercise their right to vote. He testified that Mr. Moore was a former president of the Florida State Conference of NAACP Branches and involved with an organization known as the Progressive Voters League. In those capacities, Mr. Moore pursued actions to motivate African–Americans to register to vote and to

---

**23.** The *DeGrandy* court declared that Mr. Russell was an expert in Florida redistricting policies. Moreover, Mr. Russell personally formulated a redistricting plan for the *DeGrandy* court's consideration.

participate in the political process. Mr. Russell testified that as a result of those activities, Mr. Moore's home was bombed, and both he and his wife were killed. In addition to this specific instance of discrimination aimed at diminishing African–Americans' desire to vote, Mr. Russell also testified to various techniques used in the northeast quadrant of Florida to dilute African–Americans' vote. During the trial, Mr. Russell testified to the following:

> Q: Has there been a persistent pattern of the use of dilutive techniques in northeast Florida?
>
> A: I think that one of the major points of examples of vote dilution in northeast Florida is, in fact, the Duval County, Jacksonville consolidated government. At the time of consolidation, the city of Jacksonville had a population that was 46 percent black and becoming somewhat of a force, political force, of its own; and the action—the consolidation action actually ended up bringing in that large population outside the city limits had having the effect of diluting the 46 percent ability to affect change in the political process within Duval County.
>
> I think that you can look at the history of at-large elections, in those types of instances across the state; and, in many instances, if you trace their origins back, you'll find that they were put in place for the specific purpose of diluting blacks, pockets of black populations' ability to affect change in the electoral process. That, again, is something that, even today, remains a problem with at-large districts.

Remarkably, the majority wholly disregards this testimony as supporting a finding of a compelling interest in remedying the present effects of past discrimination. The testimony was specific, substantiated, overwhelming, and unrebutted. The majority's blatant disregard for the findings of the *DeGrandy*

court and the evidence adduced at this trial indicates that the majority believes that strict scrutiny is "strict in theory," but "fatal" in fact. I cannot join in this disregard of evidence, precedent, and sound reasoning. The *DeGrandy* court had a compelling interest in both complying with the Voting Rights Act and remedying the present effects of past discrimination when it drew District 3.

### (4) Majority's Erroneous Legal Analysis

The majority's discussion of the totality of the circumstances test required under *Gingles*, indicates that the majority simply misunderstands what is required under the test. First, the majority insists that the effects of past discrimination alone are insufficient to establish a Section 2 violation.[24] The majority holds that in order for minorities to establish a claim under Section 2 they must prove the present effects of past discrimination and *existing voting practices* in Florida that discriminates against African–Americans or other racial or ethnic minority groups. The majority's test essentially eviscerates the remedial purpose inherent in the Voting Rights Act. The Voting Rights Act was enacted to "banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). The majority's requirement of showing an existing practice is unfounded and illogical. Besides, even under the majority's erroneous legal test, the defendants in this case should prevail because the *DeGrandy* court specifically found that "official state discrimination has adversely affected the ability of minorities to participate in the political process." *DeGrandy*, 794 F.Supp. at 1079–80. Without providing any analysis to rebut that finding, and without pointing to any evidence the plaintiffs

---

**24.** Surely, the majority realizes that no one in this case attempted to establish a Section 2 violation by solely relying on the present effects of past discrimination. Rather, the purpose of the inquiry into past discrimination is viewed in context with the three *Gingles* factors, socio-economic factors, lack of electoral success among other

considerations to establish a Section 2 violation. Moreover, an independent consideration of the present effects of past discrimination relates to the finding of a compelling interest in remedying those effects of discrimination independent of a consideration of compliance with the Voting Rights Act.

presented, the majority simply disregards the findings made in *DeGrandy*.[25]

Next, the majority commits an egregious error in finding that the socio-economic disparity between minority voters and white voters does not present evidence of a Voting Rights Act violation. When the Voting Rights Act was amended in 1982, a senate report stated that:

> The courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

S.Rep. No. 417, 97th Cong., 2d Sess. 29 n. 114 (1992). The majority employs even more erroneous reasoning when it makes a wholly irrelevant finding that the socio-economic disparities between African–Americans and whites in District 3 are similar to socio-economic differences between whites and African–Americans in similar districts throughout the country. The implication of the majority's finding is that since discrimination against African–Americans residing in northern states did not exist to the same extent as discrimination against African–Americans in Florida, then the socio-economic conditions of African–Americans in the north should be substantially better than the socio-economic conditions of African–Americans in the south, or at least reveal a lower socio-economic disparity with whites. African–Americans throughout America have endured discrimination and exclusion in the political process for far too long without the benefits of the Voting Rights Act. Therefore, even if African–Americans in Florida share similar socio-economic conditions as African–Ameri-

cans in states where discrimination was less "egregious," this does not advance the majority's position that these manifestations of past discrimination cannot support a finding of a Voting Rights Act violation. On the contrary, the majority's reasoning—albeit unsound—actually bolsters the finding of a Voting Rights Act violation. First, the Bositis study, assessing characteristics of members of the Congressional Black Caucus's congressional districts found similar characteristics in the socio-economic and racial make-up of the districts. *See* David Bositis, The Congressional Black Caucus in the 103rd Congress (1994). That same data, however, can be interpreted to support the defendants' claim that in order for an African–Americans to be elected to Congress or for African–American voters to elect the candidate of their choice they need a majority or a near majority African–American congressional district. As Dr. Bositis's report indicates, many African–American representatives in Congress are elected from congressional districts that have heavy African–American populations. Second, the majority's position can easily be interpreted as showing that minorities throughout the country continue to bear the effects of past discrimination in the political process. *See, e.g., King v. State Bd. of Elections*, 1996 WL 130439 (N.D.Ill., Mar. 7, 1996) (Voting Rights Act claim in the state of Illinois); *Quilter v. Voinovich*, 912 F.Supp. 1006 (N.D.Ohio 1995) (Voting Rights Act claim in the state of Ohio); *DeWitt v. Wilson*, 856 F.Supp. 1409 (E.D.Cal.), *aff'd in part and appeal dismissed in part*, —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995) (Voting Rights Act claim in the state of California); *Emison v. Growe*, 782 F.Supp. 427 (D.Minn.1992) (Voting Rights Act challenge in Minnesota). I submit that the majority's finding, without more, does not advance their position that African–Americans in Florida have not been excluded from Florida's political process.[26]

**25.** It is worth noting that Chief Judge Paul did not hear the evidence, see the exhibits, or participate in the fact finding in *DeGrandy*.

**26.** The majority's finding regarding the socio-economic conditions of African–Americans in Florida compared to African–Americans in other areas of the country, absent some analysis, embarks this court on a dangerous path: specifically, hinting at some innate characteristic within the African–American community that may more readily account for the similar socio-economic conditions.

## B. Remedying the Effects of Past Discrimination

Assuming *arguendo* that no compelling interest exists in complying with the requirements of the Voting Rights Act, then I would find that the *DeGrandy* court had a compelling interest in formulating District 3 to remedy the continuing effects of Florida's past state sponsored discrimination in voting. Both *Shaw* and *Miller* recognized that a redistricting plan that includes a majority-minority district may be justified under strict scrutiny because of the governmental interest in remedying the continuing effects of past discrimination. *Miller*, —— U.S. at ——, 115 S.Ct. at 2490 (citing *Shaw*, 509 U.S. at 654, 113 S.Ct. at 2831). Not only has the Supreme Court recognized this well established principle in the voting rights context, it has acknowledged a compelling state interest in remedying the effects of past discrimination in other areas of law, particularly affirmative action related to employment and contracting. *See Adarand*, —— U.S. at ——, 115 S.Ct. at 2117; *Croson*, 488 U.S. at 494, 109 S.Ct. at 722; *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. The Supreme Court in *Johnson v. DeGrandy* acknowledged that a lesson from *Gingles* is that "society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity." *De-Grandy*, —— U.S. at ——, 114 S.Ct. at 2661. In this case, the majority has simply disregarded the undisputed evidence of Florida's history of official and unofficial acts of discrimination and the impact that past discrimination currently has on the African–American community. Contrary to the majority's incredible assertion that the *DeGrandy* court's motivation was not to remedy past discrimination, the *DeGrandy* opinion clearly demonstrates that its goal was to remedy the effects of Florida's past discrimination against African–Americans and to prevent any further statutory or constitutional violations. *DeGrandy v. Wetherell*, 794 F.Supp. 1076, 1079–85 (N.D.Fla.1992).

## C. Narrowly Tailored Remedy

The foregoing findings of fact from the *DeGrandy* court and the expert and anecdotal testimony presented in this trial clearly demonstrate that a compelling governmental interests existed in complying with Section 2 of the Voting Rights Act and remedying the continuing effects of Florida's past discrimination to justify the *DeGrandy* court's creation of District 3.

Similarly, the record in this case proves that District 3 is narrowly tailored. In considering whether a remedy was narrowly tailored in other areas of law, the Supreme Court's opinions indicate that courts should consider (1) the relationship of the remedial goal to the relevant portion of the minority group members; (2) the impact of the remedy on third parties; (3) the efficacy of alternative race neutral or more narrowly tailored remedies; (4) the relation and flexibility of the remedy; and (5) whether the plan imposes a quota. *United States v. Paradise*, 480 U.S. 149, 171–85, 107 S.Ct. 1053, 1066–74, 94 L.Ed.2d 203 (1987); *see also, Local 28 Sheet Metal Workers v. EEOC*, 478 U.S. 421, 481, 106 S.Ct. 3019, 3052–53, 92 L.Ed.2d 344 (1986) (Powell, J., concurring), *Wygant*, 476 U.S. at 293, 106 S.Ct. at 1857. In this case, the majority's conclusion that District 3 is not narrowly tailored centers on only two of these issues. First, whether the *DeGrandy* court created more majority-minority districts than reasonably necessary to comply with the Voting Rights Act. And, second whether the creation of District 3 is overly burdensome on innocent third parties; specifically, white residents in District 3. Consequently, I will limit my discussion to these two considerations.

In spite of the majority's holding, the record in this case unquestionably demonstrates that the *DeGrandy* court did not create more majority-minority districts than reasonably necessary to comply with the Voting Rights Act and remedy the effects of Florida's legacy of racial discrimination. Moreover, the *DeGrandy* court did not attempt to maximize the number of majority-minority districts when drawing Florida's redistricting plan. The majority concedes, as it must, that

> the *DeGrandy* court did not employ a strict maximization policy. In fact, if *De-Grandy* had applied such a policy, it could possibly have created as many as 5 African–American majority-minority districts

and 5 Hispanic majority-minority districts based upon the VAP (43.4% of the total districts), or 6 African–American majority districts and 5 Hispanic majority districts based upon population (47.8% of total districts).

The majority concludes, nonetheless, that the *DeGrandy* court was engaged in "the very type of de facto proportional representation that the Supreme Court has since disapproved." Yet, the majority acknowledges that the *DeGrandy* court did not apply a "proportionality policy" as defined in the disclaimer clause of Section 2. Therefore, under the majority's reasoning in this case, any redistricting plan containing more than one majority-minority district amounts to a de facto proportional representation. In support of this conclusion the majority finds that District 3 is not narrowly tailored because the *DeGrandy* court rejected plans containing only one African–American majority-minority district. The majority states:

> The *DeGrandy* court was offered other more narrowly tailored plans that were less race based and more cognizant of traditional race-neutral redistricting criteria. To the extent that these plans created fewer than two African–American majority-minority districts and one African–American minority influence district, they were summarily rejected. *See DeGrandy*, 794 F.Supp. at 1086–87. However, the *DeGrandy* court (in rejecting these plans) apparently relied upon an erroneous assumption that its failure to create a proportional number of African–American majority-minority and influence districts would violate section 2 of the Act. This assumption has since been repudiated by the Supreme Court.

As previously discussed, the *DeGrandy* court also rejected several plans creating two African–American majority districts. *DeGrandy*, 794 F.Supp. at 1085–87. The *DeGrandy* court adopted plan 308 because it recognized legitimate state redistricting principles while also complying with the Voting Rights Act and effectively remedying the effects of Florida's history of discrimination in the voting process.

A review of the *DeGrandy* opinion leaves one with the undeniable impression that in configuring District 3, the court used race to the minimum extent possible given the court's compelling objectives. Moreover, District 3 recognizes other legitimate state redistricting interests such as community of interest as displayed in the similar economic status, background, and aspirations among the residents of the district. *See* Special Master's Report at 27–28. The *DeGrandy* court specifically rejected alternative majority-minority districts that would have joined communities "likely to have competing interests," districts that were too far flung and sprawling, including one that would have extended from Palm Beach County in south Florida to Volusia County in central Florida, and from St. Lucie County on the Atlantic coast to the Pinellas County gulf coast. *DeGrandy*, 794 F.Supp. at 1086. Even the plaintiffs' expert witness, Dr. Ronald Weber, admitted that District 3 was the most compact and narrowly tailored majority-minority district that the *DeGrandy* court considered in the north Florida area. In his testimony in this case, the following exchange occurred:

Q: And indeed you recall the court's decision saying that the plan that it adopted in 1992 was modeled as to that district on the Margolis plan. Do you recall that, sir?

A: I don't remember that statement in the opinion but I'll accept your word.

Q: And, sir, in any event, you would agree that the majority black district in northeast Florida in the Senator Margolis plan is very similar, as you look at it, to the plan, to the district in the court ordered plan?

A: I think if you look at the maps, yes you could come to that conclusion. I think if you look at data, there are some modest differences.

Q: Isn't it true, Dr. Weber, that in 1992 you expressed the opinion in this courtroom that District 3 in the Margolis plan scored relatively well on the three measures of compactness often examined in redistricting.

A: That is true, and it was in comparison to three other plans for the district in the same area of the state.

Q: And you also testified in this court that the north Florida minority district in the Margolis plan is less violative of natural and local subdivision boundaries than the north and central Florida minority districts proposed under the other plans.

A: That's right, three other plans.

Q: And Dr. Weber, could you just go ahead then and read the last sentence of your report, the 1992 report?

A: Yes, of course. "It is also my expert opinion that the Margolis plan will not result in the dilution of black or Hispanic voter rights as defined under section 2 of the U.S. Voting Rights as amended in 1992."

The majority also asserts that the configuration of District 3 will have an overly burdensome impact on innocent third parties, namely, white voters within District 3 and also African–American voters outside of District 3.[27] This position is illogical and internally inconsistent. The plaintiffs in this case did not allege that the configuration of District 3 led to dilution of white votes within District 3 or a denial of equal political access, nor did any of the plaintiffs allege that African–American voters outside of District 3 suffered a denial of equal political access because of District 3's configuration.[28] *See*

*Johnson v. Mortham*, 915 F.Supp. 1529, 1534 (N.D.Fla.1995). Second, the majority states that "[t]he fact that innocent third parties receive a fair result cannot ameliorate the deprivation of those parties' fundamental right to equally participate in the political process." Stripped to essentials, the majority's finding is that when white voters are relegated to a minority status within an oddly shaped congressional district, then their fundamental right to equally participate in the political process is harmed. Of course, the majority fails to recognize the logical corollary to that statement, which is that since African–Americans in the northeast quadrant of Florida have always been relegated to "minority voting status" within congressional districts, then they have suffered deprivations of their fundamental right to equally participate in the political process.

It is important to note that District 3 is an interim plan and will exist only until the Florida legislature adopts a valid congressional redistricting plan or through the next decennial census, whichever first occurs. *Johnson v. Mortham*, 915 F.Supp. at 1545. Furthermore, the *DeGrandy* court's formulation of District 3 does not amount to a rigid quota or an inherently inflexible remedy because white voters and white candidates are not excluded from participation in Congressional elections or from seeking office in all congressional districts. *See Johnson v. De-*

---

**27.** Note, District 3 is one of the most highly integrated congressional districts in the country and contains only a bare majority of 50.6 percent of black voting age population and cannot be considered "packed" with more African–American voters than necessary to address the compelling governmental interests discussed above. It is interesting to note that many of the congressional districts challenged throughout the country as unconstitutional racial gerrymanders "are actually among the most integrated districts in the country. The electorate of North Carolina's Twelfth Congressional District, the district described in *Shaw* is only 53.5 percent African–American; the districts condemned in Louisiana, Georgia, and Texas had roughly similar racial compositions." *See* Pamela S. Karlan, "Our Separatism? Voting Rights as an American Nationalities Policy," 1995 U.Chi.Legal F. 83, 94 (1995).

**28.** First, the plaintiffs in this case did not allege vote dilution under Section 2. *Johnson v. Mort-*

*ham*, 915 F.Supp. 1529, 1534 (N.D.Fla.1995). Second, the majority's rank speculation that African–American voters outside of District 3 will now be denied equal access to the political process is baseless as they offered no evidence to substantiate their claim. *See Clark v. Calhoun County*, 21 F.3d 92, 95 (5th Cir.1994) (recognizing that "[w]henever a majority black district is created to remedy a section 2 violation, the number of black voters in the other districts must necessarily be reduced."). More important, these plaintiffs lack standing to raise any claim for African–American voters outside of District 3. *See United States v. Hays*, —— U.S. ——, —— ——, 115 S.Ct. 2431, 2435–37, 132 L.Ed.2d 635 (1995). This lawsuit involves white voters within District 3 claiming that the configuration of District 3 violates the Equal Protection Clause, not that the configuration of District 3 diluted their vote or denied them equal access.

*Grandy,* —— U.S. at —— n. 11, 114 S.Ct. at 2658 n. 11.

Dr. David Bositis provided expert testimony regarding the political competitiveness of District 3. First, Dr. Bositis testified that unmistakable signals of competitiveness exist in District 3. For example, President Clinton only received fifty-seven percent of the vote in District 3 in 1992, according to Dr. Bositis, and this was the lowest level of support President Clinton received in any majority African–American congressional district. Second, reviewing congressional contests in 1992 and 1994, Dr. Bositis found that the voter turnout among white and black voters was about the same. Dr. Bositis also testified that in his assessment of the 1992 and 1994 District 3 congressional election, Congresswoman Brown's district was the fourth most competitive district of all of the districts in the state of Florida in 1994. Therefore, District 3 does not impose a rigid quota for African–Americans; rather, it is a competitive district that provides African–American voters an opportunity to elect a candidate of their choice. *See Johnson v. DeGrandy,* —— U.S. at —— n. 11, 114 S.Ct. at 2658 n. 11 (noting that creation of majority-minority election district does not guarantee proportional minority representation but instead provides political opportunity to minority voters). *Cf. Croson,* 488 U.S. at 509, 109 S.Ct. at 730 (non-minority contractors completely excluded from competing for a fixed percentage of contracts); *Regents of the Univ. of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (non-minorities completely excluded from participating for 16 of the 100 slots in the medical school class). District 3 does not guarantee the election of an African–American candidate, but it does ensure that African–American voters will have a reasonable opportunity to elect a candidate of their choice. District 3 is narrowly tailored.

## VI. Abdication of Court's Responsibility

The greatest wrong emanating from this decision is the majority's refusal to recognize that the *DeGrandy* plaintiffs are entitled to a remedy. The plaintiffs in *DeGrandy v. Wetherell* prevailed in their litigation in 1992. The parties in the *DeGrandy* litigation agreed that African–Americans suffered vote dilution and needed congressional districts that would provide them an opportunity to elect candidates of their choice.

If the plan adopted in *DeGrandy* is not the most narrowly tailored plan, then this court should draw a new plan or adopt one of the other proposed plans. The majority, in the name of federalism, has abandoned its responsibility to provide remedies to aggrieved parties. Instead, the majority orders the Florida legislature to formulate a redistricting plan and in the name of federalism and comity requires this state body to act before a specified date. If the Florida legislature fails to act, then this court will have to do what it should do now: that is, alter the *DeGrandy* remedy. If the majority is willing to engage in redistricting at some point in the future, under much greater time constraints, it should do so now without the confusion that is sure to follow upon the filing of this opinion.[29]

It makes little sense for aggrieved parties to seek relief in the courts only to be sent back to the very source of their harm for a remedy. Federal courts have "not merely the power but *the duty* to render a decree which will so far as possible eliminate the discrimination effects past as well as bar like discrimination in the future." *United States v. Paradise,* 480 U.S. 149, 183, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (emphasis added). If the *DeGrandy* remedy is wrong, then this court should correct that remedy. Rather, the majority in this case risks upsetting all of Florida's congressional districts and causing shifts in incumbents' districts at

**29.** As the majority correctly points out, the Florida legislature "cannot simply readopt the *De-Grandy* redistricting plan." The Florida legislature can, however, adopt a plan identical to the *DeGrandy* plan or substantially similar to the *DeGrandy* plan as long as it is not done for predominantly race-based reasons. The majority cites no law that would prevent the Florida legislature from so doing. Moreover, if one reviews the maps contained in the Appendix, then it becomes clear that the odd shape of District 3 should not make it constitutionally infirm absent predominant racial considerations. District 3 is consistent with odd shaped majority white state house and senate districts where racial considerations presumably did not predominate.

the beginning of the congressional election season. The plaintiffs in *DeGrandy* are left without relief; even the plaintiffs in this case are left without relief. The citizens of Florida, in the name of federalism, are left to await further litigation just prior to the congressional election season.

Regrettably, members of the Florida congressional delegation were denied the right to intervene in this case with a promise that the attack in this case would only affect the northeastern most parts of Florida. Unfortunately, the majority's remedy may affect every congressional district in Florida, without giving members of Congress and the voters in the districts notice or an opportunity to be heard.

For the foregoing reasons, I dissent.

APPENDIX

# "Unusually-shaped" legislative districts in Florida (1992 to present)

| District | Black Vap | Hispanic VAP | Race of Incumbent |
|----------|-----------|--------------|-------------------|
| Senate District 4 | 13.2% | 1.8% | white |
| Senate District 14 | 26.3% | 7.4% | white |
| Senate District 18 | 4.6% | 5.0% | white |
| Senate District 35 | 10.1% | 7.4% | white |
| House District 10 | 14.4% | 1.1% | white |
| House District 22 | 9.8% | 3.9% | white |
| House District 25 | 4.1% | 3.8% | white |
| House District 32 | 4.1% | 5.8% | white |
| House District 36 | 4.3% | 8.2% | white |
| House District 44 | 4.0% | 3.1% | white |
| House District 56 | 7.3% | 10.4% | white |
| House District 61 | 6.6% | 4.6% | white |
| House District 66 | 5.3% | 8.1% | white |
| House District 78 | 19.8% | 5.7% | white |
| House District 92 | 2.3% | 8.5% | white |

# STATE SENATE DISTRICT 4

# STATE SENATE DISTRICT 14

1528

## STATE SENATE DISTRICT 18

# STATE SENATE DISTRICT 35

1530

# STATE HOUSE DISTRICT 10

# STATE HOUSE DISTRICT 22

# STATE HOUSE DISTRICT 25

# STATE HOUSE DISTRICT 32

1534

## STATE HOUSE DISTRICT 36

## STATE HOUSE DISTRICT 44

1536

STATE HOUSE DISTRICT 56

HILLSBOROUGH

## STATE HOUSE DISTRICT 61

# STATE HOUSE DISTRICT 66

# STATE HOUSE DISTRICT 78

## STATE HOUSE DISTRICT 92